IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CARL CASE,

        Petitioner,

    vs.                        No. 08-CV-0542 MV/WDS

TIM HATCH, Warden, Guadalupe
County Correctional Facility,

        Respondent.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Petitioner Carl Case's Petition Under 28

U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody [Doc. 1]; Respondent

Tim Hatch's Motion to Dismiss the Application for Writ of Habeas Corpus [Doc. 17]; and

Petitioner's Partial Motion for Reconsideration [Doc. 76]. The Court has considered the Petition

and corresponding Memorandum of Law [Doc. 9], Respondent's Answer [Doc. 16], Motion and

corresponding Memorandum in Support [Doc. 18], the parties' extensive supplemental briefing

and argument presented at the December 9-10, 2010 evidentiary hearing, along with the state

court record and the relevant law governing habeas corpus petitions. While the Court is aware

that it is quite the rare habeas corpus petitioner who satisfies the strict standard imposed upon

him under the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA)

governing second and successive petitions, the circumstances of the instant case make this one

such rare petition. As set forth below, the Court **FINDS** that Mr. Case has satisfied the

requirements articulated in 28 U.S.C. § 2244(b)(2)(B) for evaluating the merits of a second or

successive habeas corpus petition. The Court **FURTHER FINDS** that Mr. Case's Petition for a

Writ of Habeas Corpus [Doc. 1] will be **CONDITIONALLY GRANTED** for the reasons stated

herein.  Accordingly, Respondent's Motion to Dismiss [Doc. 17] shall be **DENIED**.  Because

the Court finds that Mr. Case has satisfied the standard articulated in Section 2244(b)(2)(B), it

further finds that Mr. Case's Motion for Partial Reconsideration [Doc. 76] shall be **DENIED AS**

**MOOT**.


### PART I: *BACKGROUND*

## I.  **PROCEDURAL HISTORY**[1]

Petitioner Carl Case was convicted by jury on October 26, 1982 of first-degree murder

and first-degree criminal sexual penetration of Nancy Mitchell, and sentenced to life

imprisonment plus eighteen years.  The New Mexico Supreme Court affirmed his convictions in

a published opinion. *State v. Case*, 676 P.2d 241 (N.M. 1984).  Subsequently, he sought relief in

the federal courts.  The district court conditionally granted Mr. Case's federal habeas petition on

November 25, 1985.  Doc. 16 at Ex. B, pp. 1 & 14.  On March 6, 1987, the Tenth Circuit

reversed and remanded for an evidentiary hearing. *Id*. at 15.  On March 4, 1988, the district

court again granted Mr. Case's federal habeas petition, on different grounds. *Id*. at 23 & 31.

The Tenth Circuit again reversed the district court on October 25, 1989, ultimately denying Mr.

Case relief. *Case v. Mondragon*, 887 F.2d 1388 (10th Cir. 1989).

In 2004, Mr. Case filed a petition for a writ of habeas corpus in state district court.  The

petition arose from the recantations of trial testimony by two witnesses, the discovery of an

untranscribed statement by a third witness, as well as DNA testing that was performed at the

request of habeas counsel.  The state district court held a three-day evidentiary hearing, during

---

[1] Portions of the procedural history set forth in this section are adopted from the
Magistrate Judge's Proposed Findings and Recommended Disposition [Doc 41 at 2-3].

which the two recanting witnesses, Audrey Knight and Paul Dunlap, testified under oath, and under threat of prosecution for perjury, that they had fabricated their 1982 trial testimony in its entirety.  Mr. Case's trial counsel, Gary Mitchell, and the prosecutor, James Klipstine, offered testimony regarding the undisclosed interview transcript of the third witness, Bobby Autry.  The recently completed DNA testing revealed no male DNA or sperm cells in the evidence taken from Ms. Mitchell's body.

Ultimately, the state district court denied the petition in a one page order.  The relevant portions of this order include the following findings: (1) The State did not illegally suppress materially favorable evidence; (2) The State did not knowingly or recklessly present false testimony at Mr. Case's trial; and (3) The recantations of Audrey Knight and Paul Dunlap were not "newly discovered evidence" in that, assuming *arguendo* that their original testimony was false, Mr. Case knew it was false at the time they gave it.  Order Relief on Writ of Habeas Corpus at ¶¶ 1-3.

The New Mexico Supreme Court granted certiorari review, and denied relief in a published opinion.  *Case v. Hatch*, 183 P.3d 905 (N.M. 2008).  The court found the recantations of Ms. Knight and Mr. Dunlap cumulative, and further found that the prosecution did not suppress materially favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, the New Mexico Supreme Court found that Petitioner's *Brady* claim failed for lack of materiality because there was no evidence presented at trial that Bobby Autry had harmed Nancy Mitchell, and Carl Case had testified that her death was accidental.  The instant federal petition followed.

Because Mr. Case had previously sought habeas corpus relief in the federal courts, he was required to obtain permission to proceed from the Tenth Circuit Court of Appeals.  That

3

court granted permission in a written order on July 1, 2008.  Doc. 5.  On September 24, 2010, this Court issued a Memorandum Opinion and Order in which it held that a limited evidentiary hearing was necessary to resolve Mr. Case's petition.  Doc. 46.  This hearing was held on December 9 and 10, 2010.  The hearing was limited to the issue of the credibility of Ms. Knight's and Mr. Dunlap's recantations, and the Court appointed counsel to represent the witnesses for the purpose of advising them about their privilege against self-incrimination, as well as any possible exposure to perjury charges.  After being advised by counsel, both witnesses testified credibly as to their recantations, and a complete analysis of their credibility is set forth below.  *See* Part II, Section I(C)(4), "Credibility of the Recantations," *infra*.

## II.    **FACTUAL BACKGROUND**[2]

On January 30, 1982, the body of Nancy Mitchell was discovered in Eddy County, New Mexico, outside of Carlsbad and near an area on the Pecos River known locally as Six-Mile Dam.  The medical evidence at trial established that Ms. Mitchell died at least three weeks, and possibly up to six weeks, before her body was discovered.  She had bruises on the front of her upper body and a fractured skull.  The cause of death was exposure to the elements.

Ms. Mitchell was a local teenager who had run away from home on or about December 11, 1981.  While a runaway, she stayed with friends and occasionally in hotels.  The last undisputed sighting of Ms. Mitchell was approximately 9:00 or 10:00 p.m. on or about December 21, 1981, at the apartment of Ricky and Mary Worley.  Ms. Mitchell spent the previous night at the Travelodge, but checked out that day and brought her clothes to the Worley

---

[2] Portions of the factual background set forth in this section, as well as the detailed facts set forth in Part II, Section II, "Discussion," *infra*, are adopted from the Magistrate Judge's Proposed Findings and Recommended Disposition [Doc. 41 at 3-8].  However, in both sections, the Court includes additional facts not adequately developed in those findings.

residence.  Ricky's brother Curtis Worley drove her to the apartment.  Also present at the Worley residence were three young men named Mike Tweedy, Bobby Autry and Randy Davis. Ms. Mitchell left the residence with Bobby Autry, who claimed that he drove around with her for some time until he dropped her off at the Dairy Queen, where he last saw her talking to two unknown men in a blue pickup truck.  According to Mary Worley, when Ms. Mitchell left the apartment with Mr. Autry she was wearing the same clothing in which her body was found.

At Mr. Case's trial, three local teenagers – Audrey Knight, Bobby Autry, and Paul Dunlap – testified that they had seen him with a group of boys and Ms. Mitchell at a party the night she disappeared.  They told inconsistent stories, but all three stated that Mr. Case was present at Six-Mile Dam when a group of boys attacked and sexually assaulted Ms. Mitchell. The inconsistencies in these three individuals' stories will be analyzed in further detail below. *See* Part II, Section II(C)(1)(c), "Inconsistencies Between 'Eyewitness' Accounts," *infra*.

In 2003, Audrey Knight contacted the father of Curtis Worley, one of Mr. Case's co-defendants, and told him that she had fabricated her trial testimony.  Law students and lawyers from the University of New Mexico Innocence and Justice Project, who were already working on Mr. Case's case, investigated Ms. Knight's claim that she had fabricated her testimony.  In the course of this investigation, counsel contacted Paul Dunlap, who also admitted that his trial testimony had been false.  In an affidavit given to habeas counsel, Ms. Knight stated that her testimony at trial was untrue for various reasons, including intense pressure she felt from law enforcement.  Mr. Dunlap also provided an affidavit, in which he stated that he had no knowledge of Carl Case or anyone else attacking Nancy Mitchell, and had no knowledge of how Nancy Mitchell died.  Mr. Dunlap said he testified untruthfully at trial because he had been in jail for six months, was threatened with prosecution as an adult for the alleged rape and murder

of Nancy Mitchell, and was offered immunity for implicating the defendants.

Law students at the Innocence and Justice Project reviewed the prosecutor's file and discovered a taped interview with Bobby Autry that had not been transcribed nor provided to defense counsel before Mr. Case's trial in 1982.  Mr. Case argues that this constitutes an unconstitutional violation of the disclosure requirements set forth in *Brady v. Maryland*, 373 U.S. 83 (1963).

## PART II:  *PROCEDURAL REQUIREMENTS FOR SECOND AND SUCCESSIVE HABEAS CORPUS PETITIONS*

### I.   APPLICABLE LAW

Before a district court may reach the merits of a second or successive habeas corpus petition, a state prisoner must demonstrate that he meets the requirements set forth in the provisions of AEDPA governing second or successive petitions.  *See* 28 U.S.C. § 2244(b). Pursuant to this section, the petitioner must receive authorization from the Court of Appeals before he may file a second or successive petition in district court.  28 U.S.C. § 2244(b)(3).  The Court of Appeals may authorize the filing of such a petition if it finds that the petitioner makes a prima facie showing that he satisfies the strict standard set forth in Section 2244(b)(2).  A "prima facie showing" is simply "a sufficient showing of possible merit to warrant a fuller exploration by the district court."  *Ochoa v. Sirmons*, 485 F.3d 538, 545 (10th Cir. 2007) (citation omitted).

After the appropriate Court of Appeals grants the petitioner's motion to file a second or successive habeas petition, he may file said petition in the district court.  In cases resting on what has been termed the "innocence" component of AEDPA (as opposed to a claim resting on a new rule of constitutional law), *see Ochoa*, 485 F.3d at 541-42 & 542 n.4, the district court may only reach the merits of the petition if it first finds:

> (i)     the factual predicate for the applicant's claim could not have been discovered
>         previously through the exercise of due diligence; and
> (ii)    the facts underlying the claim, if proven and viewed in light of the evidence
>         as a whole, would be sufficient to establish by clear and convincing evidence
>         that, but for constitutional error, no reasonable factfinder would have found
>         the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B)(i)–(ii).  The Supreme Court has held that this provision requires the

petitioner to show "that the facts underlying the claim establish his innocence by clear and

convincing evidence."  *Calderon v. Thompson*, 523 U.S. 538, 558 (1998).  Once these two

requirements are satisfied, the Court looks to AEDPA's substantive provisions to adjudicate the

merits of the petition.

## II.    <u>DISCUSSION</u>

Mr. Case must first demonstrate that "the factual predicate for [his] claim could not have

been discovered previously through the exercise of due diligence."  28 U.S.C. §

2244(b)(2)(B)(i).  He then faces a heavy burden under AEDPA to prove by clear and convincing

evidence that, but for constitutional error, no reasonable factfinder would have found him guilty

of Nancy Mitchell's rape and murder beyond a reasonable doubt.  As described in detail below,

Mr. Case has satisfied the "due diligence" requirement under subsection (B)(i), and has further

established constitutional error in the form of a pretrial statement of a prosecution witness that

was materially favorable to the defense, and which the prosecution failed to disclose in violation

of *Brady v. Maryland*.  Mr. Case has further demonstrated that this constitutional violation, when

viewed in light of the evidence as a whole, so drastically undermines the State's evidence against

him that no reasonable factfinder could have found him guilty of the rape or murder of Nancy

Mitchell.

A.   **Due Diligence**

Following Audrey Knight and Paul Dunlap's recantations, law students investigating Mr.
Case's claims discovered an untranscribed tape of an interview with Bobby Autry in the
prosecution's file.  Mr. Autry was interviewed on January 30, February 3, March 5 and March
12, 1982.  Whereas the prosecution in Mr. Case's trial disclosed transcriptions of three of these
interviews to the defense, Mr. Case contends that the February 3rd interview was never
transcribed and the tape was never disclosed to Mr. Case's trial counsel.  The parties have
provided the Court with transcriptions of all four Bobby Autry interviews, but the format of the
February 3rd transcription is different, as it was not prepared in 1982, but rather transcribed in
preparation for the state habeas litigation.  Neither party has located a 1982 transcription of this
statement.

At the state evidentiary hearing, UNM law student Witter Tidmore testified that he and
Todd Coberly, also a law student at the time, went to Carlsbad in June of 2005 to investigate the
District Attorney's file on Mr. Case's case.  He explained that the D.A.'s office had an "open-
file policy," and he and Mr. Coberly wanted to "go through that file and make sure that we had a
complete record [of it]."  State Evid. Hr'g Tr. at 34.  Mr. Tidmore stated that he and Mr. Coberly
each had a list of everything in their files, and they compared their lists to what they found in the
D.A.'s file.  They noted a number of photographs and documents that they did not have in their
files.  They then compared the cassette tapes in the D.A.'s file to those the students had in their
file, and discovered the February 3rd Bobby Autry interview, which they did not recognize from
their file.  They later confirmed that neither the tape itself nor a transcription of the statement
were in their file.

8

Later during the state evidentiary hearing, Mr. Case presented the testimony of his 1982 trial counsel, Gary Mitchell.  Mr. Mitchell testified that at the time of Mr. Case's trial, the D.A.'s office had an "open-file policy" that applied to all criminal cases.  Specifically with respect to witness interviews, the Sheriff's Department would transcribe them onto lined paper and the D.A.'s office would provide these transcriptions to the defense.  Although the tapes would have also been available, the general understanding was that all taped interviews were transcribed. Mr. Mitchell generally would have assumed that the set of transcriptions in any given file was a complete and accurate record of the interviews on the audio tapes, and he would not have listened to the audio recordings in addition to reading the transcriptions.  With respect to the prosecution's "open-file policy," Mr. Mitchell stated: "I've never in this district had a difficult time going to somebody's office and saying, let me see what you guys have."  State Evid. Hr'g Tr. at 270.  When asked if he had heard or read Bobby Autry's February 3rd statement prior to Mr. Case's trial, Mr. Mitchell responded: "I went back and reviewed my cross-examination of Bobby Autry after reviewing this.  In my heart of hearts, I'm convinced I didn't have this."  State Evid. Hr'g Tr. at 259.

Following Mr. Mitchell's testimony, James Klipstine, the prosecutor in Mr. Case's 1982 trial, testified.  He stated that the D.A.'s office "had an open-file policy, which meant that the defense attorney at any time they requested to would actually have an opportunity to review our file."  State Evid. Hr'g Tr. at 333.  He further stated that "tapes themselves were not disclosed unless they were specifically requested.  Usually what would happen is the law enforcement agency involved in the investigation would transcribe interviews, deliver to the D.A.'s office, and then we would disclose the transcription as opposed to the tape themselves."  *Id*. at 335. According to Mr. Klipstine, had the Sheriff's Department transcribed Mr. Autry's February 3rd

statement, the transcription would have been disclosed to the defense.

Given the transcription procedures employed by the D.A.'s office in Carlsbad in 1982, it is reasonable that Mr. Case's defense counsel assumed that the transcriptions contained in the prosecution file represented a complete set of the witness statements.  "Due diligence" does not require a defense attorney, when presented with a file he is told is the prosecution's complete file, to go out of his way to request audio tapes of every single witness statement to ensure that the transcriptions are complete.  Moreover, the Tenth Circuit has cautioned that to allow the prosecution to hide behind an open file policy to escape its disclosure requirements "would permit the prosecution to . . . talismanically invok[e] the words 'open file policy,' and thus circumvent the purpose behind *Brady*."  *Smith v. Sec'y of New Mexico Dep't of Corr.*, 50 F.3d 801, 828 (10th Cir. 1995).  The Tenth Circuit reasoned that allowing an open file policy to per se satisfy the prosecution's constitutional disclosure requirements would "fail[] to recognize that *Brady* material may be found in places other than a prosecutor's file."  *Id.*  It may be inferred from the Tenth Circuit's reasoning that where, as here, an item of evidence is not in the prosecution's "open file," the defense is not expected to find it.  Respondent has presented no evidence to contradict the witnesses' testimony at the state evidentiary hearing, which unequivocally established that Bobby Autry's February 3rd statement was indeed missing from the file that the prosecution represented to be complete.   The Court therefore finds that Mr. Case has satisfied the requirements of § 2244(b)(2)(B)(i), as he has demonstrated that the February 3rd statement is newly discovered evidence that "could not have been discovered previously through the exercise of due diligence."  *See* § 2244(b)(2)(B)(i).

**B.    Constitutional Error**

Having satisfied the requirements of subsection (B)(i), Mr. Case now must demonstrate

pursuant to subsection (B)(ii) that "the facts underlying [his] claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). Before analyzing Mr. Case's claims in light of the evidence as a whole, the Court considers whether or not he has shown that constitutional error – in the form of a *Brady* violation – occurred at his trial.

### 1. *Brady v. Maryland* and its Progeny

The Supreme Court's landmark *Brady* decision stands for the principle that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. In *United States v. Agurs*, 427 U.S. 97, 103 (1976), the Court defined "three quite different situations" in which the rule of *Brady* applies. First, "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *Id*. Second, the defense requests some specific kind of exculpatory evidence, yet the prosecution fails to disclose it. *Id*. at 104-06. Third, the defense makes a general request for *Brady* material, or makes no request at all, yet the prosecution fails to volunteer evidence in its possession. *Id*. at 106-07.

In *United States v. Bagley*, 473 U.S. 667 (1985), the Court "abandoned the distinction between the second and third *Agurs* circumstances, i.e., the 'specific-request' and 'general- or no-request' situations." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). In *Bagley*, the Court held that regardless of the type of request, the prosecution's suppression of materially favorable evidence amounts to a constitutional violation "if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different."
*Kyles*, 514 U.S. at 433 (quoting *Bagley*, 473 U.S. at 682 (opinion of Blackmun, J.); and 685
(White, J., concurring in part and concurring in judgment)).  To establish a reasonable
probability of a different result, "[a] defendant need not demonstrate that after discounting the
inculpatory evidence in light of the undisclosed evidence, there would not have been enough left
to convict."  *Kyles*, 514 U.S. at 434-35.  Rather, the convicted individual must demonstrate that
"[t]he favorable evidence could reasonably be taken to put the whole case in such a different
light as to undermine confidence in the verdict."  *Id*. at 435.  Both impeachment evidence and
exculpatory evidence fall within the *Brady* rule, and the law does not distinguish between these
two types of evidence.  *Bagley*, 473 U.S. at 676.

 In *Kyles*, the Court expanded upon the concept of a "reasonable probability" that the
result of the proceeding would have been different.  The Court noted that only the prosecution
knows the content of undisclosed evidence, so it alone

> must be assigned the consequent responsibility to gauge the likely net effect of all
> such evidence and make disclosure when the point of "reasonable probability" is
> reached.  *This in turn means that the individual prosecutor has a duty to learn of any
> favorable evidence known to the others acting on the government's behalf in the
> case, including the police.*  But whether the prosecutor succeeds or fails in meeting
> this obligation (whether, that is, a failure to disclose is in good faith or bad faith), the
> prosecution's responsibility for failing to disclose known, favorable evidence rising
> to a material level of importance is inescapable.

*Id*. at 437-38 (emphasis added).  The Tenth Circuit has affirmed the principle time and time
again that suppressed evidence in the hands of police or other agents of the prosecution still
amounts to a *Brady* violation even if the prosecutor himself had no direct knowledge of the
evidence in question.  *E.g. United States v. Combs*, 267 F.3d 1167, 1174 (10th Cir. 2001);
*Engberg v. Wyoming*, 265 F.3d 1109, 1117 n.5 (10th Cir. 2001); *Smith v. Sec'y of New Mexico*

12

*Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995); *see also United States v. Smith*, 534 F.3d 1211, 1222-23 (10th Cir. 2008) (prosecution suppressed evidence when it failed to disclose report in possession of investigator even though prosecution did not know of report); *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (prosecutor's duty to learn of favorable evidence has been interpreted broadly because of his "special status" within American criminal justice system).

As noted above, situations involving the prosecution's knowing use of perjured testimony present a distinct category of *Brady* violations. *Agurs*, 427 U.S. at 103. "A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict." *Bagley*, 473 U.S. at 679 n.9 (citing *Napue v. Illinois*, 360 U.S. 264, 271 (1959)).

> **2.      Relevant Facts**

Bobby Autry testified at trial as one of three eyewitnesses to the attack on Nancy Mitchell that led to her death.[3]  As noted above, the Eddy County Sheriff's Department interviewed Mr. Autry four times in early 1982, but neither a tape nor a transcription of the February 3rd interview were disclosed to Mr. Case's trial counsel.

> **a.      *Bobby Autry's January 30, 1982 Statement***

In his January 30th statement, Mr. Autry denied having any knowledge of the crime, and denied having any sexual encounters with Nancy Mitchell.  He explained that he was friends with Ms. Mitchell, and sometime before Christmas of 1981 he and a friend picked her up to go to a party at an area called Gidak's hole.  Ms. Mitchell left the party for a short while with someone named Corbin Price, but she then returned.  At the end of the evening Mr. Autry drove

---

[3] The other two "eyewitnesses" were Paul Dunlap and Audrey Knight, both of whom have now recanted their testimony implicating Mr. Case in the rape and murder.

Ms. Mitchell back to town, and she wanted him to stay out all night long, but he felt sick and needed to go home.  He dropped her off at a Dairy Queen where she saw two male friends in a pickup truck, and he then went home.  The deputies asked numerous times if he knew the names of the two boys or if he could describe what they looked like, and he could not.  He was able only to say, "Just looked like two dudes in a pickup."  Tr. 1/30/82 Autry Statement at 8.

### b.    *Bobby Autry's February 3, 1982 Statement*

Bobby Autry again gave a statement to sheriff's deputies on February 3rd, the contents of which were never disclosed to the defense before trial.  It appears that this tape remained in the prosecution's file until 2004, when students at the Innocence and Justice Project discovered it during the course of their investigation.

In this statement, Mr. Autry stated that on the night of the party at Gidak's hole, he had taken Ms. Mitchell for a drive to a place called "the Flumes" before the party.  In response to the question of whether he made out with her on this drive, he stated, "I tried, but I – she said no, and I didn't."  Tr. 2/3/82 Autry Statement at 9.  Upon further questioning, the investigators established that Mr. Autry and Ms. Mitchell had gotten fully undressed together, and the following exchange occurred:

> Q:    [W]hen she took her underwear off, did you advance to the intercourse stage?
> A:    Well, we just laid there and fooled around for a while, then I tried to make out with her . . . .  I tried to – I got fixed up about half way in, and she said no, she pushed back, and I said alright.
> Q:    Your penis went half way into her vagina?
> A:    About half, something like that.
> . . .
> Q:    She never did fight you?
> A:    [No response]
> Q:    She just – she agreed to?
> A:    Well, she pushed me back – she shoved me back when I tried to make out with her.

Q:      And then what happened?
A:      She just said let's go to the party.  She got mad, said let's go to the party.

*Id.* at 11-12.

Soon after Mr. Autry admitted that he had indeed briefly had intercourse with Ms.

Mitchell, Deputy Dominguez followed up on this issue:

Q:      Do you remember [the investigators] asking you if you had had, at any
        time, intercourse with Nancy Mitchell?
A:      Yeah.
Q:      And what did you tell him?
A:      I told him no, cause I, I didn't know if she was raped at the time or what,
        and I didn't want nobody to point the finger at me cause I didn't do it.
. . .
Q:      [A]s far as you're concerned, you did have intercourse with her.
A:      No, not really.
Q:      Your vagina [sic] went in half way, that's intercourse.
A:      Yeah, well, I guess you could say that.  But –
Q:      How long did you stay there, in her?
A:      Bout that long.  I barely got in and she just pushed me back.
Q:      Did you get mad?
A:      No.  I got – I got mad, yeah, but not, not that mad.  I said well hell, ain't
        no great big loss to get turned down by a girl.
Q:      You didn't get mad because she wouldn't let you?
A:      Well, anybody'd get mad, but – I don't mean like in – like you're gonna
        do something like that to her.  Just get kind of teed off or something.

*Id.* at 14-16.  Mr. Autry agreed to give the investigators hair and blood samples, and the

interview continued.

The details that Mr. Autry provided next were inconsistent with his January 30th

interview.  Whereas on January 30th he stated that Ms. Mitchell had left the party at Gidak's Hole

with Corbin Price and then returned, on February 3rd he stated that he did not see her after she

left with Mr. Price.  Rather, he saw her one or two days later, when he was driving around with

her and dropped her off at the Dairy Queen at the end of the night, where she saw two male

friends in a pickup truck.  He again was unable to identify the two boys in the truck.

15

### c.     *Bobby Autry's March 5, 1982 Statement*

On March 5, 1982, Bobby Autry told investigators that he saw Nancy Mitchell in downtown Carlsbad about two or three nights after the party at Gidak's hole, but he then corrected himself to say one or two nights.  Tr. 3/5/82 Autry Statement at 1.  It is not clear from the transcript if he was referring to that night or the night of the party, but he stated that when he and Ms. Mitchell were "riding around," he "tried making out with her."  *Id*. at 3.  He elaborated only insofar as to state: "I tried making out with her.  Got her clothes and we was drunk."  *Id*.[4]

### d.     *Bobby Autry's March 12, 1982 Statement*

On March 12, 1982, Bobby Autry took and failed a polygraph test.  Later that day, Mr. Autry again gave a statement to representatives of the Eddy County Sheriff's Department, after telling one of the deputies on the telephone that he had information regarding Ms. Mitchell's death and a "pact" related to it.  Tr. 3/12/82 Autry Statement at 1.  He stated that he was in town when Nancy Mitchell and a group of boys – including Curtis Worley, Carl Case, Mike Tweedy, Joe Brown, and someone he could not identify – picked him up to go "riding around."  *Id*.  The officers had the following exchange with Mr. Autry:

> Q:     Is that the one, you said you knew his name was Paul?
> Q:     [Illegible] fellow, tall skinny?
> A:     Well I couldn't really identify him.
> Q:     Paul Dunlap?
> A:     Yes, something like that.

*Id*.

---

[4] The investigator later referred to this alternatively as "when you tried to make love to her," *id*. at 4, and "when you tried to have sexual intercourse with her."  *Id*. at 6.  However, the transcript makes no other reference of the fact that Mr. Autry previously stated that he did in fact penetrate Ms. Mitchell for a brief period of time.

After driving around town, the seven of them drove towards Six-Mile Dam to drink beer. Mr. Autry denied that they went to a party or met up with other people before going to the dam. He stated that after they got out of the car Curtis Worley hit Nancy Mitchell with his fist, knocked her to the ground, and tried to tear her clothes off.  Someone else, possibly Joe Brown, hit her in the back of the head with a stick or pipe.  Mr. Autry said he ran off, but he heard Ms. Mitchell yelling for help and he saw the others on top of her.  He got home about fifteen minutes after midnight.  He did not see anybody else arrive at the scene, but claimed to have seen the others attacking Ms. Mitchell on the ground and then putting her back into the car.  Mr. Autry said that he received threatening phone calls telling him not to tell anyone about what he had seen.  When asked if he ever saw Audrey Knight that evening, he stated, "I don't guess I know an Audrey Knight."  *Id*. at 12.  The investigators tried to describe her to him, but he maintained that he did not know her.

The investigators then steered the interrogation to the night shortly before Christmas that Mr. Autry had been driving with Nancy Mitchell.  They asked him what he did with her that night, and he simply stated that they drove around for a while and then he dropped her off at Dairy Queen.  He then said that he saw Ms. Mitchell two or three days later with Mr. Worley, Mr. Case and "Paul Dunlap guy."  *Id*. at 7.  When asked to describe Paul Dunlap, Mr. Autry could not remember what he looked like.  The investigators asked: "Was he a white male? . . . He wasn't a black guy was he or a Spanish guy."  *Id*.  Mr. Autry responded, "Uh uh, he wasn't black."  *Id*.  Mr. Autry offered no further details about what Paul Dunlap looked like.  He was able to give at least some details about what Carl Case, Joe Brown and Mike Tweedy looked like.

17

### e.    *Bobby Autry's Trial Testimony*

At trial, Mr. Autry testified that on the night of January 1, 1982, Curtis Worley, Carl Case, Joe Brown, Mike Tweedy, and Paul Dunlap picked him up in town right around when it was getting dark, and Nancy Mitchell was in the car.  He stated that the group did not go to a party, but rather drove a few times up and down the main drag in Carlsbad, and then headed directly toward Six-Mile Dam on a dirt road called Forni Road.  On the way to Six-Mile Dam, they stopped on Forni Road, where people used the bathroom and threw beer bottles at a sign on the road.

When asked on direct examination about his relationship with Ms. Mitchell, Mr. Autry stated that she was not his girlfriend, rather she was "more or less just a pretty close friend." Trial Tr. at 979.  Mr. Klipstine asked Mr. Autry as follows:

> Q:    Did you ever have sexual intercourse with Nancy Mitchell?
> A:    No, sir.
> Q:    Did you ever try?
> A:    Yes, sir.
> Q:    When was that?
> A:    I don't know what date it was for sure.
> Q:    Was that before or after she had run away?
> A:    After.

Trial Tr. at 980.

Mr. Autry then described the scene at Six-Mile Dam after everyone got out of the car. Mr. Worley "reached out to pinch Nancy on the breast and she slapped him and he hit her and knocked her down.  Everybody was just like a bunch of vultures on her." *Id*. at 982.  Mr. Case pushed Ms. Mitchell to the ground.  It appeared that Joe Brown tried to hit Ms. Mitchell with something, possibly a pipe.  Mr. Worley ripped Ms. Mitchell's pants open and the rest of the group tried to tear her clothes off.  Mr. Autry ran home because he wanted nothing to do with the

18

attack, and he estimated that he arrived home around midnight.  He later received calls on the

telephone, once from Mr. Worley, and once from a voice he believed to belong to Mr. Case, both

of whom threatened Mr. Autry as well as his parents.

Mr. Autry maintained that he did not tell anyone about what he saw because he was

scared.  When the police first questioned him, he did not tell them what happened because he

and his parents had both received threats, and he did not want to risk his or his parents' lives.  He

stated that he finally told the truth after he took – and presumably failed – a lie detector test.

On cross examination, the defense demonstrated to the jury that although Mr. Autry was

originally charged with Ms. Mitchell's rape and murder, he was released from jail under what

appeared to be an offer of immunity in exchange for his testimony against the other defendants.

The defense attempted to impeach Mr. Autry with his inconsistent statements during the three

interviews it had knowledge of; however, Mr. Autry was able to reconcile the inconsistencies by

explaining he initially lied because he and his parents were threatened.  The defense next tried to

impeach him by showing that he generally did not get along with Mr. Case or Mr. Worley.  He

had fought with Mr. Case over Mr. Case's ex-wife, and he had fought with Mr. Worley over Ms.

Mitchell.  Finally, the defense elicited testimony from Mr. Autry that he had spent some time in

jail for this offense, and attempted to suggest that he was so scared of going to prison that he

would lie and implicate others in order to take the investigation off of him.  Although he

admitted that the prospect of going to prison was "frightening," Mr. Autry maintained that he

was not scared of what might happen to him there, because "I ain't stupid enough to go to the

state penitentiary."  Trial Tr. at 1027.

On re-direct examination, Mr. Klipstine asked Mr. Autry if Ms. Mitchell "slept around,"

to which he replied that he did not know.  Trial Tr. at 1031.  Mr. Klipstine then confirmed that

Mr. Autry "had tried [to sleep with her], . . . and hadn't been successful." *Id*.  On re-cross

examination, defense counsel did not pursue any questioning regarding Mr. Autry's attempt to

have a sexual relationship with Ms. Mitchell.  Rather, counsel again attempted to impeach Mr.

Autry by demonstrating the ways in which his story changed between the interviews conducted

on January 30, March 5, and March 12, 1982.

       **3.**      **Analysis**

           **a.**      ***Suppression***

The Magistrate Judge in the instant federal case concluded that "the February 3 statement

was not transcribed and not produced to defense counsel."  Doc. 41 at 11.  Respondent did not

file objections to this finding.  The Court agrees that the statement was suppressed, based on the

overwhelming evidence in this case.  *See* Section II(A), "Due Diligence," *supra* (finding that the

February 3rd statement constitutes newly discovered evidence that Mr. Case could not have

previously discovered through the exercise of due diligence).  Although the sheriff's

department's policy was generally to transcribe witness interviews for the prosecution, neither

party has located a transcription of Mr. Autry's February 3rd interview that matches the format of

the other 1982 transcriptions.  Moreover, Mr. Case has provided excerpts of the transcripts of his

co-defendants' trials, which all but definitively demonstrate that no defense attorney had access

to the tape.  *See* Doc. 16, Ex. E at 6 (Petitioner's Supplemental Memorandum of Law, filed in

state district court in August of 2005, highlighting (1) portion of cross-examination of Mr. Autry

at Curtis Worley's trial, in which defense counsel referred to the three statements Mr. Autry gave

to police, and labeled the dates of the statements as January 30, March 5, and March 12, 1982;

and (2) portion of redirect examination of Mr. Autry at Joe Brown's trial, where prosecutor

elicited testimony from Mr. Autry that he had "made a pass" at Ms. Mitchell, but did not get

angry at her when she "said no").  As Respondent has in no way rebutted this evidence, the Court finds that the statement was suppressed.

The parties dispute whether or not the prosecutor, James Klipstine, knew of the suppressed Bobby Autry statement.  Regardless of whether or not Mr. Klipstine had subjective knowledge of the suppressed February 3rd statement, Deputy Tony Dominguez, who interviewed Mr. Autry, certainly did.  In fact, Deputy Dominguez persisted in questioning Mr. Autry about his sexual encounter with Ms. Mitchell, which eventually led to his concession that they had indeed had intercourse.  It is well-established that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  *Kyles*, 413 U.S. at 437-38.

### b.      *Favorability and Materiality*

Evidence is "favorable to an accused," *Brady*, 373 U.S. at 87, when it has any exculpatory or impeachment value to the defense.  *Strickler*, 527 U.S. at 281-82.  At the very least, the suppressed February 3rd statement would have been favorable to Mr. Case's defense for its potential to impeach Bobby Autry's testimony under oath that he had never had sex with Nancy Mitchell.  *See Case*, 183 P.3d at 919 (suppressed statement had "some impeachment value").  The parties vehemently disagree as to whether or not the statement was material. Before evaluating the materiality of the statement, the Court must ascertain the proper standard to apply.

Citing the case law establishing that "a conviction obtained by the knowing use of perjured testimony . . . must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," *Agurs*, 427 U.S. at 103, Mr. Case argues that the Court should apply the "any reasonable likelihood" standard, rather than *Brady's*

generally stricter standard of "reasonable probability" of a different result.  In his argument, Mr.

Case assumes that the "any reasonable likelihood" standard applies equally to cases in which the

prosecution *actually knew* it was presenting perjured testimony, and those in which it *should*

*have known* that a witness was perjuring him or herself.  *See* Doc. 9 at 32 ("[I]f the prosecution

allowed testimony that it knew or should have known was perjured, the rule is that relief will be

granted 'if there is *any reasonable likelihood* that the false testimony *could have* affected the

judgement of the jury.'" (quoting *Bagley*, 473 U.S. at 678) (emphasis in Petitioner's brief)).

The law is not as clear as Mr. Case would like it to be.  In *Agurs*, the Supreme Court

articulated three distinct circumstances in which *Brady* applies, one of which is when "the

undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and

that the prosecution knew, or should have known, of the perjury."  427 U.S. at 103.  In *Bagley*,

Justice Blackmun explained that *Agurs* established "a materiality standard under which the fact

that testimony is perjured is considered material unless failure to disclose it would be harmless

beyond a reasonable doubt."  473 U.S. at 679.  However, this portion of *Bagley* did not

command a majority of the Supreme Court.  *See United States v. Kaufman*, 783 F.2d 708, 709

(7th Cir. 1986) ("this portion of [Justice Blackmun's] opinion was joined only by Justice

O'Connor and, consequently, does not constitute a holding of the [Supreme] Court.").  The Court

has found no Tenth Circuit case law adopting the principle that the prosecution's use of

testimony it *should have known* was perjured should be subjected to the "any reasonable

likelihood" standard.  As Mr. Case has not demonstrated that Mr. Klipstine knowingly elicited

perjured testimony from Mr. Autry, *see* Part III, Section III(A)(3), "Presentation of Perjured

Testimony," *infra*, the proper standard to apply to the suppressed Bobby Autry statement, and to

the prosecution's use of Mr. Autry's perjured testimony, is the general *Brady* standard of

"reasonable probability."

At the outset of the materiality analysis, it is important to note that "[w]hat might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict." *Banks v. Reynolds*, 54 F.3d 1508, 1518 (10th Cir. 1995). Materiality depends upon the circumstances; when a habeas petitioner's claim rests on an alleged *Brady* violation, relief is not warranted if his "conviction is supported by overwhelming evidence of guilt." *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (citation omitted). The natural corollary to this principle is that "[w]ithheld, favorable evidence . . . , in a context where the undisclosed material could have been used to render the evidence of guilt ambiguous[,] has a more significant impact than where the evidence of guilt is otherwise ample." *Spicer v. Roxbury Correctional Inst.*, 194 F.3d 547, 561 (4th Cir. 1999) (quotation marks omitted).

Mr. Case's conviction rested on the eyewitness testimony of three teenagers, who recounted substantially inconsistent versions of the events surrounding Nancy Mitchell's death. *See* Section II(C)(1)(c), "Inconsistencies Between 'Eyewitness' Accounts," *infra*. Aside from these eyewitnesses, the State's witnesses offered little to no testimony connecting the defendant, Carl Case, to Nancy Mitchell's murder. Moreover, the State offered scant, if any, physical evidence that *anyone*, let alone Mr. Case, raped Ms. Mitchell. The forensic and investigative witnesses testified as to the state of the victim's body, whereas witnesses such as Ms. Mitchell's mother and best friend testified as to her whereabouts before she disappeared. This testimony and evidence is described in further detail in Section II(C)(1)(a), "Non-Eyewitness Testimony," *infra*. Ultimately, the significant weaknesses in the State's case render the jury's guilty verdict "already questionable," *see Banks*, 54 F.3d at 1518, bolstering the materiality of the suppressed Bobby Autry statement.

i.     *Defense Theory that Bobby Autry Was the True Perpetrator*

In evaluating the materiality of the suppressed statement, the Court must consider two general, and somewhat overlapping, aspects of the value of the evidence.  The Court must assess the statement's "utility to the defense as well as its potentially damaging impact on the prosecution's case." *Banks*, 54 F.3d at 1518 (citing *Kyles*, 514 U.S. at 434-40).  Respondent argues that the materiality analysis does not permit an inquiry into whether the evidence would have materially changed the defense strategy, trial preparation, or trial tactics.  Doc. 36 at 4.  He argues that *Brady*, *Bagley*, and *Kyles* control, yet fails to explain how an evaluation of whether the suppressed evidence would have materially changed the defense trial strategy would be in conflict with these cases.

In fact, the entire tenor of the Supreme Court's decision in *Kyles* compels the conclusion that an assessment of the materiality of any given piece of evidence requires a holistic assessment of the entire trial, including the defense's trial strategy.  Materiality is shown by demonstrating "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.  The Supreme Court explained that the "touchstone of materiality" under *Brady* "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. at 434.  In *Kyles* itself, the Supreme Court assessed how the suppressed evidence would have affected the proceedings as a whole, including in its analysis an assessment of how the suppressed evidence might have changed the defense's trial strategy.  514 U.S. at 445-46.  The Court in *Kyles* cited Tenth Circuit case law for the proposition that *Brady* permits an analysis into how the defense might have utilized the suppressed evidence. *Id*. at 446 (citing

24

*Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) for the proposition that a "common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and [courts] may consider such use in assessing a possible *Brady* violation").

In *Banks*, the Tenth Circuit made clear that in assessing the materiality of any given piece of evidence, this Court must evaluate "its utility to the defense as well as its potentially damaging impact on the prosecution's case."  54 F.3d at 1518.  In evaluating the evidence's "utility to the defense," Tenth Circuit case law clearly permits, and even requires, this Court to evaluate how the suppressed evidence would have affected the entire proceeding, including the defense's trial strategy.  *See*, *e.g.*, *Bowen*, 799 F.2d at 613 (court may consider how suppressed evidence may have opened door to different trial tactics); *Banks*, 54 F.3d at 1519 ("[E]vidence in the hands of a competent defense attorney may be used to uncover other leads and defense theories.  Thus, we may draw reasonable inferences as to what those other lines of defense may have been.") (citation omitted); *Trammell v. McKune*, 485 F.3d 546, 551 (10th Cir. 2007) (recognizing that suppressed evidence may have been used to support defense theory that another person committed the offense).

The suppressed statement would have supplied the defense with a theory as to who was actually responsible for Nancy Mitchell's murder.  *See Banks*, 54 F. 3d at 1519 ("[Suppressed] evidence in the hands of a competent defense attorney may be used to uncover other leads and defense theories. [The Court] may draw reasonable inferences as to what those other lines of defense may have been.") (internal quotation omitted).  Gary Mitchell, Mr. Case's defense counsel, testified as follows at the state evidentiary hearing:

> Q:     [C]an you tell us whether you had received [Bobby Autry's February 3, 1982 statement] in discovery, either in a transcribed format or a taped format . . . prior to Carl Case's trial?

> A:     . . . In my heart of hearts, I'm convinced I didn't have this.  Because had I
> had it, I would have cross-examined differently and I would have used it, but
> I didn't use it . . . . *[T]he big thing in this case for me, one of the big things,*
> *was trying to find somebody that did this other than my client* . . . . [Bobby
> Autry's admissions in this statement] showed that there was somebody else
> there that had wanted to have intercourse with this young lady at a different
> time and a different place . . . . [I]t would have been great if I could have
> cross-examined him about the fact that he actually had a sexual relationship
> with her, and obviously was frustrated by it because he made some, as I
> recall, some comment in here about the inability to conclude that
> relationship.
>
> Q:     The information in this statement about he becoming mad at her and she
> becoming mad at him, was that information you had before you stood up to
> cross-examine Bobby Autry?
>
> A:     No.
>
> Q:     How can you be sure?
>
> A:     Well, I shouldn't say – well, if I had that information, I was incompetent, I'll
> put it that way.  And I may be a lot of things at times, but, by golly, if I have
> the information, I use it, and I just do not believe – I mean, I would have used
> it.  I looked for everything I could to cross-examine these three – the three
> primary witnesses with.  I would have used it.  I would have hit him over the
> head with it, if I had had it.

State Evid. Hr'g Tr. at 259-61 (emphasis added).  Mr. Mitchell described Mr. Autry as one of

three primary witnesses, whose testimony needed to be "destroy[ed]" at trial.  *Id*. at 264.  He

further stated that he would have used the suppressed statement to impeach Mr. Autry, the

importance of which was "critical."  *Id*.

Without the suppressed statement, the defense was unable to cast any doubt on Mr.

Autry's statement that he once unsuccessfully "tried" to have sexual intercourse with the

deceased victim in the case.  In contrast to Mr. Case and his co-defendants, who the prosecution

painted as "animals . . . [who threw Nancy Mitchell] into the bushes like so much used garbage,"

Trial Tr. at 1689, Mr. Autry came across as a gentleman who respected Ms. Mitchell's wishes

not to have sex with him.  It is understandable that the defense attempted to avoid any further

questioning on Mr. Autry's "attempt" to have intercourse with Ms. Mitchell; any competent

26

defense attorney in defense counsel's position would not have further cross-examined Mr. Autry out of fear that counsel would only solidify the chivalrous image the prosecution had begun to paint for the jury.  However, had the prosecution disclosed Mr. Autry's February 3rd statement to the defense, defense counsel could have demonstrated that Mr. Autry indeed not only "tried" to have sex with the victim, but actually succeeded in penetrating her, before she got angry and pushed him away.  His consequent anger at her would have, at a minimum, suggested to the jury that he was not the gentleman that he initially purported to be.

Had the prosecution disclosed Mr. Autry's suppressed statement to Mr. Case's defense counsel, the defense first could have asked prosecution witnesses specific questions to lay a foundation for the possibility that Mr. Autry was in fact the killer, and also could have called additional witnesses to support this theory.  At trial, the State's expert, Dr. Greggory Kaufman, testified as to his "very, very rough estimate" that Ms. Mitchell had died three weeks prior to January 31, 1982.  Trial Tr. at 724.  However, on cross-examination, Dr. Kaufman stated that the death "might have occurred significantly longer [ago] than that."  *Id*. at 726.  The last undisputed sighting of Ms. Mitchell occurred on or about December 21, 1981.  *See* Worley Arrest Warrant ¶ 4 ("On 31 January 1982 Mary Helen Worley told police officers that Nancy Mitchell on or about 21 December 1981 was clad in the same clothing as that in which the body was found").  She was in Bobby Autry's company on December 21st, and it is at least *feasible*, based on Dr. Kaufman's limited testimony, that she died that very evening.  However, defense counsel did not pursue this line of questioning with Dr. Kaufman, because the defense's theory appeared to be that Ms. Mitchell in fact died *after* January 1, 1982.  *See* Trial Tr. at 1351-56 (defense unsuccessfully moving for continuance to secure witness who would state that she saw Ms. Mitchell on January 6, 1982); *see id*. at 1313 & 1331-32 (defense witnesses Larry and Stella

Lunsford testifying that they saw Ms. Mitchell on January 16, 1982). Similarly, on cross-examination of the State's crime lab examiner, Lawrence Lee Renner, counsel for Mr. Case asked: "Was there any evidence taken from anybody else other than Curtis Worley and Curtis Worley's car and Joe Brown?" Trial Tr. at 1045. Mr. Renner responded, "Bobby Lee Autry." *Id*. Counsel in no way followed up on this reference to Mr. Autry.

Bobby Autry admitted to sheriffs deputies that he and Nancy Mitchell had briefly had intercourse a few days before Christmas, and he further admitted that her refusal to continue to have sex with him made him mad. Had counsel had access to Mr. Autry's February 3rd statement, he almost certainly would have further explored the possibility that Ms. Mitchell in fact died on the night that Mr. Autry penetrated her briefly and then got mad when she pushed him away. One minor but notable detail is that Ms. Mitchell's best friend, Melanie Kirkes, testified that she last saw Ms. Mitchell on December 20, 1981. In support of its theory that Bobby Autry in fact murdered Ms. Mitchell prior to Christmas, the defense could have emphasized the fact that no one – not even Ms. Mitchell's best friend – had seen her for over ten days before her alleged death, suggesting she actually died prior to January 1, 1982. The defense could have further elicited testimony from Dr. Kaufman as to what he believed to be the earliest possible date Ms. Mitchell could have died. The defense could have attempted to introduce the arrest warrant for Curtis Worley, which included the results of a "preliminary autopsy" estimating that Ms. Mitchell died three to six weeks prior to January 30, 1982. *See* Worley Arrest Warrant ¶ 2.

In fact, ostensibly because the defense theory was that Ms. Mitchell had in fact died later in January, the defense appears to have intentionally distracted from Dr. Kaufman's concession that the death could have occurred significantly *before* January 1st, in an effort to focus on the

possibility that she had died later than that:

> Q:  . . . [Y]ou were able to indicate how close you felt your estimate [that she had been dead for three weeks] was, within three to five days – three to five weeks, I believe was correct?
>
> A:  I believe that's probably – that's probably the upper limits of reliability that I could place on my estimate.
>
> Q:  Okay.  So, when you say three weeks, assuming a week is seven days, twenty-one days, the maximum you are actually talking about is 26 days, is that right, from the date of the autopsy?
>
> A:  Well, I think that limit of reliability applies more to the – more to the lower end of the spectrum of the time of death.  I think death might have occurred perhaps – perhaps a few days sooner – or, a few days later than that.  I think it might have occurred significantly longer than that, longer ago than that.

Trial Tr. at 725-26.  Dr. Kaufman's testimony is ambiguous: he seems to agree, with some qualification, with defense counsel's characterization of his estimate as "within three to five days – three to five weeks."  It is unclear from the transcript whether the doctor's agreement is with "three to five days" or "three to five weeks."  Dr. Kaufman's reference to "significantly . . . longer ago than that" is vague, and the defense did not pursue this line of questioning.  Had defense counsel had access to the suppressed tape, he almost certainly would have pursued the possibility that the death could have occurred as long ago as five weeks (or five weeks plus five days, depending on how one interprets Dr. Kaufman's testimony) before the body was found.  Given that the direct cause of death was *not* Ms. Mitchell's physical injuries, but rather exposure to the elements, the defense could have questioned Dr. Kaufman regarding how many days might have passed between Ms. Mitchell's killer abandoning her while she was still alive, and her ultimate death.

Armed with the suppressed statement which would lend support to a defense theory that Bobby Autry was the actual killer, the defense could have called Ricky or Mary Worley to testify that Ms. Mitchell was wearing the clothing in which her body was found on the night of

this sexual encounter with Bobby Autry.  Both Worleys gave statements on January 31, 1982, the day after Ms. Mitchell's body was found.  Ms. Worley stated that Ms. Mitchell went to the Worleys' house the day after Curtis Worley paid for her to stay at the Travelodge.  Police later established that this was on or around December 21, 1981.  Worley Arrest Warrant ¶ 4.  Ricky Worley stated that Ms. Mitchell left clothing at the Worleys' house that day, but never returned to pick it up.[5]  According to Ms. Worley, Ms. Mitchell was at the Worley home with Curtis Worley, Mike Tweedy, Bobby Autry, and two other boys.  Ms. Worley described what Ms. Mitchell was wearing that night: red pants and a black and white shirt with red trim, the same clothing in which her deceased body was found.  Ricky Worley recalled that Ms. Mitchell had left alone with Mr. Autry; moreover, Mr. Autry himself stated in the suppressed statement that prior to his sexual encounter with Ms. Mitchell, he had picked her up from Ricky and Mary Worley's house, and they left alone together.  This testimony from Ricky and Mary Worley could have laid the groundwork for the defense theory that Mr. Autry was the actual killer.

After beginning to lay this foundation, Mr. Case's counsel could have used the suppressed statement to call into question Mr. Autry's contention on direct examination that he had never had intercourse with Nancy Mitchell, and could have introduced his prior statement that he became "mad" and "teed off" when Ms. Mitchell rebuffed him.  To prove that Mr. Autry's statement that he had never had sex with Ms. Mitchell was a *lie*, rather than simply an inaccurate choice of words, the defense could have introduced the following portion of the suppressed statement:

---

[5] Specifically, Mr. Worley told police on January 31, 1982 that on the night in question, Ms. Mitchell "had brought her clothes in, which y'all got the other day."  Tr. 1/31/82 R. Worley Statement at 3.  The Court reads this statement to mean that the officers retrieved Ms. Mitchell's clothes from the Worleys' home sometime after her disappearance.

> Q:    Do you remember . . . [investigators] asking you if you had had, at any time,
>        intercourse with Nancy Mitchell?
> A:    Yeah.
> Q:    And what did you tell him?
> A:    I told him no, cause I, I didn't know if she was raped at the time or what, and
>        I didn't want nobody to point the finger at me cause I didn't do it.

Tr. 2/3/82 Autry Statement at 14-15.

Furthermore, the defense could have pointed to the facts that (1) no semen was found

inside Ms. Mitchell nor on her underpants, and (2) she had no bruising on the back side of her

body, to argue that the evidence was entirely consistent with a scenario in which Bobby Autry

beat her in his car and dragged her off after she refused to let him complete the sexual act.  The

defense had a strong argument that the lack of bruising on the back of Ms. Mitchell's body

defied the State's theory of a brutal gang rape on a rocky river bed.  But without Mr. Autry's

suppressed statement, the defense could offer the jury no other specific explanation as to how

she died.

ii.      <u>The Statement's Potential to Undermine the Jury's
Confidence in the Investigation</u>

In addition to creating a viable defense theory that Bobby Autry was Nancy Mitchell's

true killer, access to the suppressed statement would have allowed the defense to highlight the

overall weaknesses in the State's case.  The physical evidence presented at trial was weak, and

even the prosecutor himself acknowledged during his closing argument that the State's

eyewitnesses were not ideal witnesses.  Trial Tr. at 1646 (referring to witnesses as "troubled

young people").  The Tenth Circuit has recognized that it is a "common trial tactic . . . to

discredit the caliber of the investigation or the decision to charge the defendant," and the Court

"may consider such use in assessing a possible *Brady* violation."  *Bowen v. Maynard*, 799 F.2d

593, 613 (10th Cir. 1986).  Therefore, it is appropriate for the Court to consider the fact that the

31

defense could have argued to the jury that the State had not adequately conducted its

investigation, since it chose not to pursue further investigation of Bobby Autry.  *See Trammell*,

485 F.3d at 551 (explaining that suppressed evidence could also have been used to cast doubt on

police officers' decision to focus their investigation on habeas petitioner, rather than another

potential suspect).  This would have exacerbated the weaknesses of the State's evidence,

including the dearth of physical evidence of rape and the irreconcilably inconsistent eyewitness

versions of the events.

In *Kyles*, the Supreme Court discussed a similar situation in which a prosecution witness,

Beanie, had been interviewed by police and given potentially incriminating statements.  514 U.S.

at 445-47.[6]  According to the Court,

> Beanie's various statements would have raised opportunities to attack . . . the
> thoroughness and even the good faith of the investigation.  By the State's own
> admission, Beanie was essential to its investigation . . . [; yet] Beanie's statements
> to the police were replete with inconsistencies . . . .  Their disclosure would have
> revealed a remarkably uncritical attitude on the part of the police.

*Id*. at 445.

It is not clear from the record why the Eddy County Sheriff's Department chose to focus

their investigation on Mr. Case and his three co-defendants, and why Mr. Dunlap and Mr. Autry

were offered immunity in exchange for their testimony.  There is no evidence that the decision to

charge these four defendants was made in bad faith.  However, had the defense had access to Mr.

_____

[6]Beanie's statements were more incriminating than those Mr. Autry made, and the police
investigation in that case was blatantly sloppy at best, and corrupt at worst.  This Court does not
wish to imply that the statement suppressed in the instant case is entirely analogous to the
suppressed statements in *Kyles*.  However, the Supreme Court's analysis in that case is
instructive, as it details how undisclosed statements that tend to incriminate or impeach a
prosecution witness could have been used to call into question the thoroughness and accuracy of
a police investigation.

Autry's suppressed statement, it certainly could have attacked the *thoroughness* of the investigation, just as the Supreme Court observed in *Kyles*. Moreover, like Beanie, Mr. Autry was "essential" to the prosecution's case in that he was one of three eyewitnesses to testify at trial. Confronting such an essential witness with the suppressed statement at issue in this case could have significantly undermined the jury's confidence in the police investigation of Ms. Mitchell's rape and murder.

*iii.*     <u>The Need for the Defendant to Testify</u>

Finally, the Court agrees with Mr. Case's contention that, had defense counsel had knowledge of the suppressed Autry statement, Mr. Case never would have testified in his own defense. At trial, the defense presented some alibi witnesses, but Mr. Case ultimately testified that he had been present at Six-Mile Dam with the other men and Nancy Mitchell, but that none of the men had raped Ms. Mitchell. However, he described Curtis Worley's aggressive sexual advances toward Ms. Mitchell, which Ms. Mitchell continuously resisted. Mr. Case further testified that the young men did not physically assault Ms. Mitchell, with the exception that Curtis Worley struck her one time. Mr. Case said that after a period in which Mr. Worley struck Ms. Mitchell and continuously attempted to remove her shirt, Ms. Mitchell said she had to go to the bathroom and walked out onto the dam. Mr. Case saw her fall down the hill and tumble into the grass and weeds below, where he lost sight of her. He said that it did not look like a particularly hard fall, but that Ms. Mitchell did not get up. Mr. Case said that Curtis Worley called to her once, and then Mr. Worley insisted that the men leave and drive back to town, and Ms. Mitchell would simply have to walk. The defense theory was that she had fallen off the earthen dam and hit her head, resulting in her death.

33

At the state evidentiary hearing, Mr. Case testified that he had made up the story of Ms. Mitchell falling down the hill.  He stated that during December and January of 1982, he was homeless and often slept in his car.  He gave his defense counsel a list of names of people who might possibly be able to corroborate an alibi defense, but counsel was unable to establish such a defense.  Although Mr. Case stayed with Margie Croley and Ron Rainwater, his friend's parents, for a time, he could not remember specifically what he had done or where he had stayed on the night of January 1, 1982.  However, as he sat through the testimony of all the other witnesses, it was easy for him to fabricate a story that was relatively consistent with their testimony.

Following Mr. Case's state evidentiary hearing testimony, defense counsel Gary Mitchell testified.  He explained that he had been investigating a potential alibi defense, because Mr. Case maintained that he had not been present at the alleged party on January 1st.  Mr. Mitchell stated that his defense team interviewed numerous young people, all of whom – like Mr. Case – appeared to be transients, and none was able to solidly support an alibi defense.  He further stated as follows:

> [A]s we got down closer and closer to trial and the State's investigators became more and more concise and precise in what their theory of this case was, I . . . ha[d] a, what I like to refer to as a come-to-Jesus meeting with Carl.
>
> I told him point blank . . . that nobody was going to buy his story.  This wasn't going to work, that we've got all these witnesses talking about you being out there, all of these things happening, nobody is going to believe this thing, Carl, and I'm just telling you.  This is a death penalty case . . . .  And if the jury thought you was lying to them . . . [they] wanted to kill you for that . . . .  I didn't want to have a jury think that we were giving them some nonsensical-type defense and get punished for it later on in a death case . . . .
>
> And at the end of the day, Carl, in what was a very emotional situation for him – I remember – he was a young man at the time, he was really distraught about it.  I felt horrible about sitting there with the young man and doing this.  But at the end of the day, he said, all right, Mr. Mitchell, this is what happened.

State Evid. Hr'g Tr. at 265-67.  In context it is clear that by "this is what happened," Mr. Mitchell was referring to what eventually became Mr. Case's trial testimony: his story that he never attacked Ms. Mitchell, rather that she fell down the hill at Six-Mile Dam.

The Court has reviewed some authority suggesting that if it indeed finds that the prosecution violated *Brady*, the Court is *prohibited* from considering the content of Mr. Case's testimony.  In *Harrison v. United States*, 392 U.S. 219, 223 (1968), the Supreme Court held that where a criminal defendant testified at trial "in order to overcome the impact of confessions illegally obtained," the testimony "was tainted by the same illegality that rendered the confessions themselves inadmissible."  *Id*. at 223.  The Court reversed the defendant's conviction because the prosecution had not demonstrated that its introduction of illegally obtained confessions did not induce the defendant's testimony.  *Id*. at 225.  In *United States v. Pelullo*, 105 F.3d 117, 124-25 (3d Cir. 1997), the Third Circuit examined whether *Harrison* extended to a situation in which the defendant decided to take the stand only because the government unlawfully withheld vital impeachment evidence as to one of its witnesses.  The court held: "When a defendant's testimony is compelled [] by a constitutional violation, that testimony must be excluded from subsequent proceedings."  *Id*. at 125.  The court further held that the government bears the burden of proving that the defendant would have testified even had the constitutional violation not occurred.  *Id*. (quoting *Harrison*, 392 U.S. at 225: "Having . . . us[ed] the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony").

As the Court has found no Tenth Circuit case on point, it is not convinced that it must disregard Mr. Case's testimony in its entirety.  However, at a minimum, these cases as well as others from the Tenth Circuit permit the Court to consider whether or not a defense attorney

would have put his client on the stand absent the State's withholding of Bobby Autry's February 3rd statement. *See Banks*, 54 F. 3d at 1519 ("[Suppressed] evidence in the hands of a competent defense attorney may be used to uncover other leads and defense theories. [The Court] may draw reasonable inferences as to what those other lines of defense may have been.") (internal quotation omitted); *see also Trammell*, 485 F.3d at 551 (recognizing that suppressed evidence may have been used to support defense theory that another person committed the offense). Respondent has pointed to no evidence to contradict Mr. Mitchell's testimony at the state habeas proceeding. He merely asserts, in a conclusory fashion, that Mr. Case's assertion that he would not have testified had the February 3rd statement been disclosed should be rejected because it "is made in hindsight" and it is "self-serving." *Id*. at 9.

The Court finds that Mr. Mitchell would have had little reason to put his client on the stand to tell such a far-fetched story if he could have put forth another, more credible defense theory. Had Mr. Case never taken the stand, the crux of the prosecution's closing argument would have lost its meaning. During closing argument, Mr. Klipstine acknowledged the inconsistencies between the stories told by Ms. Knight, Mr. Dunlap and Mr. Autry, and he effectively minimized these inconsistencies by calling upon the jury to "determine who has a reason to lie." Trial Tr. at 1647. In essence, the prosecution was able to use Mr. Case's testimony – which was impelled by the State's failure to disclose Mr. Autry's February 3rd statement – to buttress its own case. Had Mr. Case never testified, Mr. Klipstine never could have accused him of lying. Nor could the State have presented much of its rebuttal case, and Mr. Case would not have had to again take the stand to defend himself against the rebuttal witnesses' testimony.

*iv.*     *The Suppressed Statement was Material*

Although the Magistrate Judge found that the contents of the suppressed statement were not materially different from those of the statements the prosecution disclosed, this Court disagrees.  Whereas Mr. Autry admitted during the suppressed statement that he had inserted his penis half-way into Ms. Mitchell's vagina before she got mad, she pushed him off, and then *he* got mad, in the other interviews he only went so far as to say that he "tried making out with her." Tr. 3/5/82 Autry Statement at 3.  Although the sheriff's deputy conducting the interview asked Mr. Autry about when he "tried to make love . . . or have sexual intercourse" with Ms. Mitchell, *id.* at 6, these questions have little meaning unless viewed in context of the February 3rd interview.

In addition, Mr. Autry stated during the March 5th interview that he "got her clothes and we was drunk."  *Id.* at 3.  However, this statement would not appear significant to defense counsel, in light of the other witness statements explaining that Ms. Mitchell, a runaway, left changes of clothes at other people's homes and later returned to retrieve them.  *See* Tr. 1/31/82 M. Worley Statement at 4 ("Q: [W]as this the occasion that Nancy brought her clothes [to your house]?  A: Uhuh.  Q: [H]ow was she carrying the clothes?  A: Well she had her sweater on top of all of them."); Tr. 1/31/82 R. Worley Statement at 1-3 ("[Curtis and Nancy] went back to the Motel room and picked up her things, and came back over to the house . . . . [W]hen she came in that night, she had brought her clothes in."); *see also* Trial Tr. at 680 (testimony of Melanie Kirkes that sometime around December 20th, Ms. Mitchell called "to come and get her clothes").  In light of these statements, this Court disagrees with the Magistrate Judge's proposed finding that Mr. Autry's statement that he "got her clothes" obviously meant that he undressed Ms. Mitchell.  *See* Doc. 41 at 12.

37

Based on this analysis, the Court finds that the suppressed statement was material in that, "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (citations omitted). The defense's entire theory would have changed, and Mr. Mitchell would have emphasized during closing argument that the forensic evidence was much more consistent with uncompleted intercourse and an attack in Bobby Autry's car, followed by the body being dragged into a remote location, than a gang rape on a rocky river bank. The defense would have had a substantial basis for discrediting Bobby Autry's story in its entirety as self-serving, and would have had only two "eyewitnesses" to "destroy." The prosecution could not have accused Mr. Case of lying, but rather would have had to explain to the jury why the police did not focus their investigation on Mr. Autry, despite his lie about not having intercourse with Ms. Mitchell because he "didn't want nobody to point the finger at [him]." Mr. Case has therefore established that a *Brady* violation occurred, and he has satisfied Section 2244(b)(2)(B)'s requirement that he show constitutional error.

## C.     The Evidence as a Whole

Having proven that his trial was plagued by constitutional error, Mr. Case now must show that the facts underlying his claim, if proven and viewed in light of the evidence as a whole, establish by clear and convincing evidence that, but for the *Brady* violation, no reasonable jury would have found him guilty. 28 U.S.C. § 2244(b)(2)(B)(ii). "The evidence as a whole" includes the evidence presented at Mr. Case's trial as well as the newly discovered evidence that has come to light since trial. *See House v. Bell*, 547 U.S. 518, 538 (2006) ("Because a . . . claim [of actual innocence based on newly discovered evidence] involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how

reasonable jurors would react to the overall, newly supplemented record.").[7]  "If new evidence so requires, this may include consideration of the credibility of the witnesses presented at trial." *Id*. at 538-39.

Here, the new evidence consists of the suppressed Bobby Autry statement, the recantations of Paul Dunlap and Audrey Knight, and the results of the DNA testing.  Respondent argues that "the evidence as a whole" does *not* include the recantations, *see* Doc. 75 at 5, but the case he offers in support of this assertion in fact does not support it.  *See McDaniel v. Brown*, 130 S. Ct. 665, 672 (2010) (per curiam) (finding it improper for district court to supplant record with report that was not presented in state court when ruling on a sufficiency-of-the-evidence claim under *Jackson v. Virginia*, 443 U.S. 307 (1979)).  Indeed, in its order granting Mr. Case authorization to file the instant petition, the Tenth Circuit stated that both the evidence of the recantations as well as the DNA testing are "relevant to an evaluation under § 2244(b)(2)(B)(ii) of the evidence 'as a whole.'"  Doc. 5 at 9.

The Court carefully reviewed this new evidence in light of the 1982 trial transcript in its entirety as well as pretrial investigation-related documents submitted by the parties – including audio recordings and transcripts of interviews with Audrey Knight, Paul Dunlap and Bobby

---

[7] *House v. Bell* did not involve a claim under Section 2244(b)(2)(B).  However, the Supreme Court in that case analyzed a habeas petitioner's burden under *Schlup v. Delo*, 513 U.S. 298 (1995), of proving actual innocence.  A *Schlup* claim is a claim of actual innocence based on newly discovered evidence, which excuses a habeas petitioner from procedural default in a "truly extraordinary" case.  *House*, 547 U.S. at 536-37.  The Court in *Schlup* held that the petitioner had the burden of showing "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  513 U.S. at 327.  Although the petitioner's burden under Section 2244(b)(2)(B) is higher, the relevant language – "no reasonable juror would have convicted him in the light of the new evidence" is identical in meaning to the language of Section 2244(b)(2)(B)(ii) – "in light of the evidence as a whole . . . no reasonable factfinder would have found the applicant guilty."  It follows that this Court must consider the newly discovered evidence that the jury did not have before it, including the recantations of Paul Dunlap and Audrey Knight, in its evaluation of "the evidence as a whole."

Autry – and the state evidentiary hearing transcript and related exhibits.  The Court further reviewed State District Judge Gary Clingman's April 10, 2006 order and the published opinion of the New Mexico Supreme Court.  As set forth in detail in the Court's September 24, 2010 Memorandum Opinion and Order [Doc. 46], this record[8] was insufficient for the Court to come to a conclusion with respect to "the evidence as a whole."  Because the record from the state habeas proceeding was devoid of any conclusions regarding the credibility of the recantations of Audrey Knight or Paul Dunlap, the Court was unable to meaningfully weigh the *Brady* violation against the evidence in its entirety.

On December 9-10, 2010, the Court held an evidentiary hearing for the limited purpose of evaluating the credibility of the recantations of Audrey Knight and Paul Dunlap.  Prior to the hearing, the Court issued an order stating: "[I]f the recantations are to be believed, Mr. Case will have satisfied the threshold requirement set forth in 28 U.S.C. § 2244(b)(2)(B)(ii)."  Doc. 46 at 7.  As set forth in Section I(C)(4), "Credibility of the Recantations," *infra*, the Court found these recantations to be credible.  Furthermore, as detailed in Section I(C)(1), "Weaknesses in the State's Case," *infra*, the State's evidence at Mr. Case's trial was already quite weak.  The Court accordingly concludes that the "evidence as a whole" – consisting of the feeble evidence presented at trial, the *Brady* violation, the credible recantations, and the DNA evidence – establishes that no reasonable factfinder would have found Mr. Case guilty of the rape or murder of Nancy Mitchell.

### 1.    Weaknesses in the State's Case

The testimony at the 1982 trial established that Nancy Mitchell died sometime in

---

[8] The Court did not review the audio recordings themselves until after the evidentiary hearing, where the parties so requested.

December of 1981 or January of 1982, and the cause of death was exposure to the elements following a beating that rendered her unconscious.  Although the zipper on her pants was broken and her blouse was on inside-out, the State presented no physical evidence of rape.  No one other than Bobby Autry, Paul Dunlap and Audrey Knight claimed to have witnessed the attack on Ms. Mitchell.

### a.    *Non-Eyewitness Testimony*

In addition to the three eyewitnesses, the State presented testimony from the law enforcement officers who investigated the report of a dead body; two of Ms. Mitchell's close friends (Melanie Kirkes, who identified the body, and Lisa Ward); the dentist who confirmed Ms. Mitchell's identity; the forensic pathologist who testified as to the physical injuries and cause of death; Ms. Mitchell's mother; investigators from the Sheriff's Department and the District Attorney's office; and a crime lab investigator who performed tests on physical evidence found at the scene of the crime.  The Court has carefully reviewed this testimony in its entirety. As analyzed in this section, the lion's share of this evidence has incredibly limited evidentiary value with respect to proving that Carl Case and his co-defendants raped and murdered Nancy Mitchell.  Rather, the State's case hinged on the testimony of Bobby Autry (the subject of the now discovered *Brady* violation), as well as Paul Dunlap and Audrey Knight, who have both recanted their testimony in its entirety.

Ray Ramirez, a lieutenant with the Eddy County Sheriff's Department, testified that he responded to a 911 call referencing Nancy Mitchell's dead body, and he described the scene where the body was found in relation to various streets and unnamed roads.  He described the clothing she was wearing as well as the rocky terrain.  Jack Childress, the sheriff of Eddy County, also testified as to Ms. Mitchell's clothing and the location of the body.  Investigator

Gary McCandless of the Eddy County Sheriff's Department testified as to the condition of the body, providing little new information.  He was not cross-examined.  Deputy Eddie Carrasco also provided little in the way of new information, but he testified as to the procedures for shipping the body to the Office of the Medical Investigator.  Melanie Kirkes, Ms. Mitchell's best friend, identified her body.  She testified that Ms. Mitchell had briefly dated Mr. Case before he broke up with her, and further stated that Ms. Mitchell was scared of sexual intercourse, but was not scared of Mr. Case.  Another friend, Lisa Ward, testified that Ms. Mitchell had dated Mr. Case, and that she had never dated Mr. Worley.  She further stated that sometime in early January of 1982, Mr. Worley told her that he had "gotten rid of" Ms. Mitchell.  Trial Tr. at 704-05.

Dr. Dale Harris, a dentist, testified that he had treated Ms. Mitchell since she was a child.  After studying her x-rays, he was able to confirm the identity of the body by its teeth.  Dr. Greggory Kaufman, the forensic pathologist, testified as to the state of Ms. Mitchell's body.  He stated that the body was "in a state of moderate to severe decomposition."  Trial Tr. at 713.  Ms. Mitchell had contusions and abrasions on her head, neck, and the front of her chest, as well as a few on her abdomen.  She had abrasions on her trunk, the backs of her hands, and the tops of her feet.  Based on the patterns of the contusions and abrasions, Dr. Kaufman believed her body had been dragged.  Ms. Mitchell also had deep bruises on her skull that were consistent with a beating to her head.  Dr. Kaufman testified that his investigation had uncovered no acid phosphatase – an enzyme present in human semen – inside Ms. Mitchell's body nor on her clothes.  He stated that her body presented no evidence of knife wounds.  He ultimately concluded that she had been beaten unconscious, and her eventual death was caused by exposure to the elements.

42

Nancy Mitchell's mother testified that she ran away on December 11, 1982, and the last time she saw her daughter alive she was at Ricky and Mary Worley's house on December 19, 1982.[9]  Captain Ray Ahlstrom, the Eddy County Sheriff's Deputy in charge of the investigative unit, testified that he interviewed Mr. Case on March 2, 1982, and he denied being at any party with Ms. Mitchell at Six-Mile Dam.  Mr. Case claimed that he had last seen Ms. Mitchell in mid- to late-December, 1981.  Next, Dennis Deluche, an investigator with the D.A.'s office, testified that he took Mr. Case's statement on February 2, 1982.  Mr. Case had also told Investigator Deluche that he last saw Ms. Mitchell sometime around Christmas, 1982.  Investigator Deluche further testified as to Mr. Case's and Mr. Worley's contentious relationship with respect to Ms. Mitchell; in essence, Mr. Case told Investigator Deluche that on several occasions, Mr. Worley grabbed Ms. Mitchell forcefully, and Mr. Case had to "slap him down" and remind him that Ms. Mitchell was not his girl.  Trial Tr. at 779-80.

Following the above-described testimony, Audrey Knight and Bobby Autry testified.  Next, the State presented the testimony of Lawrence Lee Renner, who worked for the New Mexico State Police Crime Lab.  Mr. Renner testified that he found no evidence of seminal fluid on Ms. Mitchell's underwear or other clothing.  However, this was not uncommon, given the body's state of decomposition.  Mr. Renner further testified that he compared pieces of black electrical tape found at the murder scene to other pieces that were present in Curtis Worley's car.  He could not conclusively state that the tape had come from the same roll of tape, but they

---

[9] Since the murder investigation commenced on January 30, 1982, exact dates for events in December 1981 were difficult to establish.  Bobby Autry and Mary Worley were questioned about the night when Nancy Mitchell was in the Worleys' home.  *See* Section II(B)(3), "Analysis," *infra*.  Bobby Autry believed this occurred on December 20, 1981, whereas Mary Worley believed that it was "on or about" December 21, 1981.  It is apparent to the Court that Ms. Mitchell's mother, Bobby Autry, and Mary Worley were talking about the same event, and that it occurred sometime between December 19 and December 21, 1981.

exhibited similar characteristics.  Following Mr. Renner's testimony was the testimony of Paul Dunlap.  The State then rested, and Mr. Case presented his case-in-chief.

As is evident from the above summary of the non-eyewitness testimony, the State presented little evidence linking Mr. Case to the murder, and scant, if any, evidence that Nancy Mitchell was raped.  Whereas the State presented a theory to the jury that four young men jumped on Ms. Mitchell while she lay on the rocky river bank and tore off her clothes "like a bunch of vultures," Trial Tr. at 982, Dr. Kaufman testified as to bruising and abrasions on Ms. Mitchell's head, neck, the front of her chest, her abdomen, her trunk, the backs of her hands, and the tops of her feet.  At no point did Dr. Kaufman state that Ms. Mitchell had bruising on her back,[10] her buttocks, or the backs of her legs, despite the fact that the State's theory was of a violent gang rape on a bed of rocks.  This medical evidence does not directly contradict the "eyewitness" testimony at trial, but when it is viewed in combination with two witnesses' subsequent recanting of their testimony, it strongly supports the recantations.  Moreover, the State *never* presented medical evidence supporting its theory that Ms. Mitchell had been raped, and it is implausible that the jury would have convicted *anyone* of rape were it not for the eyewitness testimony.

**b.**     *The "Eyewitness" Versions of the Events*

Ms. Knight, Mr. Autry, and Mr. Dunlap's testimony at trial displayed considerable inconsistencies.  Not only did each witness give testimony at trial that contradicted, in varying degrees, recorded statements they had given to law enforcement, but the three witnesses' statements differed substantially when compared to one another.  This was so notable that Mr.

---

[10] While the doctor's reference to the body's "trunk" could indeed include her back, in the context of his testimony it appears to refer at least primarily to the front of her torso.

Klipstine, the prosecutor, acknowledged in his closing argument that these eyewitnesses were not ideal witnesses, but rather they were "troubled young people." Trial Tr. at 1646. However, he contrasted their testimony with that of Carl Case and implored the jury to "determine who has a reason to lie." *Id*. at 1647.

<em>i.</em>   <u><em>Audrey Knight</em></u>

On March 9 and March 14, 1982 Audrey Knight gave statements to deputies with the Eddy County Sheriff's Department implicating Mr. Case and others in the death of Nancy Mitchell. The Court has reviewed the transcriptions of these statements, as well as audio recordings of the original statements themselves, in light of her 1982 trial testimony. Ms. Knight's two statements to the police differed substantially.

<em>a.</em>   <em>March 9, 1982 Statement</em>

During Ms. Knight's March 9th statement, the deputies asked her questions that were so leading in form, that it now appears that she volunteered little information without first being fed most of the details. The audio recording of the statement is replete with long pauses, which are difficult to appreciate in the written transcript. Continuously throughout this interview, the deputies would ask questions and receive no response, so they would rephrase their questions to contain more and more of the response they hoped for, until Ms. Knight finally gave them their desired answer. They repeatedly praised her when she gave the answer they sought, but when she gave an answer that clearly contradicted the known facts of the case, they were silent. The following summary of the March 9th statement emphasizes those portions the Court found to be most disturbing, given the leading nature of the questioning and the deputies' apparent willingness to feed the details of a story to their witness.

45

Ms. Knight stated that the last time she saw Nancy Mitchell was at a party at the Island after New Year's.  Ms. Knight arrived at the party around 10:00 p.m., and saw Ms. Mitchell there with a group of boys.  The group all left together in a car Ms. Knight could not identify, and went to a location on the river.  When the deputies asked Ms. Knight to describe this location, she could not.  They asked her if there was a dam, to which she replied that there was, but she did not know its name.  Deputy Carrasco asked, "Is that Six-Mile Dam?" to which Ms. Knight responded, "I think it is."  Tr. 3/9/82 Knight Statement at 2.  When Deputy Carrasco asked Ms. Mitchell whose car the group left in, she responded that she did not know.  He asked: "Did you remember seeing Curtis's car out there?" to which she responded in the affirmative. *Id*. at 3.  However, she did not state that Mr. Worley's car was in fact the car in which Ms. Mitchell left with the group of boys.  Ms. Knight described Mr. Worley's car as dark blue, but could not provide any other descriptive characteristics such as a make, model or year.

In response to the deputies' efforts to establish who Ms. Mitchell was with before she died, Ms. Knight stated that Ms. Mitchell came to the party with Curtis Worley, Carl Case,[11] and four other young men.  She stated that she did not recognize the remainder of the boys in the group because she had never seen them before and she "didn't really look very good."  *Id*. at 3.  However, the officers continued to attempt to elicit these individuals' identities through their questioning.  Although Ms. Knight initially stated that she did not know if Joe Brown was involved in the attack, later in the interview she stated with relative certainty that one of the four young men was Joe Brown (although she subsequently expressed some uncertainty as to whether or not Mr. Brown was present).  *Id*. at 17, 25.  She stated that she did not know who the other

---

[11] Throughout the statement, Ms. Knight and the deputies referred alternately to Mr. Case as "Carl" and "Scratch," which was his nickname.

boys were, but described one of them as being tall, skinny and blond, and another as having dark

brown hair and a mustache.  Deputy Dominguez then had the following exchange with Ms.

Knight:

> Q:     Do you know a Randy Davis?
> A:     I don't – no sir, but I've heard of him.
> Q:     This tall, blond, skinny individual, about how old is he?
> A:     I wouldn't know.
> Q:     Nineteen, eighteen?
> A:     He looked about – eighteen or nineteen.
> Q:     Does he – you ever seen him in school?
> A:     I don't – I don't – I don't know.  I ain't never really looked.

*Id*. at 3.

When asked if one of the three remaining boys was Mike Tweedy, Ms. Knight responded

in the negative.  When asked if one of the three was Bobby Autry, she said she had not seen

Bobby Autry; Deputy Carrasco then asked if she was certain she had not seen Mr. Autry, and she

responded: "Uh – I can't be for sure."  *Id*. at 16.  The deputies then changed the topic, but shortly

thereafter returned to Bobby Autry.  This time, when asked if "[Bobby Autry] couldn't have

been one of those six" young men with Ms. Mitchell, Ms. Knight responded, "He might have

been."  *Id*. at 18.  Finally, the fourth time the officers asked Ms. Knight if Bobby Autry was in

the car, she responded in the affirmative.  *Id*. at 25.

During the remainder of the interview, the officers attempted to ascertain the identities of

the two boys who were not yet positively identified.  The following exchange occurred:

> Deputy Carrasco:     Do you know a Paul Dunlap?
> Audrey Knight:       I don't know.
> Deputy Carrasco:     Audrey, was it Paul –
> Captain Ahlstron:    Please.  Audrey, we've got to know.  Was it Paul Dunlap?
> Deputy Carrasco:     It was, wasn't it?
> Audrey Knight:       [Illegible/inaudible] sir.
> Deputy Dominguez:    If – we know – we know where he's at and all this, ok?
> Captain Ahlstrom:    He's [illegible/inaudible] now too.  It was Paul Dunlap,

|                    | was it not?                                                        |
|--------------------|--------------------------------------------------------------------|
| Audrey Knight:     | Yes, sir.                                                          |
| . . .              |                                                                    |
| Captain Ahlstrom:  | Now, Audrey, let me ask you this.  We've accomplished this much, now.  We're talking about in that car was Scratch Case, Curtis Worley, Joe Brown, Paul Dunlap, Bobby Autry – now who was the other one, please. |
| Audrey Knight:     | I don't know for sure.                                            |
| . . .              |                                                                    |
| Deputy Carrasco:   | Mike Tweedy?                                                       |
| Deputy Dominguez:  | You know Mike Tweedy, don't you Audrey?                           |
| Audrey Knight:     | Yes sir.                                                           |
| Deputy Carrasco:   | Was it Mike Tweedy Audrey?  Audrey, please?  Was it Mike Tweedy?  Yes or no? |
| Audrey Knight:     | Yes sir.                                                           |
| Captain Ahlstrom:  | All right, now.  Thank you. Now we've accomplished that.          |
| Deputy Dominguez:  | You saw them there and there's no doubt in your mind that they were there, right? |
| Audrey Knight:     | No, sir.                                                           |

*Id.* at 30-31.  As this summary of the transcript demonstrates, Ms. Knight went from

unequivocally stating that she had not seen Bobby Autry, to saying she could not be sure she had

not seen him, to saying he might have been one of the six boys who drove off with Ms. Mitchell,

to finally stating the Bobby Autry was indeed present.  She then, with apparent reluctance and

uncertainty, identified Paul Dunlap and Mike Tweedy as the remaining members of the group of

boys with Ms. Mitchell.  After identifying all these individuals, the officers thanked her for what

she had "accomplished."

During the same interview, Ms. Knight began to describe a scene the morning after the

party near a place in Carlsbad called the Juggernaut,[12] where she saw Carl Case with a knife, and

overheard him admitting to stabbing Ms. Mitchell.  Toward the middle of the interview, Ms.

---

[12] Throughout the record, witnesses refer to the Juggernaut more or less interchangeably with another location in Carlsbad called the Sound Castle.  It appears that these two locations were in close proximity to each other.  To minimize confusion, the Court will hereinafter refer to this location as the Sound Castle.

Knight again stated that she overheard Carl Case state that he stabbed Ms. Mitchell. Notably, the first mention of the word "knife" in this interview came from Deputy Carrasco, who said, "Please tell us everything. You said something about a knife?" *Id*. at 6. Either Deputy Carrasco introduced the topic of a knife to Ms. Knight as part of the deputies' consistent efforts to feed her a story, or at some point during the interview, the officers turned off the tape recorder, and Ms. Knight mentioned a knife. Given Ms. Knight's testimony at the federal evidentiary hearing that the deputies frequently turned the recorder on and off for purposes of coaching her, *see* Section II(C)(4)(a), "Audrey Knight's Recantation," *infra*, the form of this question from Deputy Carrasco greatly troubles the Court. Exacerbating the problematic nature of this question is the fact that it was part of an ongoing effort to feed Ms. Knight a story. When the officers asked her if Mr. Case had admitted to sticking the knife somewhere in Ms. Mitchell, Ms. Knight responded that he had, but she did not know where. The deputies continued to prod Ms. Knight about where Mr. Case had stabbed Ms. Mitchell, and Deputy Dominguez finally asked, "The vagina? You heard it. We didn't. We're asking you, please tell us. It's important." *Id*. at 7. In contrast to much of the interview, Ms. Mitchell did not corroborate this question with an affirmative answer.[13]

Later in the interview Ms. Knight continued to describe the scene at the Sound Castle where she overheard Mr. Case say he stabbed Ms. Mitchell. Some members of the group were worried they might get in trouble, and Mr. Case assured them that they would not. Ms. Knight stated that "the blond-headed guy" was also present, and the officers asked if she was referring to Paul Dunlap, to which she responded in the affirmative. *Id*. at 37. She stated that Mr. Case

---

[13] It should be noted that the State presented no evidence at trial of any knife wounds or marks on Ms. Mitchell's body.

had reassured Mr. Dunlap that he would not get in trouble, since all he had done was help hold Ms. Mitchell's hands and remove her shirt.  Ms. Knight further stated that Bobby Autry, Joe Brown and Mike Tweedy were present during this conversation, but she did not provide any details regarding what they said.

Although during the recorded interview Ms. Knight gave no indication that any of the boys had threatened her, Deputy Carrasco asked: "Did they threaten you?  Did they ever tell you to keep your mouth shut – not say anything?  Did they – did they tell you that they would do the same thing to you if you went and told anybody, Audrey?" *Id*. at 7.  Ms. Knight responded to this question in the affirmative, and the audio recording conveys a tone of acquiescence in the officers' questions.

Shortly after eliciting her statements about being threatened, the deputies had the following exchange with Ms. Knight:

| | |
|---|---|
| Deputy Carrasco: | Audrey, did they tell you what they did to Nancy, besides – the knife? |
| Audrey Knight: | Huh-uh. |
| Deputy Carrasco: | Did – they mention anything about a rape?  Come on, kid, please tell us.  If they did, tell us. |
| Audrey Knight: | Hell, they did.[14] |
| Deputy Dominguez: | Who raped her? |
| Audrey Knight: | It – Curtis and Scratch was the only two I heard that was talking about it. |

*Id*. at 8.  Next, the deputies asked Ms. Knight what Ms. Mitchell was wearing that night, and although she first stated she could not remember, she then stated that she was "pretty sure" Ms. Mitchell was wearing blue jeans.  *Id*. at 9.  Ostensibly because Ms. Mitchell in fact was wearing red pants, the deputies immediately changed the subject and did not ask Ms. Knight anything

---

[14] As reflected in the audio recording, Ms. Knight sounded quite defeated and unconvincing in this answer.

further about what Ms. Mitchell was wearing.  However, later in the interview, the deputies

again asked Ms. Knight what Ms. Mitchell was wearing:

> A:      I – I – I'm pretty sure she was wearing blue jeans.  But I'm not for –
> Q:      Real sure?
> A:      No sir.

*Id*. at 20.

Ms. Knight stated that she left the party around 2:00 a.m., after seeing Ms. Mitchell leave

with Curtis Worley, Carl Case, Joe Brown, and the three other boys that she later identified as

Bobby Autry, Paul Dunlap, and Mike Tweedy.  She could not identify the car in which the group

left, and stated that even if she saw the car again, she probably could not identify it.  Deputy

Dominguez then stated: "Okay.  Here we have a purse.  And Audrey, I know it hurts, babe, but –

look at this purse.  Is that her purse?"  *Id*. at 11-12.  Ms. Knight confirmed that it was Ms.

Mitchell's purse, and stated she had seen Ms. Mitchell with it when she got out of the car.[15]

Deputy Dominguez then again asked Ms. Knight, "Whose car?" to which she finally replied,

"Um – I think it was Curtis's that she was with and – I think it was his – I'm pretty sure it was

his car."  *Id*. at 12.

Ms. Knight indicated that when the boys were getting ready to leave the party with Ms.

Mitchell, they discussed taking her to an area on the other side of the dam.  The deputies asked

Ms. Knight if she knew what the boys planned to do to Ms. Mitchell.  She was reluctant to

answer, and the deputies asked her if she knew what the term "gang-bang" meant.  *Id*. at 18.  At

no point prior to this question did Ms. Knight ever use the term "gang-bang."  She responded

---

[15] At the federal evidentiary hearing, Ms. Knight referred to the purse as an example of
the officers feeding her details of the story.  She stated that when she was unable to describe Ms.
Mitchell's purse, the officers brought it into the room and showed it to her, and she confirmed
that it was Ms. Mitchell's purse.

that she was familiar with the term, and when they asked if the boys planned to gang-bang Ms. Mitchell, Ms. Knight said yes, again conveying a tone of compliance, rather than confidence, in her answer.  *Id*. at 18-19.  The deputies continued to feed Ms. Knight details as she let the story unfold.  For example, Deputy Carrasco stated: "We want you to be frank.  Don't – don't hold back – if they said they, excuse the language here, but if they said they were going to fuck her – if that's what they said, go ahead and tell us – all they said."  *Id*. at 23.  Ms. Knight responded, in a tone that conveyed defeat: "You know, they did – they said exactly that[.]" *Id*.

After substantial prodding, Ms. Knight finally told the deputies that when she left the party at the Island, she drove along another dirt road, where she saw the group of boys with Ms. Mitchell.  Curtis Worley was in the front passenger seat with Ms. Mitchell, and the other boys were in the car.  Ms. Knight began to get out of her truck, when the boy she had described as tall, skinny and blond (but whose name she did not know) approached her and told her not to go closer to the car.  She stated that Ms. Mitchell was at least partially undressed and Mr. Worley had his pants off and his hand over Ms. Mitchell's mouth.  Ms. Knight got out of her car, but Carl Case approached her and told her to leave, and she did not attempt to argue with him because she was afraid of him as well as Curtis Worley.  Later in the interview Ms. Knight stated that Mr. Case threatened her as well as her family, and that the blond boy said the rest of the boys would help Mr. Case to realize his threats.  At this point, Ms. Mitchell saw Ms. Knight.  It appeared to Ms. Knight that Ms. Mitchell bit Mr. Worley's hand, cried out for help, and he then hit her in the head.  Deputy Dominguez asked Ms. Knight who tore Ms. Mitchell's pants, and who put her clothes back on.  He obviously asked these questions in light of physical evidence that he had reviewed: the body was found clothed, with the blouse inside-out and the pants torn. However, at no point before this question had Ms. Knight ever indicated that she had seen

anyone tear Ms. Mitchell's pants or put her clothes back on.  Yet another example of the officers feeding Ms. Knight her story occurred when Deputy Dominguez asked if her headlights were on, and if this is why she was able to see what was taking place.  She replied in the affirmative.  In conclusion, Ms. Knight stated that after she left, she waited in her car for a while trying to figure out if she could help Ms. Mitchell in any way.  She turned around and drove back, but the group saw her pull over and they left, and drove toward the river.  Rather than follow them, Ms. Knight decided to go home.

Throughout the March 9th interview, Deputies Dominguez and Carrasco emphasized to Ms. Knight that she had an obligation to help them find the truth about what happened.  They pleaded that because Ms. Knight was close with Ms. Mitchell, because the two girls loved each other "quite a bit," and because they trusted each other, Ms. Mitchell now needed Ms. Knight to tell the truth.  *Id*. at 22.  Deputy Carrasco described a possible scenario where Ms. Mitchell was screaming for help and a group of boys was "beating on her [and t]earing her clothes."  *Id*.  The officers attempted to instill in Ms. Knight a sense of responsibility to tell them what happened so that this sort of attack would not happen again to another innocent friend of hers.  *Id*. at 21-24.  The audio recording demonstrates that Ms. Knight was generally unresponsive to many of their questions, and they encouraged her to come forth with whatever information she had because it was crucial that they solve Nancy Mitchell's murder.  They rewarded her with arguably excessive praise whenever she provided information they liked, even if she was reluctant or not at all confident in her answers.  The deputies employed a pleading tone with her, examples of which are as follows: "Please help us Audrey.  You – you're going to help us tremendously."  *Id*. at 4; "We're human.  We know – we have feelings also . . . .  We know that [people] hurt when they cry . . . .  Audrey, if it'd a been you out there, we would have wanted to know who did it."

*Id*. at 5; "Honey, you know – we're trying – as much to help you and all the other young ladies

in this town, from these kind of  – beasts – as anything I can think of.  And we're really here

asking you questions and just pleading with you to give us a hand to solve this and prevent this

happening again.  If we don't, you know what's gonna happen?  Another friend of yours

somewhere down the line, the same thing is gonna happen.  And honey, we just don't want that."

*Id*. at 21-22; "For God's sakes Audrey, now is the time to help her."  *Id*. at 23.

  After Ms. Knight finished telling the officers her story, they showered her with praise.

Deputy Dominguez stated: "Audrey, you just don't know what you've done for us.  You don't

know what you've done for Nancy.  You don't know what you've done for Nancy's family."  *Id*.

at 31.  Captain Ahlstrom told her that she had done "a magnificent job," and further stated that

she was "probably saving a life or two."  *Id*. at 37.  He later stated, "I'm so proud of you that I

could just pop," and told her she had "restored [his] faith in young people."  *Id*. at 42.

  The officers asked Ms. Knight if she would be willing to accompany them to the crime

scene so that they could show her the location of the party.  She responded, "I don't remember

exactly where that party was."  *Id*. at 36.  Her friend's mother, Irene Gann, who had

accompanied her to the interview, stated, "Come on, you drove your own truck out there and you

drove it out of there.  You've got to know where that party was.  Right?"  *Id*.; *see* Trial Tr. at 868

(Ms. Knight's testimony that Irene Gann, Deanna Scovotti's mother, accompanied her to the

sheriff's department when they took her statement on March 9, 1982).  Ms. Knight insisted that

she did not remember, but she agreed to accompany them to the general location.

### b.  *March 14, 1982 Statement*

  Representatives of the Eddy County Sheriff's Department again interviewed Audrey

Knight on March 14, 1982, five days after the previous interview.  Ms. Knight told the deputies

that on the evening of January 1, 1982, Carl Case was organizing a keg party at an area alternatively called "the Jungle" and "the Island," which was close to Six-Mile Dam. She stated that she went to the party at 6:30 p.m. and helped Mr. Case carry cases of beer to the Island.  She stated with confidence that Carl Case, Curtis Worley, Joe Brown, Paul Dunlap, and Mike Tweedy were at the party.  When asked if Randy Davis was present, she answered in the affirmative.  She further stated these boys, led by Curtis Worley, were talking about gang-banging Ms. Mitchell.  She then stated that Randy Davis was not actively involved in the conversations about gang-banging Ms. Mitchell, but rather he was standing behind the rest of the boys.  Then, when asked if Bobby Autry was present in the group, Ms. Knight unequivocally stated that he was not present. At the conclusion of the interview, she reiterated that she did not see Bobby Autry that night.  Ms. Knight then stated that the group of boys left the party at around 7:30 with Ms. Mitchell in the car, and those present were Carl Case, Curtis Worley, Paul Dunlap, Mike Tweedy, and Randy Davis.  She stated with confidence that they were in Mr. Worley's car.

As in the first interview, Ms. Knight stated that she followed the car to an area on the other side of the dam, where she attempted to get out of her car to help Ms. Mitchell.  However, Paul Dunlap approached her and told her to leave.  Carl Case then approached her and told her that he would hurt her friend Deanna, as well as her parents, if she did not leave.  She observed Curtis Worley on top of Ms. Mitchell in the car; they were both at least partially undressed. When Ms. Mitchell tried to yell for Ms. Knight's help, Mike Tweedy held her hands, and Mr. Worley hit her in the head.  Joe Brown and Mike Tweedy were in the back seat, and Randy Davis was standing outside the car.  Ms. Knight eventually left, but she changed her mind and turned her car around.  She drove towards the dam and passed Mr. Worley's car driving in the

55

other direction, toward the dam.  Ms. Knight stopped her car near the river and sat alone, thinking, until shortly before dawn.

The next day, Ms. Knight saw the group of boys in town, and believed that they were scared.  Mr. Case admitted to cutting Ms. Mitchell, and stated that "if anybody got in the most trouble it'd be him because he had the knife."  Tr. 3/14/82 Knight Statement at 10.  Mr. Case and Mr. Worley saw Ms. Knight and told her that if she said anything, they would hurt her, her friend, and her parents.  Ms. Knight then stated that about a week before the interview (which would be roughly two days before the first interview), she received a phone call and recognized the voice as Carl Case's.  The caller stated that Ms. Knight "[had] better keep [her] mouth shut or he'd come back and kill [her]."  *Id.* at 14.

The officers then asked Ms. Knight if any of the young men said anything about having intercourse with Ms. Mitchell.  She responded that Mr. Worley had said that "he got his money's worth," *id.* at 12, and Mr. Case agreed.  Another person, who Ms. Knight was unable to identify, expressed concern that "they shouldn't have all done it at one time."  *Id.*  They were generally concerned about someone finding Ms. Mitchell, but they reminded each other that this was unlikely, because it was too cold to go fishing.

In general, the investigators did not employ the same tone of pleading for help during Audrey Knight's second interview.  Based on the written transcription as well as the audio recording, it appears that Ms. Knight was more forthcoming and confident in her answers during the second interview.  Shortly before the conclusion of the interview, Deputy Dominguez asked: "Would you explain to us . . . the reason for some of the changes in . . . that last statement and this one?"  *Id.* at 13.  Ms. Knight responded that because she had received threats from someone she believed to be Carl Case, she was scared to answer the deputies' questions truthfully during

56

her first interview.  Deputy Dominguez then asked: "Is it possible, Audrey, that – you were confused at the very first statement that you gave us?"  *Id*. at 15.  Ms. Knight answered: "Yes sir."  *Id*.

c.     *Trial Testimony*

At trial, Ms. Knight testified that she went to a party at the island on New Year's day. Shortly after lunch that day, at the direction of Carl Case, she and a group of guys carried beer to the location of the party.  She returned to the Island right around sunset for the party, and testified that she could not remember how much time she spent there, but she drank one beer. Shortly after she arrived, Nancy Mitchell arrived in Curtis Worley's car with Mr. Case, Mr. Worley, Joe Brown, Mike Tweedy and Paul Dunlap.  Ms. Knight never testified that she saw Bobby Autry or Randy Davis with this group.  Ms. Mitchell got out of the car but then went back to leave her purse in the car; Ms. Knight identified the State's Exhibit 12 as Ms. Mitchell's purse.  Ms. Knight next stated that she overheard the boys' conversation, in which they said that Ms. Mitchell had a nice body.  Mr. Case then said, "Wouldn't you like to fuck her?"  Trial Tr. at 818-19.  The group of boys then discussed "gang-banging" Ms. Mitchell, including "which one should do what, which one should get which part," and mentioned taking Ms. Mitchell to the dam.  *Id*. at 819-21.  This conversation lasted roughly thirty minutes, and the boys then decided to ask Ms. Mitchell if she wanted to leave the party to go into town.  Ms. Knight tried to warn Ms. Mitchell not to leave with the boys, but she was unable to.

About fifteen minutes later, Ms. Knight left to drive over to the dam.  She saw Mr. Worley's car parked near the dam, and she got out of her truck and began to walk over to the car. However, Mr. Case and Mr. Dunlap jumped out of the car and told her she should not be there, and that she should leave.  Ms. Knight persisted in walking towards the car, because she saw Ms.

57

Mitchell in the car and heard her scream.  Ms. Mitchell was laying on the passenger side front seat without a shirt on, and Mr. Worley was on top of her.  Ms. Knight stated she was able to see everyone in detail "because of the way the lights were."  Trial Tr. at 827.  As she tried to approach the car, Mr. Dunlap and Mr. Case intercepted her and pushed her, after which Ms. Mitchell yelled, "Help, Audrey," and Mr. Worley hit her.  *Id*. at 828.  Mr. Tweedy then held Ms. Mitchell's hands and covered her mouth.  Ms. Knight left after she saw this portion of the attack. She drove up the road and sat in her truck for a bit, and then turned around.  While on her way back towards the dam, she passed Mr. Worley's car driving in the other direction, but she did not see where the car went.  She finally went home, and did not tell the police what she saw because Mr. Case and Mr. Dunlap had threatened to harm her friend and her family, and she was afraid.

Ms. Knight then testified that she saw the group of boys the following day in town near the Sound Castle, where they were discussing the events of the previous night.  They told Ms. Knight that if she said anything, her family and her friend Deanna "would pay for it."  Trial Tr. at 832.  Mr. Dunlap and Mr. Tweedy expressed fear of someone finding Ms. Mitchell, but Mr. Case assured them that "[i]t's too cold to go fishing, wouldn't be nobody out there."  *Id*. at 833. Ms. Knight stated that she heard the group mention having a knife.

Mr. Case's defense counsel thoroughly cross-examined Ms. Knight as to the inconsistencies in her various statements and the changes in her story.  He also introduced substantial portions of the March 9th statement, in an apparent effort to demonstrate to the jury the inconsistencies as well as the leading nature of the questioning.  Counsel pointed out that Ms. Knight had originally said that she arrived at the party at the Jungle at 10:00 p.m., and she could provide no explanation for this discrepancy.  However, she stated that this answer was not truthful when she gave it, and agreed with counsel that she "told them several different stories."

Trial Tr. at 873.  Ms. Knight stated that portions of what she told the officers in her first recorded statement were untrue, because she was trying to avoid disclosing any information.  When defense counsel pressed Ms. Knight about details to which she had testified on direct examination, she often answered that she did not know.  For example, she did not know what time she brought the beer to the Island, nor did she know who helped her.  She did not know how many people were at the party at the Island, and she could not even state whether the group was bigger or smaller than ten people.  She was unable to identify almost anyone who attended the party, aside from the group of boys involved in the attack on Ms. Mitchell.  She stated that she knew Bobby Autry and Randy Davis, and had known them for some time, but was unable to recall whether or not they were present.

It appears from the trial transcript that defense counsel elicited substantial impeaching testimony during Audrey Knight's cross-examination.  For example, he highlighted those answers that conflicted with other evidence or with Ms. Knight's testimony during Mr. Case's preliminary hearing, and emphasized this conflict to the jury.  *See*, *e.g.*, Trial Tr. at 893-95 (whether any of the boys ever explicitly stated that they "fucked" Nancy Mitchell), 895-96 (color of Ms. Mitchell's pants); 906-08 (whether Bobby Autry was present).  Of particular importance given Ms. Knight's present assertion that she completely fabricated her testimony implicating the boys in Ms. Mitchell's murder, is her evident confusion on cross-examination as to what happened and what did not.  Time and time again, defense counsel asked her whether a certain person was present, and she answered that she did not know.  She was unable to answer questions such as whether or not Mr. Case was wearing pants when he approached her at Six-Mile Dam and told her to leave.  Although she could fully see Ms. Mitchell in the car with Mr. Worley, she was unable to remember whether or not she was completely topless, or if she was

wearing a bra.

Ms. Knight's two statements and her subsequent trial testimony are plagued by inconsistencies. The most obvious inconsistencies are her statements regarding whether or not Bobby Autry and Randy Davis were involved in the attack. However, numerous other inconsistencies stand out to the Court. In her March 9th and March 14th statements, Ms. Mitchell's statement changed from having arrived at the party at 10:00 at night to having arrived at 6:30. On March 14th, she stated that she brought the beer to the Island when she arrived at 6:30, whereas at trial she stated she had brought it after lunch time and then returned to the party later. Moreover, on March 9th she stated that Ms. Mitchell and the group of boys were already present when she arrived, whereas her story on March 14th and at trial was that they arrived after her. She first stated that she could not identify the car in which the group arrived at the party – despite knowing what kind of car Mr. Worley drove – and later identified the car as Mr. Worley's. When viewed independently, each of these contradictory statements is relatively minor; however, in the aggregate, and particularly in light of the leading nature of the detectives' questioning, Ms. Knight's inability to remember so many minor details corroborates her present assertion that she did not actually witness the events to which she testified.

### ii.   *Bobby Autry*

As discussed above, Bobby Autry gave four taped statements to representatives of the Eddy County Sheriff's Department, and he also testified at Mr. Case's trial. In the first three statements, he mentioned nothing about an attack against Nancy Mitchell at Six-Mile Dam on New Year's Day. Rather, he said that the last time he had seen Nancy Mitchell was sometime shortly before Christmas.

On March 12, 1982 – three days after Audrey Knight's first recorded statement – Mr. Autry gave a statement to representatives of the Eddy County Sheriff's Department in which he implicated Carl Case and others in Ms. Mitchell's murder.  He stated that sometime "right after Christmas," Tr. 3/12/82 Autry Statement at 8, Curtis Worley and a group of boys picked him up in town at around 9:30 or 10:00 p.m., with Nancy Mitchell in the car.  He then stated that this actually occurred "a couple days after" New Year's Eve.  *Id*. at 8-9.  When asked if it could have been the night following New Year's Eve, Mr. Autry responded, "It could have been."  *Id*. at 9.

Mr. Autry listed the group of boys in Mr. Worley's car as: Curtis Worley, Carl Case, someone named "DC," Joe Brown, Mike Tweedy, and another person whose name he did not know.  The officers asked whether the person's name might be Paul, and whether he was tall and skinny, to which Mr. Autry replied, "Well I couldn't really identify him."  *Id*. at 1.  One of the officers then asked, "Paul Dunlap?" and Mr. Autry replied, "Yea, something like that."  *Id*. When asked what Mr. Dunlap looked like, Mr. Autry could say no more than "he wasn't black." *Id*. at 7.  According to Mr. Autry, the group went riding around Carlsbad before driving directly to Six-Mile Dam.  Mr. Autry made no mention of attending a party at the Island prior to the events at Six-Mile Dam, but he believed a party was going on there.  He first stated that the other boys might have gone to the party, but then said that they could not have, based on the difficulty they would have had traveling between the Island and Six-Mile Dam.  He later confirmed that no one was present other than the people he had listed in Mr. Worley's car.

According to Mr. Autry, after the group arrived at Six-Mile Dam, people got out of the car and began throwing rocks into the river.  Ms. Mitchell was leaning against the car when Mr. Worley approached her and started "goosing" her.  *Id*. at 9.  She slapped him, and he got angry and hit her.  Another one of the boys, possibly Joe Brown, hit Ms. Mitchell in the back of the

head with an object.  The  boys threw Ms. Mitchell down on the ground and were trying to tear

her clothes off and "beat the hell out of her," *id*. at 10, and Ms. Mitchell was screaming.  Mr.

Autry became scared and ran home.  He estimated that the attack occurred sometime between

10:30 and 11:30, and that he arrived home at about 12:15 or 12:20 a.m.  He claimed that he

never saw anyone else drive up to Six-Mile Dam during the attack, including Audrey Knight.

The following day, he received a threatening phone call and he believed the caller was Mr.

Worley.  He later received more threatening phone calls but could not identify the callers.

At trial, Bobby Autry testified that on the night of January 1, 1982, Curtis Worley picked

him up in town a little bit after dark.  With Mr. Worley in the car were Nancy Mitchell, Carl

Case, Joe Brown, Mike Tweedy and Paul Dunlap.  They did not go to a party at the Island, but

rather rode around town before heading to Six-Mile Dam.  On the way to Six-Mile Dam, they

stopped on Forni Road where some people went to the bathroom and others threw rocks and beer

bottles at a road sign.  They then proceeded to Six-Mile Dam, where everyone got out of the car.

Mr. Worley "reached out to pinch Nancy on the breast and she slapped him and he hit her and

knocked her down.  Everybody was just like a bunch of vultures on her."  Trial Tr. at 982.  Mr.

Autry then observed Mr. Worley rip open Ms. Mitchell's pants, Mr. Case push her to the ground,

and Mr. Brown hit her with something.  Mr. Autry claimed that he knew Audrey Knight, but had

not seen her that night, nor had he seen Mr. Worley in the front seat of his car with Ms. Mitchell

as Ms. Knight had described.

After witnessing the other boys attack Ms. Mitchell, Mr. Autry got scared and ran home.

He stated that it took him 30 or 40 minutes to get home.[16]  He further stated that in the days that

followed, he received threatening phone calls from people he believed to be Mr. Worley and Mr.

---

[16] On cross-examination, he stated that he lived about a mile from Six-Mile Dam.

Case.  He stated that he did not initially tell the police about what he saw because he was afraid the threats would be realized.  He further stated that he decided to tell the truth after he had taken – and presumably failed – a polygraph test.

On cross-examination, Mr. Autry stated that he could not remember what he had done on January 2, 1982.  He could not remember whether or not he discussed the attack on Ms. Mitchell with Audrey Knight, or any of the boys involved in the attack.  When defense counsel pushed him to try to remember what he did the day following the attack, he became defensive: "I can't remember what I done.  Do you know what you done on that day?"  Trial Tr. at 1006.  Mr. Autry continued to express an utter lack of memory as to anything that occurred on January 2, 1982, and finally, in response to counsel's continued questioning, Mr. Autry became non-responsive on the witness stand and simply stated: "Don't ask me."  *Id*. at 1009.  However, he did agree with counsel that he probably would have remembered discussing the attack with Ms. Knight or the other boys, so such a conversation probably did not occur.

### iii.    *Paul Dunlap*

Paul Dunlap was arrested in March 1982 for the rape and murder of Nancy Mitchell.  The prosecution moved to try him as an adult.  That motion was denied, and the State appealed the decision.  After approximately six months in jail, Mr. Dunlap accepted the State's offer of complete immunity in exchange for his testimony against Carl Case and the others charged with raping and murdering Nancy Mitchell.

In his recorded statement on September 2, 1982, Mr. Dunlap stated that he attended a party near Six-Mile Dam[17] on the night of January 1, 1982.  He stated that between thirty and fifty people attended the party.  At around 8:00 or 9:00 p.m., he got a ride from downtown

---

[17] He later confirmed that the precise location of the party was the Island.

Carlsbad to the party in a blue pick-up.  He could not identify anyone in the pick-up.  He denied stopping on the way to the party to throw rocks and beer bottles at a road sign, and stated "I'm pretty sure I would have remembered [that]."  Tr. 9/2/82 Dunlap Statement at 6.  After several hours at the party, Mr. Dunlap began looking for a ride back home.  He said he saw Curtis Worley leaving the party and asked him for a ride.  According to Mr. Dunlap, Joe Brown and Bobby Autry were in the back seat with him, and Curtis Worley, Nancy Mitchell and Carl Case were in the front seat of the car.  Mr. Dunlap stated that Mike Tweedy was not in the car and was not at the scene of the crime.

Mr. Dunlap believed that after the party, the car stopped at an area just below Six-Mile Dam.  After stopping the car, Mr. Worley suddenly pulled Ms. Mitchell out of the car and slapped her down to the ground.  He was then joined by Joe Brown and Carl Case, who took off Ms. Mitchell's shirt and bra.  At that point, they saw headlights coming and put Ms. Mitchell back into the car.  Mr. Dunlap stated that he had gotten back in the car once the attack began, but that Audrey Knight drove up, and he and Carl Case went to talk to her.  Mr. Dunlap stated that he never heard Ms. Mitchell call out to Ms. Knight for help.  He denied driving somewhere else after Ms. Knight left, stating the car did not move until the group drove back to town.  After Ms. Knight left, Mr. Dunlap got back in the car and did not participate in the attack on Nancy Mitchell.  The other boys had taken Ms. Mitchell out of the car and removed her shirt, bra and pants.  At one point Mr. Worley was on top of her, without his pants on, followed by Mr. Case and Mr. Brown.  Although Ms. Mitchell initially struggled, she stopped struggling at some point, and Mr. Dunlap believed she was unconscious.  Afterwards, the boys put Ms. Mitchell's clothes back on her.  Mr. Worley and Mr. Case carried Ms. Mitchell away, and Mr. Brown followed them.  He said he had been threatened by the others not to tell anyone what had happened, and

he never again discussed it with them.  In the days that followed the attack, "there wasn't no talk about it anywhere."  Tr. 9/2/82 Dunlap Statement at 3.

At trial, Paul Dunlap's testimony was consistent with his September 2, 1982 statement. When Mr. Klipstine asked him why he waited until September to tell the police what he saw, he said he did not know.  Although Mr. Dunlap maintained his story that Mr. Case and Mr. Worley "carried" Ms. Mitchell away following the attack, Mr. Klipstine asked: "How did they drag her off?"  Trial Tr. at 1074.  Mr. Dunlap did not specifically challenge Mr. Klipstine's characterization of the men as "dragging" Ms. Mitchell; rather, he explained that Mr. Case and Mr. Worley each had one of Ms. Mitchell's arms over their shoulders.  The Court notes that Mr. Klipstine's phrasing of the question – which followed an expert's opinion testimony that the forensic evidence was consistent with the body having been dragged – appears to be an attempt to manipulate the witness's statement so as to reconcile what the jury may have perceived as conflicting evidence.  Because Mr. Dunlap did not correct Mr. Klipstine, the jury could have perceived him as being complicit in the prosecutor's characterization of the men as "dragging" Ms. Mitchell.

On cross-examination, Mr. Dunlap affirmed his testimony that Bobby Autry was present on the night of the attack (but ran away), whereas Mike Tweedy was never present.  He further stated that although he witnessed Joe Brown attacking Ms. Mitchell, he never saw him hit her with anything that resembled a pipe.

### c.  *Inconsistencies Between "Eyewitness" Accounts*

Although some aspects of the three eye-witness accounts of the attack on Nancy Mitchell are generally consistent, the extent to which each story is clearly incompatible with the others is striking.  The major inconsistencies, each of which the Court will discuss in turn, are as follows:

(1) the identities of the people present and the time of the attack; (2) the location of the attack;

(3) the manner of transportation used to arrive at the location and whether or not a party first

occurred at the Island; and (4) the alleged conversation that took place near the Sound Castle the

day following the attack.

      As the Court already detailed, the eyewitness versions of who was present during the

attack on Nancy Mitchell vary considerably, even when the Court considers only the trial

testimony itself, without respect to the witnesses' pretrial statements.  Most notably, Paul Dunlap

consistently stated without hesitation that Mike Tweedy was never present during the attack,

whereas Bobby Autry and Audrey Knight stated that Mr. Tweedy participated in it.  Moreover,

Audrey Knight and Bobby Autry both claimed that they never saw each other at Six-Mile Dam,

even though both claimed to have witnessed the attack itself.[18]  At first blush, it would appear

feasible that Mr. Autry could have run away prior to Ms. Knight's arrival; however, as explained

below, such a scenario would be in direct conflict with Paul Dunlap's account of the events.

      Mr. Dunlap claimed to have been present both when Bobby Autry ran away[19] and when

Audrey Knight arrived.  He stated that Mr. Worley slapped Ms. Mitchell down onto the ground

and Mr. Case and Mr. Brown began taking off her clothes, after which point Mr. Dunlap

observed Ms. Knight's headlights.  Mr. Autry stated that he saw the boys begin to attack Ms.

Mitchell, and he then ran out of fear.  When viewed in context of each other, these accounts

suggest that Mr. Autry's decision to flee occurred within minutes of Ms. Knight's arrival.

---

    [18] Of course, Ms. Knight originally claimed in her March 9th statement that Bobby Autry *was* present during the attack.

    [19] Mr. Dunlap did not actually testify that he saw Mr. Autry run away.  However, he stated that Mr. Autry was in the car when the group left the Island together, but Mr. Dunlap was "not sure" where Mr. Autry went after the attack began.  Trial Tr. at 1074.

Ms. Knight's trial testimony was vague as to the time that she witnessed the attack, and she ultimately testified on cross-examination that she did not remember what time it occurred. However, in her March 9th statement, she stated that she arrived at the Island at 10:00 p.m., and the group left in Mr. Worley's car about two hours later.  She then stated that she stayed at the Island after Mr. Worley's car left, and did not leave until shortly after 2:00 a.m., at which point she encountered Mr. Worley's car – and witnessed the attack – on her way home.   In her March 14th statement, she stated that Mr. Worley's car left the party at the Island around 7:30 p.m., and Ms. Knight followed shortly thereafter and arrived at the scene of the attack.  In conflict with *both* of Ms. Knight's already incompatible versions of the timing of the attack, Mr. Autry stated that he was picked up in town just after dark, and he estimated that the attack occurred at Six-Mile Dam sometime between 10:30 and 11:30.  He stated that he ran all the way home – to his house which was located roughly a mile from the scene of the crime – and arrived at midnight or shortly thereafter.

The Court has reviewed these various accounts time and time again, and has dissected them to determine if there is *any* way to make sense of what seem to be irreconcilable conflicts.  In summary, by Paul Dunlap's account, Bobby Autry and Audrey Knight missed each other at Six-Mile Dam by a matter of minutes, and they witnessed portions of the attack that occurred in close temporal proximity.  By Ms. Knight's conflicting accounts, she witnessed the attack either around 8:00 p.m. or 2:00 a.m.  By Mr. Autry's account, he witnessed the attack sometime between 10:30 and midnight.[20]  It is simply impossible to make sense of these incompatible

---

[20] The Court extends Mr. Autry's estimate by one half-hour, given the fact that he testified that he arrived at his house – which was one mile from the scene of the attack – shortly after midnight.  If this account is accurate, he could not have left Six-Mile Dam long before midnight, given that he ran the entire way home.  If Mr. Autry was indeed running all the way to his house, it could not possibly have taken him more than thirty minutes to arrive there.

accounts of the time at which the attack occurred.

Next in the list of inconsistent accounts is the various eyewitnesses' descriptions of where the attack occurred. Admittedly, it is difficult for this Court to understand the significance of these inconsistencies, being unfamiliar with the pertinent area of the Pecos River, and never having seen the trial exhibits depicting the area. However, it is still possible to appreciate from the eyewitness descriptions of the location of the attack that their respective described locations were in significant conflict. Ms. Knight stated that the Island was located upstream from Six-Mile Dam, and that it could be accessed via a dirt road off of Forni Road. She stated that when she left the Island, she saw Mr. Worley's car parked on the side of Forni Road, some distance from the river, *before* she reached Six-Mile Dam, and she never drove below the Dam.[21] On the other hand, both Mr. Dunlap and Mr. Autry stated that the attack occurred somewhere *below* Six-Mile Dam. Mr. Autry could pinpoint the precise location of the attack because he often fished there. He described the location as one-half mile below Six-Mile Dam, and explained that to access it, the group drove along Forni Road past the dam. Mr. Dunlap stated that he saw Ms. Knight's car arrive below Six-Mile Dam, near the river.

The next inconsistency undermining the evidence against Mr. Case is Bobby Autry and Paul Dunlap's incompatible descriptions of the events that occurred prior to the attack at Six-Mile Dam. Mr. Dunlap claimed that he was picked up in town in a blue pick-up truck, and he was unable to identify the driver of the truck nor any of its passengers. He stated that the truck

---

[21] Ms. Knight's placement of the attack above Six-Mile Dam makes it even more difficult to reconcile her account with Mr. Autry's, wherein they both claimed to have never seen the other one. It would be feasible for the group to have stopped on Forni Road before Ms. Knight arrived, and then driven below the dam to complete the attack. However, given Mr. Autry's testimony that he ran home from the location below the dam shortly after the attack began, this explanation does not resolve the conflict between the two witnesses' accounts.

was headed to a party at the Island, and he denied stopping on the way to the party to throw rocks and beer bottles at a sign.  He then stated that he left the party in Mr. Worley's car, and much to Mr. Dunlap's surprise, the car drove to a remote location and its occupants began to attack Nancy Mitchell.  Bobby Autry, however, stated that he was picked up in town in Curtis Worley's black Cougar, in which Paul Dunlap was a passenger.  The group did not go to a party at the Island, but rather drove around for a bit and then headed directly to Six-Mile Dam, stopping to throw rocks and beer bottles at a sign on their way there.

Finally, the Court observed various incompatibilities between the witnesses' accounts of what happened on the day following the attack on Nancy Mitchell.  Ms. Knight told an involved story placing Carl Case, Curtis Worley, Paul Dunlap, and possibly others at the Sound Castle on the morning or afternoon of January 2, 1982.  She recounted various versions of the conversations these individuals were having, some of which directly involved Mr. Dunlap having a discussion with the others about the likelihood that they would be caught.  Mr. Dunlap, however, stated that he never had a conversation at the Sound Castle with the other boys who were present during the attack.  In fact, he adamantly stated that he never discussed the attack with anybody after it happened, affirming that by "anybody," he meant "not a soul on Earth." Trial Tr. at 1109.  Bobby Autry stated that he could not remember what he did on January 2, 1982, but he believed he did not see Ms. Knight, Mr. Worley or Mr. Case that day.

If the Court were to view each aspect of these conflicting accounts of the attack in isolation, it would not find the State's case against Mr. Case to be particularly weak.  No inconsistency standing alone is so obvious or extreme so as to cast doubt on the jury's guilty verdict.  However, when viewed in combination, these inconsistencies render the evidence against Mr. Case among the weakest in which a guilty verdict may be sustained.  Moreover, they

69

strongly suggest that those purporting to be eyewitnesses in fact fabricated all or part of their testimony.

### 2.   Carl Case's Testimony

A weighing of the evidence as a whole requires the Court to evaluate *all* the evidence presented at trial, including the defense's own case.  The defense presented various witnesses, all of whom testified as to Mr. Case's good character and/or as to his whereabouts on January 1, 1982.  The defense also called two witnesses who testified with certainty that they had seen Nancy Mitchell alive on January 16, 1982.  However, during the State's rebuttal case, Dr. Greggory Kaufman testified that he could "absolutely exclude" the possibility that she was alive on that date.  Trial Tr. at 1482-83.

As the defense's final witness, Carl Case testified in his own defense.  At the state evidentiary hearing, he explained that similar to Mr. Dunlap, he pieced together a story based on the testimony of others.  However, he changed the salient facts of these people's testimony and essentially created a non-incriminating version of the events of January 1, 1982.

In summary, Mr. Case testified that Curtis Worley and a group of young men picked him up in town between 10:00 and 10:30 p.m. that night, and proceeded to Six-Mile Dam to drink beer.  While the group was drinking, Mr. Worley began to tease and pinch Ms. Mitchell, and she would respond by slapping him or telling him to stop.  However, Mr. Case described the mood as playful.  The two were "arguing" but Mr. Case "didn't take it seriously."  Trial Tr. at 1390. Mr. Worley "back-handed" Ms. Mitchell once, but not with sufficient force to make her fall down.  *Id*.  Ms. Mitchell and Mr. Worley began wrestling on the hood of Mr. Worley's car, and as Mr. Worley tried to force her shirt off, Mr. Case told him he "didn't want any part of this." *Id*. at 1391-92.  Mr. Case walked away from the car and headed down to the dam.  He returned

70

when he saw headlights approach; the lights belonged to Audrey Knight.  Mr. Case did not want

Ms. Knight to associate him with Mr. Worley's inappropriate behavior towards Ms. Mitchell, as

it would ruin his reputation.  He denied threatening Ms. Knight; rather, he simply told her to go

back to town.

Mr. Case then testified that after struggling a bit with Mr. Worley, Ms. Mitchell walked

away from the car and went down towards the dam to use the bathroom.  She was "pretty

drunk," and she "tumbled and rolled down the [hill]."  *Id*. at 1393.  Mr. Worley yelled for her,

but she did not answer.  Mr. Case assumed that Ms. Mitchell was embarrassed and did not want

to return to the car until Mr. Worley apologized.  Mr. Worley refused to apologize, and he yelled

to Ms. Mitchell "[W]e will just drive back into town and you can walk."  *Id*.  Mr. Case felt bad

about this, but "Curtis was out of his head . . . .  I didn't want to tangle with Curtis because he

was bigger than I was[.]"  *Id*. at 1395.  After hearing nothing more from Ms. Mitchell, the young

men left her at the dam and drove back into town.  On cross examination, the State did not

definitively demonstrate that Mr. Case was lying in his testimony, but Mr. Klipstine successfully

showed that the story was far-fetched.

### 3.    DNA Evidence

As the Court has already observed, the State presented minimal physical evidence at Mr.

Case's trial to support its theory that Ms. Mitchell had been gang-raped at Six-Mile Dam.  In

fact, the physical evidence regarding Ms. Mitchell's injuries called the State's theory into doubt,

but these doubts were overcome by the testimony of three eyewitnesses who claimed to have

witnessed the attack.

Against the backdrop of this weak physical evidence, the Court has reviewed the

evidence of DNA testing that Mr. Case presented at the state evidentiary hearing.  Although the

experts at the 1982 trial testified that their examination of Ms. Mitchell's body revealed no male sperm cells, the absence of male DNA on the body holds greater significance.  Mr. Case's expert witness, forensic scientist Marc Taylor, testified that modern DNA testing is "far, far more sensitive" than the testing conducted in 1982.  State Evid. Hr'g Tr. at 301.  He explained that procedures used prior to the advent of DNA testing made it "very very difficult [to detect sperm] when you have an abundance of cellular material from the vagina, particularly when you're dealing with an incident where there is decomposition."  *Id.* at 320.  Mr. Taylor stated that in contrast to the procedures used in 1982, modern DNA testing is a "powerful tool" in forensic science in part because "sperm cells are packaged to protect the DNA."  *Id.* at 314.  He elaborated:

> We routinely will find examples of samples where there has been degradation of the vaginal cells, the nucleo-epithelial cells from the vagina, and we get beautiful profiles on the sperm cells because of this protection.  There are cases in which I have isolated samples from bodies that have been weeks decomposed.  Vaginal sample, we get a partial or no profile from the female, and we get a complete profile from the sperm of the male.

*Id*.  Mr. Taylor further stated that his examination of Ms. Mitchell's fingernail clippings revealed "a fairly large amount" of female DNA, *id*. at 311, and a vaginal dab also revealed female DNA, but neither test revealed any male DNA.  In other words, although female DNA is more susceptible to degradation than male DNA, tests of Ms. Mitchell's body revealed the presence of female, but not male, DNA.  *See id*. at 327.

On cross-examination, counsel for the State pointed out that "you won't detect sperm if there's no ejaculation."  *Id*. at 325.  Mr. Taylor agreed, but further noted on re-direct examination that "we've got the ability to detect extremely small quantities of semen, highly dilute semen, and still get typing profiles.  And even smaller quantities just from the standpoint

of just detecting whether or not there is DNA from a male there." *Id*. at 328.  The Court

understands that Mr. Taylor's testimony does not unequivocally establish that no sperm was

present inside Ms. Mitchell's body, but it casts serious doubt as to whether or not any of her

attackers ejaculated inside her.  Although it is technically physically possible that Mr. Case and

his co-defendants could have committed criminal sexual penetration without any one of them

emitting any semen whatsoever, such a scenario is far-fetched.  It is in the context of this already

weak prosecution case that the Court examines the credibility of the recanting witnesses'

testimony.

### 4.    Credibility of the Recantations

At the December 2010 hearing, both Audrey Knight and Paul Dunlap testified as to their

fabrication of their trial testimony.  They also explained the circumstances surrounding their

respective and independent decisions to recant their testimony.  The facts of their testimony were

generally consistent with their state evidentiary hearing testimony.  The Court found both

Audrey Knight and Paul Dunlap to be credible witnesses.

To aid the Court in making credibility assessments of each witness, the Court reviewed

the relevant case law regarding post-trial recantations.  In general, "recanted testimony is

properly viewed with suspicion."  *United States v. Pearson*, 203 F.3d 1243, 1275 (10th Cir.

2000) (citation omitted).  A witness's post-trial recantation is suspect because

> [t]he trial is the main event in the criminal process.  The witnesses are there, they are
> sworn, they are subject to cross-examination, and the jury determines whether to
> believe them.  The stability and finality of verdicts would be greatly disturbed if
> courts were too ready to entertain testimony from witnesses who have changed their
> minds, or who claim to have lied at the trial.

*United States v. Grey Bear*, 116 F. 3d 349, 350 (8th Cir. 1997).  While this Court has been

unable to find any circuit court cases expressly articulating factors to guide in assessing the

credibility of witness recantations, the Tenth Circuit criminal jury instruction for assessing witness credibility is a good starting point.  Jurors are instructed to consider the following questions:

> Did the witness impress you as honest?  Did the witness have any particular reason not to tell the truth?  Did the witness have a personal interest in the outcome in this case?  Did the witness have any relationship with either the government or the defense?  Did the witness seem to have a good memory?  Did the witness clearly see or hear the things about which he/she testified?  Did the witness have the opportunity and ability to understand the questions clearly and answer them directly?  Did the witness's testimony differ from the testimony of other witnesses?

Tenth Circuit Pattern Criminal Jury Instructions § 1.08 (2005).  A number of these factors – whether the witness had a reason not to tell the truth, whether she had a personal interest in the outcome of the case, and whether she had a relationship with either party – apply with particular force to the assessment of the credibility of a recanting witness.

In *United States v. Jones*, 315 F. App'x 714 (10th Cir. 2009) (unpublished), the Tenth Circuit focused on a small number of specific factors that may serve to undermine a recanting witness's testimony.  The court affirmed the district court's denial of the defendant's motion for a new trial after his codefendant recanted his trial testimony.  In doing so, the court held that the following factors undermined the credibility of the recantation: (1) the judge ruling on the motion for a new trial had also taken the plea and observed the testimony of the recanting witness, placing the judge in a strong position to personally assess the credibility of the original testimony versus the recantation; (2) several other trial witnesses corroborated the recanting witness's original trial testimony; and (3) other evidence presented at trial – including videotaped surveillance – directly contradicted the recantation.  *Id*. at 716.  This list is in no way exhaustive; rather, it is simply a list of the court's observations of which circumstances rendered the recantation in *Jones* not credible.

In *Russell v. Smith*, 68 F.3d 33 (2d Cir. 1995), the Second Circuit did not articulate

specific factors for courts to consider in assessing the credibility of recantations, but its analysis

is instructive.  There, a state criminal defendant whose case was dismissed after a witness – the

defendant's brother – recanted his grand jury testimony, sued one of the investigating officers on

the case, alleging that the officer coerced the witness to testify falsely.  *Id*. at 34-35.  The court

found that the recantation was "more suspect than most" for the following reasons: (1) the

testimony that the witness recanted implicated his own brother; (2) the testimony was consistent

with statements the witness had given to police prior to testifying; (3) the testimony was

corroborated by another witness; (4) the testimony was corroborated by physical evidence "as

well as other circumstances"; and (5) the recanting witness refused to testify under oath as to his

recantation.  *Id*. at 36.

In *United States v. Earles*, 983 F. Supp. 1236 (N.D. Iowa 1997), the district court

articulated seven factors to employ in assessing the credibility of a recantation, all of which this

Court finds helpful and instructive in the instant case.  First, the court noted that the skepticism

generally applicable to recantations "is further heightened in cases in which family members are

involved and the witness has feelings of guilt or the family members seek to influence the

witness to change his or her story."  *Id*. at 1248.  The court then identified seven factors relevant

to its assessment of the credibility of a recanting witness:

> (1) the interest of the witness in the result of the hearing; (2) the witness's relation
> to any party in interest; (3) the witness's demeanor upon the witness stand; (4) the
> witness's manner of testifying; (5) the witness's tendency to speak truthfully or
> falsely, including the probability or improbability of the testimony given his or her
> situation to see and observe; (6) the witness's apparent capacity and willingness to
> tell truthfully and accurately what he or she saw and observed; and (7) whether the
> witness's testimony is supported or contradicted by other evidence in the case.

*Id*. at 1254 (citations omitted).  This Court has carefully considered the *Earles*, *Russell*, and

75

*Jones* factors and concludes that both recantations in the instant case are credible.

### a.  *Audrey Knight's Recantation*

At the December 2010 evidentiary hearing, Ms. Knight testified first, and she was open and candid about what she termed her "mental problems." Fed. Evid. Hr'g Tr. at 25.[22]  She was unable to articulate the nature of these problems, but she stated that they did not affect her ability to testify.  Her memory of Nancy Mitchell's murder is "a little vague," *id*., but she remembers her role in the investigation.  Her account of Mr. Case's trial and the investigation leading up to it was factually consistent with her testimony in 2005 in state court; however, it is clear from the state court transcript that Ms. Knight was not on anti-psychotic medication at that time, and significant portions of her testimony were incoherent.  In contrast, her testimony in this Court was coherent and credible, and lacking only in that her memory of some of the events of 1982 – including the time of year of her participation in the investigation – was fuzzy.

Ms. Knight testified credibly about the extreme pressure she felt from the law enforcement officers investigating Ms. Mitchell's murder.  She stated that when the deputies first questioned her, they arrived at her school and took her into an empty classroom, where they asked her what she knew about Ms. Mitchell's death.  In response to her insistence that she knew nothing, the deputies informed her that multiple witnesses had seen her truck at the party where Ms. Mitchell died.  She felt the officers were "pointing the finger" at her, *id*. at 32, and telling her that she was at fault for Ms. Mitchell's death.  They told her that she "had to know something," *id*. at 33, because witnesses had placed her at the party where Ms. Mitchell died.  Ms. Knight believed that the deputies questioned her for between forty-five minutes to an hour

---

[22] All citations to the federal evidentiary hearing transcript are to the court reporter's unofficial transcript.  Page numbers are subject to change in the official version of the transcript.

on that occasion.

Ms. Knight further testified that sometime after the deputies pulled her out of class to question her, they visited her at the Holiday Inn, where she worked.  They brought her into the "party room,"[23] and they told her they did not believe her when she said she was not involved in the murder.  They continued to "point[] a finger" at her, *id*. at 37, and accused her of being an accessory, because she had driven kegs of beer to the party.  Ms. Knight told them she did not know anything about the murder, but "they didn't buy that."  *Id*.  According to Ms. Knight, the story of Ms. Mitchell's murder was "in the [local newspapers] every time you turned around." *Id*. at 43.  The deputies informed her that they were under a great deal of pressure from their boss to report "that they were getting more information and it was coming to a head on how it was done and who done it."  *Id*.

Eventually, after being questioned for what she remembered as every two weeks for roughly six months, *see id*. at 40, Ms. Knight constructed a lie based on the investigators' leading questions.  She explained that she "used what they told [her]," *id*. at 39, and "put two and two together," *id*., to tell the detectives a fabricated story about how Nancy Mitchell died.  She stated, however, that she tried to remedy the situation before the defendants went to trial: at the first preliminary hearing, she approached one of the prosecutors and told him that her testimony was a lie.  The prosecutor responded that "the gentlemen know what they're doing, they're doing their job, just let them do their job."  *Id*. at 45.  She clarified that by "gentlemen," the prosecutor was referring to the sheriff's deputies.  She was unable to remember which prosecutor she spoke to.

---

[23] Ms. Knight did not provide any detail as to the "party room," but in the state evidentiary hearing she testified that it was the room where the Holiday Inn held banquets.  State Evid. Hr'g Tr. at 460-61.

After the trials concluded, Ms. Knight eventually moved out of town, and she explained her reasons for this as follows: "I lied and I knew it.  And there's a lot of people that used to ask me about it, and I didn't like discussing it.  So I went somewhere where they didn't know me." *Id*. at 46.  Many years later, she told her partner, April Rose, that she had lied in the trials, and she had never actually witnessed the events to which she testified.  A few years later, she finally confessed to Curtis Worley's father, after which law students from the University of New Mexico Innocence and Justice Project contacted her and visited her at her home.  Ms. Knight stated that neither Mr. Worley's father nor the representatives of the Innocence and Justice Project ever pressured or threatened her.  The law students brought her an affidavit they had drafted after their interview with her, which she signed.  As of the date of the federal evidentiary hearing, she had not communicated with the law students or with Mr. Case's counsel (Peter Schoenburg) since the state evidentiary hearing, other than one recent phone call in which Mr. Schoenburg told her that this Court had appointed counsel to represent her.

Before summarizing Ms. Knight's testimony during cross-examination, the Court must note that at various times during the course of this examination, counsel for Respondent phrased her questions in a manner that clearly confused Ms. Knight.  For example, counsel used words beyond Ms. Knight's comprehension such as "corroborated," *id*. at 68, "recanted," *id*. at 82 and "adjudication," *id*. at 130.  She referred repeatedly to "the state evidentiary hearing" or "the state habeas proceeding," *id*. at 71, 75 & 76, without explaining to the witness which proceeding that was, either by date or any other distinguishing characteristic.  It was immediately obvious that Ms. Knight did not understand which proceeding counsel was referring to, nor did she understand certain other questions, but it was apparent that she did not feel comfortable asking for clarification.  Twice, the Court had to remind counsel to more appropriately identify the

proceedings so that a layperson could understand the question.  In fact, on a number of occasions, it appeared that counsel was intentionally confusing Ms. Knight.  For example, after Ms. Knight stated that she did not want to sign the portion of the affidavit containing a statement that she felt threatened, counsel asked her: "And who did you feel threatened by?"  *Id*. at 67.  Ms. Knight responded that she didn't remember all of their names, but Carl Case was one of them.  Counsel responded: "So Carl Case threatened you?"  *Id*.  Ms. Knight, whose original statement clearly meant that she had *not*, in fact, felt threatened, responded in the negative.  This type of questioning, whose obvious purpose is to confuse a witness whose mental stability is at issue, is improper.

On cross-examination, Ms. Knight stated that she takes two medications for her condition – Benztropine and Hadol.  She was unable to explain what her condition was, but she stated she underwent a psychiatric evaluation after she assaulted her former partner, April Rose, and she is now prescribed these two medications.  The purpose of the medications is to keep her stabilized, as she has a bad temper.  Ms. Knight also stated that at one time she was "picked up by a Chapter 51" in Wisconsin.  *Id*. at 58.  She was unable to define "Chapter 51."[24]  When counsel asked Ms. Knight directly if she would have any trouble recalling the 1982 investigation and trial, as well as the circumstances surrounding her 2003 recantation and her 2005 testimony, she said that nothing would prevent her from remembering these events, with the exception of normal memory loss and aging.

Ms. Knight stated that she had not prepared for the hearing in any way.  She did not review her state court testimony nor did she review any documents at all.  Moreover, she was

---

[24] Chapter 51 of the Wisconsin Statutes codifies the State Alcohol, Drug Abuse, Developmental Disabilities and Mental Health Act.  This Act details the policies and protocol for involuntary commitments of mentally ill adults.  WIS. STAT. § 51.20 (2010).

unaware of the content of the testimony of anyone else at Mr. Case's trial, including Mr. Case himself, as well as Paul Dunlap.

Ms. Knight testified that over the course of the investigation of Nancy Mitchell's death, sheriff's deputies questioned her numerous times, and their line of questioning continued to change. She explained: "[T]hey was putting their story together, just like I was putting mine together. So, they had a different questioning every time they came around me." *Id*. at 62. When asked how she felt about testifying in the federal proceeding, she responded:

> I'm a little angry because I was only 16, and I was scared into doing something I didn't want to do. And I told the truth in the very beginning of it, but nobody listened. And I – I wasn't going to take the blame for something I didn't do.

*Id*. at 74. She stated that she was scared of going to jail because she was a good kid, who worked hard and had never been in trouble. However, she further stated that she feels bad about lying at Carl Case's and his co-defendants' trials. In response to counsel's question: "[D]o you consider yourself clever?", *id*. at 89, Ms. Knight stated that her decision to piece together a string of lies and land a group of men in jail was by no means clever. She further stated that she did not enjoy the limelight of testifying in these criminal trials, and in fact she moved away from Carlsbad because she was tired of being questioned about the case.

In conclusion, counsel for Respondent asked Ms. Knight whether she wanted Carl Case to be released from prison. She responded: "If he's guilty or innocent. I mean, whatever it should be. If he's innocent, he needs to be released. If he's guilty, he needs to stay in there. No different from what I think about myself." *Id*. at 92.

After Ms. Knight testified as a witness for the Petitioner, counsel for Respondent called her at a witness. During this direct examination, Ms. Knight stated that during the March 1982 interviews with representatives of the Eddy County Sheriff's Department, the deputies routinely

turned off the tape recorder "whenever they had a problem with what I was saying." *Id*. at 121.

They would turn off the recorder and coach her, and then turn it back on and continue with

questioning.

Ms. Knight's demeanor and the content of her testimony was entirely consistent with

telling the truth. She appeared honest, albeit somewhat confused, and the inaccurate portions of

her testimony are reconcilable. Her contention that she was questioned every two weeks for six

months before she finally fabricated her lie is incompatible with the undisputed facts of this case.

She was first questioned sometime after January 30, 1982, when Ms. Mitchell's body was found.

On March 9, 1982, she gave her first statement to police implicating Carl Case and others.

Notwithstanding the factual inaccuracy of Ms. Knight's testimony that she was questioned over

the course of six months, the Court found her testimony credible. It is entirely understandable

that a sixteen-year-old girl being questioned repeatedly by law enforcement would be so scared

by this experience, that she would later exaggerate certain aspects of the experience in her

memory. What might have felt like an eternity to the teenage Audrey Knight, was in reality a

matter of slightly more than a month. Moreover, it is entirely possible that Ms. Knight did

indeed meet on various occasions with deputies or prosecution investigators for six months, to

review the content of her testimony. Particularly in light of the fact that the case in its entirety –

from the discovery of the body until the conclusion of all four defendants' cases – lasted for

most of 1982, Ms. Knight's faulty memory of when in 1982 she decided to fabricate her story

does not undermine the substance of her testimony.

Similarly, Ms. Knight's confusion about when during the school year Ms. Mitchell died

does nothing to suggest that her recantation is any less credible. At the evidentiary hearing in

this Court, she indicated that the deputies were questioning her sometime around "senior week,"

which is near graduation.  However, Ms. Mitchell's body was found in the winter, months before graduation.  After reviewing the state evidentiary hearing transcript, it appears that Ms. Knight remembered distinctly that the party where Ms. Mitchell died was alleged to have occurred on a significant day, but she was unable to "remember if it was New Year's or if it was a graduation." State Evid. Hr'g Tr. at 457.  Particularly given that, according to Ms. Knight's recantation, this party never actually happened, it is not surprising that nearly thirty years after the fact she would be unable to remember the time of year that a fictitious party occurred.

Ms. Knight further testified that she had testified in six preliminary hearings, and eventually her decision to fabricate her testimony landed six men in jail.  *Id*. at 67 & 90.  On cross-examination, counsel for Respondent drew attention to this, asking: "Now, the six men are in jail, I'm, I really – I'm unclear.  Who are you referring to?"  *Id*. at 90.  Ms. Knight was unable to remember all of their names.  The record of this case demonstrates that four individuals, including one juvenile, went to jail or prison for the rape and murder of Nancy Mitchell: Carl Case, Curtis Worley, Joe Brown, and Mike Tweedy.  However, Bobby Autry and Paul Dunlap were also initially charged with the offense.  Although it appears that the State dropped charges against Mr. Autry and he never had a preliminary hearing, *see* Trial Tr. at 1003-05, Ms. Knight did testify in a preliminary hearing against Paul Dunlap.  Her memory of testifying against six men, when in fact it was only five, is not so flawed as to call into question her honesty or credibility.  Nor does this inaccuracy suggest that Ms. Knight's complete testimony – that her 1982 trial testimony implicating Carl Case in the rape and murder of Nancy Mitchell was a fabrication – is somehow substantially affected by her memory problems.  Certainly Ms. Knight, now in her mid-forties, misremembers specific details about events that occurred when she was sixteen and seventeen years old.  However, it was clear from the entirety of her testimony that

82

she vividly remembers – and in fact feels haunted by – her decision to fabricate a story about a group of young men attacking Nancy Mitchell, when in fact she witnessed nothing of the sort.

Finally, Respondent has focused heavily on Ms. Knight's mental illness, and the Court agreed to review Ms. Knight's prescription records before making its final determination with respect to her credibility.  On February 3, 2011, counsel for Ms. Knight filed a copy of Ms. Knight's prescription with the Court.  The prescription reads: "Current psychiatric meds: 1. Haldol 7.5 mg []; 2. Cogentin 2 mg []."  An internet search revealed that Cogentin is a brand name of the generic drug Benztropine.

The Court finds that Ms. Knight indeed has an unspecified mental illness, and she is prescribed psychiatric medication to treat this illness.  She in no way appeared mentally ill or delusional at the hearing.  In contrast, at the state evidentiary hearing, significant portions of her testimony were largely incoherent, and at times she appeared clearly paranoid.  *See*, *e.g.*, State Evid. Hr'g Tr. at 476 ("from Texas to Washington state I felt thoroughly threatened") and 483-85 (describing constant harassment about her false testimony, but when asked who was harassing her, responding that she never "got close enough to catch who they were").  Whereas she had not yet begun taking Haldol and Cogentin at the time of the state proceeding, she now takes these medications regularly, and her condition is controlled.  The Court therefore finds that Ms. Knight's mental condition does not make her testimony that she lied at Mr. Case's trial because of intense pressure she felt from law enforcement, any less credible than that of a person with no history of mental illness.

The Court has also carefully reviewed Ms. Knight's 1982 trial testimony, which is summarized in detail in Section II(C)(1), "Weaknesses in the State's Case," *supra*.  When viewing this testimony – particularly the testimony she gave on cross-examination – in light of

her present recantation, the Court finds that the extent of Ms. Knight's confusion at trial about very basic events lends credibility to her recantation.  As set forth in detail above, she was unable to recall certain crucial details, such as who was present at the party at the Island, a rough estimate of how many people were present, and whether or not Carl Case was dressed when he approached her at Six-Mile Dam.  While a jury at the time could have listened to her testimony and found her credible notwithstanding her shoddy memory, the jury certainly would have found differently had it heard Ms. Knight's December 2010 testimony before reaching its verdict. Without the benefit of the evidence of Ms. Knight's recantation, however, Mr. Klipstine's final exchange with Ms. Knight easily would have served to minimize or remove the jury's doubt that she was testifying truthfully:

> Q:  [I]t's true that you weren't entirely true with the police officers when you gave [your March 9, 1982] statement?
> A:  Yes, sir.
> Q:  Why weren't you telling the police the truth?
> A:  Because I was scared.
> . . .
> Q:  Let me ask you, so there is no confusion, not talking about what was said in March, we are talking about right here today, you are under oath: Was Carl Case present at that party on the Island the night he and other men were talking about gang banging or raping Nancy Mitchell?
> A:  Yes, sir.
> Q:  And was he present whenever you drove your car up and looked inside that car?
> A:  Yes, sir.
> Q:  And was he present when you overheard that conversation at the Sound Castle?
> A:  Yes, sir.

Trial Tr. at 967-69.

Also lending credibility to Ms Knight's recantation is the fact that she was one of three "eyewitnesses" to testify that Carl Case and a group of boys attacked Nancy Mitchell at Six-Mile Dam.  Paul Dunlap, one of the other "eyewitnesses" has also recanted his testimony, and in

84

doing so, has corroborated much of Ms. Knight's recantation.  Bobby Autry, the other eyewitness, has not recanted his testimony; however, he has never testified for the purpose of contradicting the recantations.  At the state evidentiary hearing, which covered all issues related to Mr. Case's state habeas petition, the parties presented the testimony of seventeen witnesses. The federal evidentiary hearing was limited to the specific issue of the credibility of the recantations.  Bobby Autry's testimony would have been highly relevant at either of these hearings.  Were Mr. Autry available and willing to *affirm* his 1982 testimony under oath, and in light of Mr. Dunlap's and Ms. Knight's recantations, Respondent certainly would have called him to do so.  While it is entirely possible that Respondent's counsel searched for Mr. Autry and was unsuccessful in finding him, Respondent's inability to present *any* eyewitnesses to contradict Ms. Knight's testimony undermines his contention that Ms. Knight's recantation should not be believed.

With respect to the factors listed in *Jones*, *Russell*, and *Earles*, *supra*, the Court finds that nearly *all* factors courts have articulated to guide in the assessment of a recanting witness's credibility, point in favor of a finding that Ms. Knight's recantation is credible.  The Court can identify *no* factor that would suggest that Ms. Knight's recantation should not be believed.  With respect to Ms. Knight's relationship to the petitioner, *see Russell*, 68 F.3d at 36 (finding recantation "more suspect than most" because recanted testimony implicated witness's brother) and *Earles*, 983 F. Supp at 1248 (finding that skepticism generally applicable to recantations "is further heightened in cases in which family members are involved"), Ms. Knight was friends with Carl Case in 1982, but she has had no contact with him since his trial.  When asked if she was "infatuated" with him, Fed. Evid. Hr'g Tr. at 65, she responded that she was not. Particularly given the fact that she testified that she had been in a long term relationship with a

female partner, the Court can identify no basis to conclude that Ms. Knight has any romantic interest in Mr. Case. Although Mr. Case testified at his 1982 trial that Ms. Knight tried to have a sexual relationship with him, Trial Tr. at 1372-73 & 1415-17, this allegedly occurred when she was in high school, and Ms. Knight has had at least two female partners in her adulthood. *See* State Evid. Hr'g Tr. at 477 (describing a woman named Juliette Rhodes as "an ex").

The Court next considers whether the record contains any physical evidence or witness testimony that contradicts or undermines Ms. Knight's recantation. *See Jones*, 315 F. App'x at 716 (videotaped surveillance contradicted recantation); *Russell*, 68 F.3d at 36 (recantation undermined by fact that physical evidence corroborated original testimony); *Earles*, 983 F. Supp. at 1254 (listing as relevant factor in assessing credibility of recantations "whether the witness's testimony is supported or contradicted by other evidence in the case"). As noted above, Mr. Dunlap's independent recantation strongly corroborates Ms. Knight's. *See* Section II(C)(4)(b), "Paul Dunlap's Recantation," *infra* (describing similar pressure from police and stopping tape recorder). Notably, Bobby Autry's trial testimony does not directly contradict Ms. Knight's recantation, as he claimed to have never seen her at Six-Mile Dam. Furthermore, the physical evidence presented at trial does not undermine Ms. Knight's recantation, as no semen or evidence of male sperm cells were found on the body or on Ms. Mitchell's clothing, and her injuries were not consistent with the story that Ms. Knight told. While Ms. Knight said that she observed the group of boys attacking Ms. Mitchell as she lay on the rocky banks of the Pecos River, the State's forensic expert testified that she had no bruising on the back side of her body. Trial Tr. at 716-17.

Like the recanting witness in *Russell*, whose recantation the court determined was not credible, Ms. Knight's trial testimony was relatively consistent with statements that she had

given to sheriff's deputies prior to trial.  However, this consistency is undermined by her testimony that she in fact told deputies numerous times that she knew nothing about Ms. Mitchell's death, and only told them a fabricated story because she was afraid that she would otherwise be charged in connection with the crime.  And unlike the recanting witness in *Russell*, Ms. Knight did testify under oath – twice – as to the truthfulness of her recantation.

The Court now addresses the seven *Earles* factors, a comprehensive list the Court found to be the most helpful tool in assessing the credibility of the recantations in the instant case. Audrey Knight has little, if any, interest in the result of the instant habeas corpus petition.  She persuasively stated that her only hope for the outcome of this case is for Mr. Case to remain in prison if he is guilty, and be released if he is innocent.  As discussed above, she has no meaningful relationship to Mr. Case, or any other "party in interest" in this proceeding.  *See Earles*, 983 F. Supp. at 1254.

While on the witness stand, Ms. Knight appeared somewhat nervous, but no more so than the average person who does not testify with regularity.  Her nervousness did not rise to the level of indicating that she was withholding anything or being less than truthful.  Although she appeared somewhat confused about details, she was confident in the substantive content of her testimony.  She did not speak with eloquence, but she forcefully conveyed the significant events in this case, including the pressure she felt from law enforcement to come up with a story about Nancy Mitchell's death, as well as the subsequent circumstances leading up to her eventual confession that she had lied at trial.

With respect to Ms. Knight's "tendency to speak truthfully or falsely," *see id*., the Court notes that any recantation of sworn testimony is by its very nature either itself a lie or an admission of a previous lie.  Therefore, if Ms. Knight is telling the truth today, her testimony

87

demonstrates to the Court that she lied on multiple occasions when she was a teenager. However, she also demonstrated the reasons for her decision to lie. While perhaps not all people in Ms. Knight's position in 1982 would have so strongly feared being formally accused of Ms. Mitchell's murder, it is entirely believable that she responded to the deputies' questioning with such a fear. The tone of the deputies' March 1982 interviews with Ms. Knight as discussed in Section II(C)(1)(b)(i), "Audrey Knight," *supra*, as compared to her description of them "pointing the finger" at her during the unrecorded interviews, is disturbing. The detectives conveyed a clear message of approval and gratitude for Ms. Knight's lies and rewarded her at each step of her fabricated story. In contrast, when she had tried to tell them the truth, they responded with disbelief, and warned her that she could be an accessory. She therefore has not demonstrated any "tendency to speak . . . falsely." *See Earles*, 983 F. Supp. at 1254. The second prong of this *Earles* factor addresses the "probability or improbability of the testimony." *Id*. While the Court hopes that police questioning in the manner Ms. Knight described is rare, it is not unheard of. The murder of a sixteen-year-old girl shocked the small town of Carlsbad, and police were surely under enormous pressure to solve the case. At the state evidentiary hearing, Deputy Eddie Carrasco testified that he worked his "days off pretty much full-time" on the Nancy Mitchell murder. State Evid. Hr'g Tr. at 404. Audrey Knight stated that the story was in the newspapers "every time you turned around." Fed. Evid. Hr'g Tr. at 43. The Court therefore finds that Ms. Knight's story is not improbable.

As discussed in detail above, Ms. Knight exhibited a "capacity and willingness to tell truthfully and accurately what . . . she saw and observed." *See Earles*, 983 F. Supp. at 1254. Finally, her testimony is supported by other evidence in this case, namely the recantation of Paul Dunlap. The Court can find no evidence that specifically contradicts Ms. Knight's testimony,

with the obvious exception of the now recanted 1982 testimony of Paul Dunlap, Carl Case, and Ms. Knight herself.  Although counsel for Respondent elicited testimony from Ms. Knight that she gave her March 1982 statements of her own free will, and she was not forced or coerced to give them, this does not mean that their content was truthful.  And although Deputies Carrasco and Dominguez testified at the state evidentiary hearing that they had not, in their opinions, exerted undue pressure on Ms. Knight to come up with a fabricated story, she is in a far better position than they to testify as to her fear of being prosecuted for a crime she did not commit.  Ms. Knight's only *recorded* statements do not corroborate her assertion that the deputies "pointed the finger" at her, but she has always claimed that they only engaged in this conduct in unrecorded interviews.

In conclusion, the Court finds Ms. Knight's recantation of her 1982 trial testimony to be credible.  Her only interest in coming forth with the recantation is her need to relieve her conscience, which was immediately apparent in the remorseful tone she used when she stated: "It wasn't clever what I done."  Fed. Evid. Hr'g Tr. at 89.  Her demeanor on the witness stand was entirely consistent with telling the truth, and she did not contradict herself during her testimony.  Her recantation is corroborated by that of Mr. Dunlap, as well as the physical evidence in the case that defies the State's theory that Ms. Mitchell was gang-raped on a rocky river bank.

### b.    *Paul Dunlap's Recantation*

In contrast to Ms. Knight, Paul Dunlap exhibited an impressively vivid memory of the events surrounding Nancy Mitchell's murder in 1982, and he was able to answer detailed questions with substantial clarity.  Like Ms. Knight, the Court finds that Mr. Dunlap's testimony was credible.

89

At the state evidentiary hearing, Mr. Dunlap testified that law enforcement first interrogated him about Nancy Mitchell's death in March of 1982.  He stated that the officers told him, "We don't think you did anything, but we think you saw something and we need your help."  State Evid. Hr'g Tr. at 62.  He continued to tell the officers that he had no knowledge about Nancy Mitchell's death, but the officers seemed unwilling to accept that as the truth.  *Id*. at 63.

Mr. Dunlap further testified that at his initial bail hearing, Audrey Knight and Bobby Autry testified untruthfully that they had seen him with Nancy Mitchell and the other boys on January 1, 1982.  Bail was denied, and he remained in juvenile detention for six months as the prosecution attempted to try him as an adult.  He then stated:

> [T]he whole time, the six months I was in there, you know, I told them the truth, that I didn't know anything about the situation.  And after six months of seeing how everything was going and that they had people that were gettin' up there and willing to give false testimony and all, I figured they were going to sink me unless I – unless I made the deal with them.

*Id*. at 69-70.  The "deal" he was offered was to "help them get their conviction" in exchange for immunity.  *Id*. at 71.  Mr. Dunlap stated that he wrote and memorized a script using the testimony he had heard at his bail hearing, and destroyed the script after memorizing it.  Using the testimony of Bobby Autry and Audrey Knight, as well as the investigators' "frequently asked questions" that suggested the details they sought, he created a story, keeping it simple so that he would not forget it.  *Id*. at 94.  He told his fabricated story to the investigating officers as well as the district attorney, and they appeared to like the story.  At the trials of Carl Case and the other defendants, Mr. Dunlap testified that he was present at Six-Mile Dam when Nancy Mitchell disappeared and he saw the other boys assault her.  Ultimately, Mr. Dunlap testified that all of his testimony implicating Carl Case in the murder of Nancy Mitchell was false.

90

At the federal evidentiary hearing, Mr. Dunlap's testimony was consistent with that at the state proceeding. He stated that he learned of Ms. Mitchell's death in January of 1982. He was arrested in Odessa, Texas sometime in early- to mid-March of 1982, shortly after his eighteenth birthday. He stated that Deputies Dominguez and Carrasco approached him and asked if he could answer a few questions. He agreed, and they took him to a police station to interview him. For an hour or two, they did not tell him why they were questioning him, but eventually they showed him a picture of Ms. Mitchell's dead body. They informed Mr. Dunlap that they believed that he witnessed the murder, but they did not believe he was involved in committing it. The deputies stated that they needed Mr. Dunlap's help in convicting the perpetrators, and he responded, "Well, I would love to help you, but I don't know anything about it." Fed. Evid. Hr'g Tr. at 143.

Mr. Dunlap estimated that the deputies' questioning lasted over twelve hours. He stated that they acted as if they did not believe his statements that he knew nothing about Ms. Mitchell's murder. They asked leading questions, such as "Wasn't you with Mr. Case? Mr. Worley, and the other people involved? Wasn't you in Mr. Worley's old car? Wasn't y'all with that girl? Wasn't y'all at that party?" *Id.* at 145. Mr. Dunlap maintained that he had not been present at nor involved in any way in Nancy Mitchell's murder. At the conclusion of the questioning, the deputies arrested Mr. Dunlap and informed him he would be charged with murder and rape because he refused to accept an offer of immunity in exchange for his testimony against the other defendants.

The deputies transported Mr. Dunlap back to Carlsbad, where he appeared in court for a bail hearing. At the hearing, Audrey Knight and Bobby Autry testified that they had seen Mr. Dunlap with Ms. Mitchell and a group of boys at the party where Ms. Mitchell was believed to

have died.  These two witnesses testified that the group squeezed into Curtis Worley's car and

drove to Six-Mile Dam, where the attack on Nancy Mitchell occurred.  At the conclusion of the

hearing, the court declined to allow the State to prosecute Mr. Dunlap as an adult, but held him

without bail.  The State continued to move to try Mr. Dunlap as an adult, which scared him

because he understood that the State was seeking the death penalty against the other adult

defendants.

Mr. Dunlap described his relationship with his lawyer, and stated that he hardly

interacted with him at all.  He first had a lawyer named Luis Juarez, who was then replaced by

Joe Gant.  He remained in juvenile detention in Artesia and heard scarce news of his case.  Mr.

Gant visited him on one occasion and advised him to take the offer of immunity,

notwithstanding Mr. Dunlap's insistence that he had no knowledge of Ms. Mitchell's murder.

According to Mr. Dunlap:

> After six months of sitting in jail and seeing nothing change, like I said, they weren't
> pursuing any further investigation that I could tell, they never came and talked to me
> again.  They took my good lawyer that was trying to help me, they gave me a guy
> that only suggest I take their deal.  You know, after a couple months after he come
> and, you know, had told me that, I had never seen him again either.  And I decided
> maybe I should take their deal.

*Id*. at 154.  Mr. Dunlap decided to tell the correction officer that he wanted to meet with his

lawyer about taking the deal.  However, Mr. Dunlap is certain that he never saw his lawyer after

that; rather, on September 2, 1982, a law enforcement officer arrived at the detention facility and

brought him to Carlsbad to speak to Mr. Klipstine.

Before he was released from jail, Mr. Dunlap pieced together a story based on the

testimony he had heard at his bail hearing, as well as the questions that Deputies Dominguez and

Carrasco asked him "repeatedly and repeatedly," *id*. at 156, on the day of his arrest.  He had no

direct knowledge of the events he claimed to have witnessed; rather, he wrote down a fabricated story, memorized it, and subsequently destroyed it.  Mr. Dunlap described his story as "very simple so it would be easy to remember, because they expected me to repeat it over and over." *Id*. at 157.  He met with Mr. Klipstine at the District Attorney's office, who recorded his statement.  Mr. Dunlap signed an immunity agreement, and then accompanied Mr. Klipstine to Six-Mile Dam.

At the federal evidentiary hearing, counsel for Mr. Case introduced state court records demonstrating that as of the date that Mr. Dunlap met with Mr. Klipstine and signed the immunity agreement (September 2, 1982), the New Mexico Court of Appeals had affirmed the trial court's denial of the State's motion to try Mr. Dunlap as an adult, and the New Mexico Supreme Court had denied certiorari.  The court denied certiorari on August 20, 1982, roughly two weeks before Mr. Dunlap's meeting with Mr. Klipstine.  The case was remanded to the state district court on August 27, 1982, just under a week before this meeting.  Mr. Dunlap emphatically stated that his lawyer never told him that the State's motion had been denied, nor that the denial had been affirmed by the higher courts.  He claimed that he did not learn of this until the date of the federal evidentiary hearing, when his present counsel showed him the appellate court documents affirming the trial court's denial of the State's motion.  He speculated that, had he known there was no chance he would be tried as an adult, he would have rejected the State's offer of immunity.

When asked how he felt about fabricating his testimony, Mr. Dunlap responded:

Well, it was not what I wanted to do.  I was not happy about it at all, and it wasn't easy to do.  I felt at a point that it's all I could do.  It was – if everybody's drowning, you the only one with a chance to save yourself, and after six months, seeing nothing was changing and the other people were giving false testimony about me, and nothing was being pursued, they took my good lawyer from me, my new lawyer had

93

> nothing to say but, "Take the deal." . . . The deal was, from day one, we know you
> didn't do it, but you got to help us, we can't get these guys without you. And for six
> months I stuck by my guns and told them, I wished I could help you, I don't have the
> information you want. Nothing changed. Eventually I just gave in and saved
> myself. It may be a greedy thing to do, but I was 18 and didn't know any better.

*Id.* at 167-68.

Mr. Dunlap next explained that in addition to Carl Case, he testified against Curtis

Worley and Joe Brown in their respective criminal trials. However, he did not testify against

Mike Tweedy, a juvenile, who Mr. Dunlap believed also faced false accusations of Nancy

Mitchell's murder.[25] Mr. Dunlap explained that although he did not know Mike Tweedy, he

knew that he was a juvenile. He believed that Mr. Tweedy also claimed to know nothing of the

murder, and had been offered immunity in exchange for his testimony implicating the other

defendants. He refused to implicate Mr. Tweedy, because he saw him as a victim of the same

undue pressure as the authorities were exerting upon Mr. Dunlap. However, unlike Mr. Dunlap,

Mr. Tweedy "stood by his guns," *id*. at 170, and "rode it out and didn't make any deals," *id*., of

which Mr. Dunlap was proud.

In December of 2003, Mr. Dunlap was working as a youth minister for a church in

Carlsbad. He testified that one evening after work, two law students visited him and asked him

about his testimony in the 1982 trials. Although he "tried to lie to [the law students] at first," *id*.

at 173, he quickly felt he had to tell the truth. He felt some sense of relief for telling the truth,

but he was also scared because he did not want to relive the case and have to testify in more

proceedings. He eventually signed an affidavit stating that his testimony in 1982 implicating

Carl Case was false in its entirety. He later testified truthfully at the 2005 state evidentiary

---

[25] On cross-examination, Mr. Dunlap stated that he testified as a defense witness for Mr.
Tweedy, and told the same story implicating Mr. Case, Mr. Worley, and Mr. Brown, but stated
that Mr. Tweedy was not present.

hearing.

Mr. Dunlap stated with conviction that he and Mr. Case were not friends in 1982, nor did they "hang in the same crowd."  *Id*. at 180.  Other than seeing Mr. Case at the state evidentiary hearing in 2005, Mr. Dunlap has had no contact with him since the 1982 trial.  Mr. Dunlap then offered:

> I personally don't like Carl Case.  I have reason to dislike him.  I'm testifying that I gave false evidence in 1982 . . . because it's the right thing to do.  I am definitely not Mr. Case's friend.

4:00.  He later explained that Mr. Case once stole from Mr. Dunlap's friend's store, and when Mr. Case learned that Mr. Dunlap had informed his friend of the theft, he told Mr. Dunlap, "You're going to die, motherfucker."  *Id*. at 189.[26]

On cross-examination, in response to the question of why he was testifying and what he hoped the outcome of the proceeding to be, Mr. Dunlap stated:

> To give testimony to attempt to get these defendants a new trial, I assume . . . .  I wish that the State would take the evidence in consideration . . . .  I believe, with my testimony, even if it was just my testimony, that it brings into question the entire trial.

*Id*. at 182.  Counsel for Respondent focused heavily on the fact that, whereas Mr. Dunlap represented his agreement with the prosecution as a promise of immunity in exchange for testimony implicating the other defendants, the agreement in fact provided for immunity in exchange for *truthful* testimony.  Counsel elicited testimony from Mr. Dunlap that he "held up [his] part of the bargain" when he testified at trial, and then attempted to show that he had, in

---

[26] This testimony directly contradicts Mr. Dunlap's 1982 testimony, wherein he stated that he and Mr. Case had never gotten in a fight nor did Mr. Case ever threaten to beat him up, or "anything of that sort."  Trial Tr. at 1056.  However, given Mr. Dunlap's general reluctance at trial to divulge more information than was minimally necessary, the Court does not find this to undermine the credibility of his 2010 testimony.

fact, testified truthfully. *Id.* at 191. However, Mr. Dunlap consistently stated that, although the agreement stated on paper that he was to testify truthfully, it was clear from the day that the deputies questioned him in Odessa that they believed he witnessed the attack on Ms. Mitchell and they wanted him to testify as to this attack. The Court notes that such an agreement – to provide testimony implicating specific individuals in a crime regardless of whether or not the witness had personal knowledge of their participation in the crime – would never be an express agreement. Mr. Dunlap's testimony that he "held up his part of the bargain" does not, as Respondent would suggest, indicate that his 1982 testimony was truthful. Rather, it supports Mr. Dunlap's consistent position that whereas express requirement of the immunity agreement included a promise to testify truthfully, in reality the agreement was offered in exchange for Mr. Dunlap's specific testimony implicating Mr. Case and his co-defendants in the Nancy Mitchell rape and murder.

 Counsel for Respondent asked Mr. Dunlap why he agreed to this deal when he was, in fact, innocent. He explained as follows:

> They were having no trouble coming up with people to lie for them, that was obvious. So I assumed, [that my being convicted] was a distinct possibility . . . . [W]hen they first took me to court . . . they rolled in Audrey Knight up on the stand and I was, Oh, well, this is going to be over quickly, you know. She has no evidence against me of any kind. And she got up there and told her made-up story, and followed promptly by Mr. Autry. And, lesson learned. You know, do they have the power to get people to say what they wanted? Absolutely. And, absolutely, in the end, they had it over me.

*Id.* at 212-13.

 Counsel next attempted to impeach Mr. Dunlap's testimony that he had no knowledge before the federal evidentiary hearing that the State had lost its motion to try him as an adult. Counsel asked Mr. Dunlap to refer to a portion of his 1982 trial testimony, which reads as

follows:

Q:     [Do you know if the State] tried to have you bound over to be tried as an
       adult?
A:     Yes, sir.
Q:     Didn't succeed, did they?
A:     Not that I know of.
. . .
Q:     You were still afraid that the State would do something to get you tried as an
       adult, is that right?
A:     Naturally.
. . .
Q:     Paul, do you recall the date – were you ever told the date when the appellate
       court in New Mexico decided that you wouldn't be tried as an adult?
A:     The appellate court?
Q:     Uh-huh.
A:     No, I don't.
Q:     When was your transfer hearing?
A:     In April.
Q:     Sometime after that, wasn't it?
A:     Yes, sir.
. . .
Q:     Wasn't very long before you decided to take the grant of immunity offered
       to you by the State, was it?
A:     Oh, it was a couple of months after that.
Q:     That you decided to testify for the State?
A:     Yes, sir.
Q:     But your fear of going to prison was a definite factor in your deciding to
       accept that immunity, is that right?
A:     Yes, sir.

Trial Tr. at 1110-16. After reading this portion of his trial testimony, Mr. Dunlap remained

confident that he in fact had no knowledge that the State had lost its final appeal. He explained

that his lawyer never communicated with him, but the jailer at the juvenile facility would

occasionally tell him "well, they had another trial today to try to get you tried as an adult, you're

lucky you still get to stay in the juvenile thing for now." *Id*. at 229.

The Court found Mr. Dunlap to be a credible witness. He remembered the events in

question with impressive detail and clarity, and he did not appear confused or disoriented in any

way.  He appeared to be telling the truth, and did not appear to be hiding anything or attempting

to withhold pieces of his story.  While he was sometimes unable to recall substantial portions of

his 1982 testimony, it is not surprising that one would be unable to remember the details of a

story that was entirely concocted.  Although at times Mr. Dunlap appeared defensive, this was

generally in response to questions on cross-examination that were quite obviously targeted at

undermining his credibility or suggesting he was lying.  He had a slight reluctance in his

demeanor, which made sense to the Court given his expressed feelings of dread at the thought of

reliving this case again, and having to testify in further proceedings.  Mr. Dunlap stated that his

decision to lie in the 1982 trials was not something he enjoyed discussing, and he had done his

best to forget it entirely.  It was painfully evident that he felt remorse for lying at the defendants'

trials, and he was ashamed to have to provide details of his lie in a courtroom full of strangers.

Mr. Dunlap's testimony contained very few obvious errors or inaccuracies.  The Court

only notes two small portions of his testimony that could be attacked as incredible, but as the

Court will explain, it finds his testimony credible in its entirety.  First, Mr. Dunlap testified that

when he went to the District Attorney's office on September 2, 1982 to accept the State's offer

of immunity, he spoke only to Mr. Klipstine, and no sheriff's deputies were present.  However,

the transcription of the interview states, at the top of the page, that Deputy Eddie Carrasco and

Captain Ray Ahlstrom were also present.  At the hearing, Mr. Dunlap stated that was "somehow

incorrect information," *id*. at 159, and he was certain that only he and Mr. Klipstine were

present.  He affirmed this assertion on cross-examination, but conceded that the deputies "may

have come and went" prior to the commencement of Mr. Dunlap's statement.  *Id*. at 215.

The Court reviewed the transcript and listened to the recording of Mr. Dunlap's

statement, which demonstrate that Deputy Carrasco and Captain Ahlstrom were indeed present

and they asked the majority of the questions.  Moreover, Mr. Dunlap testified at Mr. Case's 1982 trial that Captain Ahlstrom and Deputy Carrasco were present during the statement.  However, the officers' presence does not affect the Court's assessment of whether or not Mr. Dunlap is telling the truth.  The Court first notes that, like Audrey Knight, Paul Dunlap testified in December of 2010 as to events that occurred nearly thirty years ago, between March and October of 1982.  While he remembered most significant events with remarkable clarity, it is in no way surprising that he misremembered certain details.  Moreover, if he were lying about the truthfulness of his 1982 testimony, he would still have no reason to lie about who was present when he gave his first statement implicating the defendants.  Rather, the Court finds that the inconsistency is simply due to Mr. Dunlap misremembering who was present for the statement.  Just as it is understandable that Audrey Knight remembered a one- to two-month period as six months, Paul Dunlap may have been particularly affected or intimidated by the prosecutor, with whom he had had no contact outside the courtroom.  His memory of Mr. Klipstine's presence and his failure to remember the other people that were present in no way suggests that he is lying about his decision to fabricate his trial testimony in order to be released from jail.

The Court was also somewhat perplexed by Mr. Dunlap's testimony that, despite not knowing Mike Tweedy, he refused to implicate him in Nancy Mitchell's rape and murder because he saw him as being "in the same boat" Mr. Dunlap.  *Id*. at 170.  The Court does not immediately understand why Mr. Dunlap felt such loyalty to someone whom he did not know.  However, the Court has carefully analyzed Mr. Dunlap's testimony regarding Mr. Tweedy, and concludes that Mr. Dunlap's testimony was sincere and credible.  He spent six months alongside Mr. Tweedy in a juvenile detention facility, and finally succumbed to pressure and agreed to testify in order to secure his own release.  Having done what he now sees as a cowardly act, he

was certainly aware that Mr. Tweedy chose not to lie in exchange for immunity, but rather "stood by his guns" and "rode it out." *Id*. It is entirely plausible that Mr. Dunlap felt that the least he could do, out of respect for someone who exhibited the bravery that he simply could not muster, was to refuse to falsely implicate him in Ms. Mitchell's rape and murder.

Just as the Court found with respect to Audrey Knight, the fact that another witness came forward independently of Mr. Dunlap and recanted her testimony lends credence to Mr. Dunlap's recantation. Respondent's inability to secure Bobby Autry to testify as to the truthfulness of his 1982 trial testimony further casts doubt on Respondent's attempt to show that Mr. Dunlap is now lying. Finally, portions of Mr. Dunlap's and Ms. Knight's testimony corroborated each other in ways that further support the credibility of their recantations. The Court was most struck by the fact that both witnesses testified that at multiple times during their recorded statements, the tape recorder was turned off and then turned on again. Ms. Knight stated that the deputies would "coach" her and then record her statement again, whereas Mr. Dunlap simply stated that the statement was recorded "off and on . . . . They had at least one recorder, and they were constantly playing with them. Sometimes they'd stop them, back them up, turn them back on[.]" *Id*. at 214. While Mr. Dunlap did not explicitly testify as to "coaching," the act of stopping and rewinding a tape recorder and then beginning to record again is clearly for the purpose of manipulating the witness's statement. Although the Court hopes that such acts are rare on the part of law enforcement officers and prosecutors, it finds it implausible that both witnesses would fabricate a lie about such a specific detail that occurred during their respective recorded statements.[27]

---

[27] The Court further notes that during his original trial testimony, Mr. Dunlap stated that his first statement to law enforcement – on March 10,1982 when he denied any knowledge of the crime – began at around 10:30 or 11:00 a.m. and lasted until 11:00 p.m. or midnight. Although

Finally, the Court evaluates Mr. Dunlap's testimony in light of the *Jones*, *Russell*, and *Earles* factors. Much of this analysis is materially identical to that with respect to Ms. Knight, and the Court can again identify no factor that would indicate it should not believe Mr. Dunlap's recantation.

The Court first notes that, like Ms. Knight, Mr. Dunlap has no relationship to Mr. Case. Moreover, whereas Ms. Knight testified that she was friends with Mr. Case prior to his trial, Mr. Dunlap was adamant that he did not like Mr. Case nor had he ever considered him a friend. Mr. Dunlap's statement that he was testifying for the purpose of "get[ting] these defendants a new trial," Fed. Evid. Hr'g Tr. at 182, does not show that he has a personal interest in the outcome of this proceeding. Although he referred to the 2005 state proceeding as a "failed attempt at appeal," *id*. at 176, this does not suggest that he is *personally* invested in Mr. Case's release from prison. Rather, these statements support the Court's finding that Mr. Dunlap feels substantial guilt for having wrongly implicated Mr. Case and his co-defendants in Nancy Mitchell's murder. Such a feeling is natural for any person with a conscience, and it does not suggest an improper investment in the outcome of the proceeding. If anything, Mr. Dunlap's regret for having lied in 1982 would make him all the more driven to tell the truth in this Court. Given the fact that he dislikes Mr. Case, the Court found no basis to conclude that Mr. Dunlap would lie to secure Mr. Case's release from prison.

Next, the Court finds that Ms. Knight's recantation supports Mr. Dunlap's, and his recantation is not strongly contradicted by other testimony or evidence. Of course, Bobby

---

he testified that the officers did not turn the recorder on and off, he confirmed on cross-examination that his typed statement from that date was seventeen pages in its entirety. It is highly unlikely that the recording could have lasted upwards of twelve hours, yet the statement was transcribed in a mere seventeen double-spaced pages.

101

Autry's original trial testimony undermines Mr. Dunlap's recantation, but the value of this testimony has plummeted given what has come to light since 2003. The physical evidence at trial – that Ms. Mitchell's body and clothing contained no semen and she had no bruising on the back side of her body – supports Mr. Dunlap's recantation of his trial testimony that he witnessed what appeared to be a gang rape on the rocky ground along the banks of the Pecos River. Although Mr. Dunlap's recanted testimony is consistent with his September 2, 1982 statement – a statement he finally gave after insisting for six months on his ignorance of Ms. Mitchell's murder – his explanation of how he came to give that statement severely undermines the strength of this consistency. He sat in custody for six months and felt abandoned by his defense attorney, and the only updates he ever heard about his case were from the jailer, who indicated that the State was continuing to fight to try him as an adult. Mr. Dunlap's testimony that he wrote out the content of his testimony and memorized it further explains why his trial testimony was consistent with his September 2nd recorded statement.

As explained above, Mr. Dunlap appeared confident and truthful, albeit sometimes defensive, on the witness stand. He forgot certain details regarding the events of 1982, but he remembered the details surrounding the significant events – including his decision to lie in 1982 as well as his decision to come forward with the truth in 2003 – with impressive accuracy. When counsel for Respondent attempted to show that Mr. Dunlap "at times [] lied under oath" and "at times [] told the truth under oath," *id.* at 218, Mr. Dunlap corrected this misleading phrasing and stated with confidence that he lied in 1982, and was telling the truth today. The Court finds that, like Ms. Knight, Mr. Dunlap has in no way displayed a "tendency to speak . . . falsely." *Earles*, 983 F. Supp. at 1254.

102

With respect to the "probability or improbability" of Mr. Dunlap's testimony, *see id.*, the Court makes similar findings to those applicable to Ms. Knight.  The Court is seriously troubled by the circumstances surrounding Mr. Dunlap's arrest as he described them.  According to Mr. Dunlap's story, the officers simply did not believe his assertions that he did not know anything about Ms. Mitchell's murder.  They told him that they did not believe he was involved, but would arrest him unless he agreed to implicate the other suspects.  Although the deputies testified at the state evidentiary hearing that they never engaged in any improper questioning or coercion, the pressure on the deputies to solve the murder, coupled with the fact that Ms. Knight described similar pressure from law enforcement, convinces the Court that such improper police questioning and coercion did in fact occur in this case.  After listening carefully to Ms. Knight's March 1982 interviews, the Court found that the deputies fed Ms. Knight her story, ostensibly out of their desperation to resolve the murder.  It is evident from those recordings that the very deputies who interviewed and arrested Mr. Dunlap had lost – the Court hopes temporarily – their commitment to seeking the truth in the investigation.  Instead, they appear to have focused on coming up with a group of suspects whose commission of the crime was feasible, and they needed the help of Audrey Knight and Paul Dunlap to succeed in this task.  Unfortunately, given these circumstances, Mr. Dunlap's testimony is not improbable.

Finally, as discussed above, Mr. Dunlap exhibited a "capacity and willingness to tell truthfully and accurately what he . . . saw and observed."  *See Earles*, 983 F. Supp. at 1254. Other evidence in this case supports his testimony, namely the recantation of Audrey Knight. Respondent has not pointed to evidence specifically contradicting Mr. Dunlap's testimony, aside from Bobby Autry, Audrey Knight, and Carl Case's original trial testimony.  For reasons already discussed, the value of these witnesses' trial testimony is slight in comparison to the strong

evidence and circumstances supporting Mr. Dunlap's recantation.  The Court therefore

concludes that Mr. Dunlap's recantation of his 1982 testimony is credible.

**D.      Conclusion**

In summary, the Court finds that Ms. Knight's and Mr. Dunlap's recantations are

credible, and they gravely undermine the jury's finding of guilt.  When viewing the *Brady*

violation in light of the evidence as a whole, Carl Case has demonstrated by clear and

convincing evidence that no reasonable factfinder would have convicted him of the rape or

murder of Nancy Mitchell.  Mr. Case has accordingly satisfied the procedural requirements for

this Court to consider the merits of his second habeas corpus petition.

### PART III: *SUBSTANTIVE ANALYSIS UNDER THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT*

**I.      APPLICABLE LAW**

Having found that Carl Case has satisfied the procedural hurdle to allow this Court to

consider the merits of his second habeas corpus petition, the Court looks to AEDPA's

substantive provisions to determine whether or not it should grant relief.  Such relief is

warranted if the 2008 New Mexico Supreme Court's adjudication of Mr. Case's habeas petition:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established federal law, as determined by the Supreme Court
> of the United States; or (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the state court
> proceeding.

*Wilson v. Sirmons*, 536 F.3d 1064, 1073 (10th Cir. 2008) (citing 28 U.S.C. § 2254(d)(1)–(2)).

For purposes of Section 2254(d)(1), federal law is "clearly established" when the

Supreme Court's prior decisions provide a "governing legal principle or principles" applicable to

the issue before the state court.  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).  A state court's

decision is "contrary to" clearly established federal law when the state court "applies a rule that contradicts the governing law set forth" by the Supreme Court or "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  A decision is also contrary to clearly established federal law "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Id.*  A state court's application of clearly established federal law is unreasonable "when the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of petitioner's case." *Wilson*, 536 F.3d at 1073 (quotations, citations and alterations omitted).

To warrant relief under AEDPA, Mr. Case must show that the state court's decision was "more than incorrect or erroneous . . . it must have been objectively unreasonable." *Id.* (quotations, citations and alterations omitted).  Relief is precluded so long as "fairminded jurists could disagree" as to the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  This Court "must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

This Court must presume that the state court's determination of a factual issue is correct; however, Mr. Case may rebut this presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).  This standard is "demanding but not insatiable . . . .  Deference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (internal quotation omitted).  A state court makes an unreasonable determination of the facts when it relies in whole

or in part on an erroneous factual finding in reaching its conclusion.  *See Wiggins v. Smith*, 539

U.S. 510, 528 (2003) (state court's finding that social service records documented sexual abuse

when in fact they did not, amounted to "partial reliance on an erroneous factual finding,"

rendering court's conclusion unreasonable).  "[I]n concluding that a state-court finding is

unsupported by substantial evidence in the state-court record, it is not enough that [this Court

would find differently] in similar circumstances."  *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th

Cir. 2004).  Rather, the state court's factual findings may be disturbed only if it is not reasonably

possible to conclude that the finding is supported by the record.  *Id*.

## II.  THE NEW MEXICO SUPREME COURT'S OPINION IN *CASE V. HATCH*

It is necessary to summarize the New Mexico Supreme Court's opinion prior to delving

into an analysis of its interpretation and application of clearly established federal law and its

determination of the facts in light of the evidence presented.  The court first provided a factual

and procedural historical summary of the case, noting that Mr. Case's convictions rested largely

on the testimony of three eyewitnesses, whose stories were "not entirely consistent."  *Case v.*

*Hatch*, 183 P.3d 905, 907 (N.M. 2008).  It further noted that Mr. Case testified at his trial, where

he "admitted he was present during the events that led to the victim's death," but he testified that

she had accidentally fallen.  *Id*.

Next the New Mexico Supreme Court recounted the facts of Ms. Knight's and Mr.

Dunlap's recantations.  The court described the substance of the recanting witnesses' statements

as "assert[ions] that they did not know anything about the events leading to Mitchell's death,"

and the court stated that the witnesses "had originally made these assertions to the police, and

they were the subject of extensive cross-examination during the trial."  *Id*.  The court then noted

that both recanting witnesses now assert that they testified falsely because of the intense pressure

they felt.  It further summarized the content of the suppressed Bobby Autry interview.

Mr. Case's *Brady* claim is the only claim he presented before the New Mexico Supreme Court that is presently before this Court.  However, some of the state court's findings and portions of its legal analysis concerning Mr. Case's other claim – that the recantations violated his fundamental right to a fair trial under the due process clauses of the federal and state constitutions – are relevant for purposes of this Court's analysis of its conclusions regarding the *Brady* claim.  Most importantly, the court found that the recantations of Audrey Knight and Paul Dunlap were not "newly discovered evidence" because they were cumulative; in other words, they repeated assertions that these witnesses had already made to law enforcement during the investigation of Nancy Mitchell's murder.  The court characterized the recantations as "efforts to revert to the original statements they gave to the police[.]" *Id*. at 917.  The court further held that, "[b]ecause the inconsistent statements were the subject of the original trial, a jury has already been charged with the responsibility of weighing the inconsistent statements." *Id*. Finally, the court stated that Mr. Case's own testimony as well as "other evidence" corroborated the original testimony of Ms. Knight and Mr. Dunlap describing the assault on Ms. Mitchell.  *Id*. By "other evidence," it appears that the court referred to Bobby Autry's eyewitness testimony as well as Dr. Kaufman's testimony that Ms. Mitchell's zipper was torn, her shirt was on inside-out, and her injuries were consistent with a beating.

The Court now examines the New Mexico Supreme Court's legal analysis with respect to Mr. Case's *Brady* claim.  At the outset, it is necessary to highlight that court's troubling lack of depth and deficit in understanding regarding *Brady* law.  First, the court characterized a *Brady* claim as a "charge of prosecutorial misconduct," requiring review of the trial court's findings under an abuse-of-discretion standard.  *Id*. at 918.  Second, although acknowledging that a

107

prosecutor's good faith motives are irrelevant for purposes of analyzing whether evidence has been suppressed, and further acknowledging that "the prosecution" encompasses law enforcement personnel, the court did not analyze whether or not the Eddy County Sheriff's Department representatives had knowledge of Bobby Autry's February 3, 1982 statement.  It briefly summarized defense counsel Gary Mitchell's testimony in the state evidentiary hearing, wherein he stated that he was convinced that the tape was suppressed because he would have used it if he had been aware of it.  The court ultimately concluded: "[W]e are not left with a clear answer about whether the taped statement was suppressed by the prosecution." *Id*.  This conclusion ignores facts in the state court record, facts which strongly support a finding that the tape was suppressed.  *See* Doc. 16, Ex. E at 6 (Petitioner's Supplemental Memorandum of Law, filed in state district court in August of 2005, highlighting (1) portion of cross-examination of Mr. Autry at Curtis Worley's trial, in which defense counsel referred to the three statements Mr. Autry gave to police, and labeled the dates of the statements as January 30, March 5, and March 12, 1982; and (2) portion of redirect examination of Mr. Autry at Joe Brown's trial, where prosecutor elicited testimony from Mr. Autry that he had "made a pass" at Ms. Mitchell, but did not get angry at her when she "said no").  Although Respondent initially argued that Mr. Case had not proven that the statement was suppressed, he did not object to the Magistrate Judge's finding to the contrary.  *See* Doc. 41 at 11 (Magistrate Judge's Report and Recommendations, concluding that "the February 3 statement was not transcribed and not produced to defense counsel", to which Respondent did not file objections).

After failing to reach a conclusion as to whether or not the statement was suppressed for purposes of *Brady*, the New Mexico Supreme Court analyzed whether or not the statement was favorable.  However, it divided the concept of favorable evidence into two separate categories:

evidence that is favorable because it has potential to impeach prosecution witnesses, and a

distinct category of evidence that holds exculpatory value.

With respect to its impeachment analysis, the court noted that Mr. Case's argument

centered around the assertion that Mr. Autry had lied to police when he told them he never had

sexual intercourse with Ms. Mitchell.  Then, on February 3, 1982, he admitted to the facts

already detailed in Part II, Section II(B)(2)(b), "Bobby Autry's February 3, 1982 Statement,"

*supra*, regarding his sexual encounter with Ms. Mitchell.  Mr. Autry then testified at trial that he

had never had sex with Ms. Mitchell, although he admitted that he had tried.  The court

concluded: "It seems reasonable that the statement has some impeachment value[,]" and

proceeded to examine its materiality.  *Case*, 183 P.3d at 919.  The court noted that at trial, the

defense introduced evidence of Mr. Autry's prior inconsistent statements, and further presented

character witnesses who testified as to Mr. Autry's tendency to lie and steal.  Therefore, his

credibility was already at issue, leading the court to conclude that "even had the statement been

disclosed to the defense, there is no reasonable probability of a different result."  *Id*.  The

suppressed statement was "cumulative of other evidence used to impeach Autry, and cumulative

evidence is not considered material for *Brady* purposes."  *Id*. (citation omitted).

The court next analyzed whether or not the suppressed statement carried any value as far

as exculpating Mr. Case and implicating Mr. Autry as the perpetrator.  It stated that under New

Mexico law, the general rules of relevancy govern the admissibility of another person's alleged

motive to commit the charged offense.  The court concluded:

> In this case, other than the alleged motive – that days or weeks before the murder,
> Autry became angry because he was unable to conclude a sexual act with Mitchell
> – Case has not pointed to the existence of other evidence, direct or circumstantial,
> which links Autry to Mitchell's murder.  Although Dunlap confirmed Autry's
> presence during the night in question, he testified that he was not sure where Autry
> went when the attack on Mitchell began, and he did not see Autry again after the

> attack began.  The motive itself is speculative.  For *Brady* purposes, exculpatory evidence cannot be purely speculative.  We therefore agree with the trial court that the State did not suppress material evidence from Case, and the trial court did not abuse its discretion.

*Id*. at 920.  In its materiality analysis, the court did not analyze the suppressed statement's potential for undermining the jury's faith in the police investigation.  *Cf.*, Part II, Section II(B)(3), "Analysis," *supra* (discussing ways in which defense could have used suppressed statement to shake jury's confidence in caliber of police investigation).

## III.   DISCUSSION

### A.   The New Mexico Supreme Court's Decision Runs Contrary to Clearly Established Federal Law

The relevant clearly established *Brady* law is set forth in Part II, Section II(B)(1), "*Brady v. Maryland* and its Progeny," *supra*.  As the Court found in Part II, Section II(B)(3), "Analysis," *supra*, the prosecution did indeed suppress favorable evidence that was material to the defense in that, had defense counsel had the February 3rd Bobby Autry interview prior to trial, there is a reasonable probability that the result of Mr. Case's trial would have been different.  *See Kyles*, 514 U.S. 433.  However, the New Mexico Supreme Court's contrary conclusion does not necessarily mandate relief.  The Court "may not issue the writ [of habeas corpus] simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Malicoat v. Mullin*, 426 F.3d 1241, 1246 (10th Cir. 2005).  Rather, this Court may only issue relief if it finds that the New Mexico Supreme Court's opinion amounted to a decision that runs "contrary to" or involved "an unreasonable application of" established Supreme Court precedent.  28 U.S.C. § 2254(d)(1).

A thorough review of the New Mexico Supreme Court's analysis with respect to Mr. Case's *Brady* claim compels the conclusion that certain aspects of its legal analysis were

contrary to clearly established federal law.  That is, the court "applie[d] a rule that contradicts

the governing law set forth" by Supreme Court precedent.  *See Williams*, 529 U.S. at 405.

It is important to observe that throughout the New Mexico Supreme Court's opinion, it

correctly identified the governing principles relating to *Brady* claims, in that it accurately quoted

the most prominent and significant rules established by the Supreme Court.  However, the

court's correct identification of the appropriate legal principle carries little weight, as it

proceeded to evaluate the *Brady* claim under distinct standards that subverted the true meaning

of *Brady* and its progeny.  In other words, the court simply gave "lip service" to the correct

standard, and proceeded to evaluate the evidence under a different, and conflicting, standard.

*See A.M. v. Butler*, 360 F.3d 787, 796 (7th Cir. 2004) ("While giving lip service to the [correct]

objective standard, the Illinois court shunned this objective test, substituting instead a focus on

the subjective belief of Detective Cassidy . . . . [This] adds weight to our conclusion that the

court's decision was contrary to Supreme Court precedent.") (internal quotations and citations

omitted).

### 1. Review for Abuse of Discretion

The New Mexico Supreme Court began its *Brady* analysis by correctly identifying

United States Supreme Court precedent's governing legal principle as follows:

> [T]he suppression by the prosecution of evidence favorable to an accused upon
> request violates due process where the evidence is material either to guilt or to
> punishment, irrespective of the good faith or bad faith of the prosecution.  In order
> to establish a *Brady* violation, the petitioner must show that: (1) the prosecution
> suppressed evidence; (2) the evidence was favorable to the accused; and (3) the
> evidence was material to the defense.

*Case*, 183 P.3d at 918 (quoting *Brady*, 373 U.S. at 87 and *Banks*, 54 F.3d at 1516).  Having

correctly identified *Brady's* governing principles, the court proceeded to announce its own

precedent's redefining of *Brady* in a way that is incompatible with *Brady's* true import, at least

as it applies to the instant case:

> An alleged *Brady* violation is a charge of prosecutorial misconduct.  *See State v. Trujillo*, [] 42 P.3d 814 [(N.M. 2002)]. The trial court's ruling on prosecutorial misconduct is reviewed for abuse of discretion because "the 'trial court is in the best position to evaluate the significance of any alleged prosecutorial errors.'"  *Id.* [at 831] (quoting *State v. Duffy*, [] 967 P.2d 807 [(N.M. 1998)]).  The trial court should be upheld "'unless its ruling [was] arbitrary, capricious, or beyond reason.'"  *Id.* (quoting *Duffy*, [] 967 P.2d 807 [(N.M. 1998)]).

*Case*, 183 P.3d at 918 (third-to-last alteration in original).  Ultimately, the court concluded that the trial court – the state habeas court – did not abuse its discretion in denying Mr. Case relief.

The court looked to its own precedent when it equated a *Brady* claim with a "charge of prosecutorial misconduct," citing a case in which the defendant alleged on direct appeal that a number of the prosecution's actions, including its failure to disclose certain pieces of evidence prior to trial, amounted to prosecutorial misconduct.  *See State v. Trujillo*, 42 P.3d 814, 831 (N.M. 2002).  In *Trujillo*, the defendant alleged "that the prosecutor's failure to disclose material evidence to the defense, improper use of leading questions, improper introduction of hearsay evidence, use of inflammatory and irrelevant evidence, and improper argument, distorted the evidence[.]" *Id.*  The court grouped these claims into one general claim of prosecutorial misconduct, ultimately finding that the trial court had not abused its discretion in denying the defendant's motion to dismiss.  *Id.* at 832.  Specifically with respect to the defendant's *Brady* claim, the court evaluated whether or not, had the evidence been disclosed, there was a reasonable probability of a different result, and ultimately resolved this question in the negative. *Id.* at 831.

Whereas the New Mexico Supreme Court's characterization of a *Brady* claim as a component of a prosecutorial misconduct claim arguably may have been appropriate in *Trujillo*, this Court has identified two primary flaws with the court's extension of this principle to Mr.

Case's case.  First, it is an over-simplification of a *Brady* violation to equate it with a charge of prosecutorial misconduct.  *See Brady*, 373 U.S. at 87 ("The principle . . . is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused."); *cf.* BLACK'S LAW DICTIONARY 576 (3d Pocket ed. 2006) (defining "prosecutorial misconduct" as "[a] prosecutor's improper or illegal act (or failure to act), esp. involving an attempt to avoid required disclosure . . .").  It is true that the willful or intentional suppression of evidence would amount to misconduct on the part of the prosecutor.  It is also true that the United States Supreme Court has, in appropriate circumstances, characterized a *Brady* violation as an instance of prosecutorial misconduct.  *See, e.g., Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler*, 527 U.S. at 281-82).  However, the *Brady* doctrine widely recognizes that the prosecution's subjective intent is irrelevant, and even the most well-intentioned prosecutor may violate *Brady* if he fails to disclose favorable material evidence of which he was subjectively unaware.  *See Brady*, 373 U.S. at 87 (suppression of material exculpatory evidence violates due process "irrespective of the good faith or bad faith of the prosecution"); *Kyles*, 514 U.S. at 437 (prosecutor has duty to learn of favorable, material evidence in hands of prosecution's agents; if he fails to do so, failure to disclose evidence still violates *Brady*); *Smith*, 50 F.3d at 824 (finding that evidence was suppressed "does not require a finding of bad faith or any other culpable state of mind on the part of the prosecutor").  The court quoted *Smith's* holding that suppression "does not require a finding of bad faith or any other culpable state of mind on the part of the prosecutor," *Case*, 183 P.3d at 918, but its subsequent characterization of a *Brady* claim as a charge of prosecutorial misconduct demonstrates that it did not apply this principle to its analysis.

Secondly, the New Mexico Supreme Court's assertion that the trial court's ruling should be upheld unless it was "arbitrary, capricious, or beyond reason" amounts to an extension of *Brady* that is contrary to clearly established federal law. The New Mexico cases the court cited in support of its application of that standard of review were on direct appeal. In *Trujillo*, the Court announced that it employs the deferential abuse-of-discretion standard because the trial judge, who presides over the trial and observes the alleged misconduct, is in the best position to evaluate the allegation. 42 P.3d at 831. Similarly, in *State v. Duffy*, the court held that a trial court is "in the best position to evaluate the significance of any alleged prosecutorial errors" because it "has broad discretion in controlling the conduct and remedying the errors of counsel during trial." 967 P.2d at 820. Both of these cases' holdings rely on the fact that it is the trial judge who presides over the proceedings in which the alleged misconduct occurs, which was not the case with respect to Mr. Case. Notably, on habeas cases in which a different judge presides over the habeas proceedings, the New Mexico Supreme Court does *not* apply the abuse-of-discretion standard to *Brady* claims, yet the court ignored that precedent in Mr. Case's case. *See Miller v. Tafoya*, 76 P.3d 1092, 1094-5 (N.M. 2003) ("In appeals pertaining to habeas corpus proceedings . . . we review questions of law or mixed fact and law de novo. Claims involving the denial of procedural due process[28] are legal questions that we review de novo.").

The court's application of the abuse-of-discretion standard was accordingly unreasonable in light of its own precedent, which acknowledges the difference between the respective vantage points of a trial court and a habeas court with respect to assessing a prosecutor's conduct at trial.

---

[28] In *Case*, the New Mexico Supreme Court acknowledged that a *Brady* claim alleges a violation of due process. 183 P.3d at 917-18 ("Case claims that his right to due process was violated because the prosecution failed to disclose one of Autry's four taped statements. This claim is based on *Brady* . . .").

More importantly, in light of federal law making clear that whether a *Brady* violation occurred is a mixed question of law and fact, it was unreasonable for the court to review the state habeas court's findings under a deferential abuse-of-discretion standard.

"Fairminded jurists," *see Yarborough*, 541 U.S. at 664, could not disagree with this Court's conclusion that the New Mexico Supreme Court's opinion was contrary to clearly established federal law. The United States Supreme Court in *Brady* itself held that "the suppression by the prosecution of evidence favorable to an accused upon request *violates due process* where the evidence is material either to guilt or to punishment . . ." *Brady*, 373 U.S. at 87 (emphasis added). Reasonable jurists could not conclude that whether or not a due process violation occurred is a purely factual question that demands deference to a trial court, particularly a trial court that did not preside over the trial where the alleged violation took place. The *Brady* Court's analysis of the significance of the suppression of materially favorable evidence compels the conclusion that an appellate court's review of a trial court's adjudication of a *Brady* claim is more than a deferential exercise. *See Brady*, 373 U.S. at 88 (framing the crux of the inquiry as "whether petitioner was denied a constitutional right"). While it would be proper to defer to the state habeas court's factual findings, the *Brady* doctrine makes clear that such deference is inappropriate with respect to legal and mixed questions. *See*, *e.g.*, *United States v. Williams*, 576 F.3d 1149 (10th Cir. 2009) ("We review de novo claims that the prosecution violated *Brady*, including the determination of whether suppressed evidence was material."); *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007) ("*Brady* claims present something of a special situation. Thus, as to findings of fact made by the district court, including determinations of credibility made both at trial and in post-trial proceedings, this court would defer under an abuse of discretion standard. But once the existence and content of undisclosed

evidence has been established, the assessment of the materiality of this evidence under *Brady* is a question of law.") (citations omitted); *United States v. Jones*, 601 F.3d 1247, 1266 (11th Cir. 2010) ("We review de novo alleged *Brady* violations."); *Brooks v. Tennessee*, 626 F.3d 878, 899 (6th Cir. 2010) ("the legal questions controlled by [*Brady*] must be reviewed de novo"); *United States v. Price*, 566 F.3d 900, 907 n.6 (9th Cir. 2009) ("[I]t is clear that the legal questions at issue in a *Brady* claim are reviewed de novo[.]"); *United States v. Davis*, 609 F.3d 663, (5th Cir. 2010) ("While we examine the *Brady* question de novo, we must proceed with deference to the factual findings underlying the district court's decision.") (citation omitted).

This Court wishes to stress that its role is not to assess the state court's application of state law. Yet the state court's error in applying New Mexico case law involving direct appeals to a habeas case is highly pertinent because it amounted to an improper application of state precedent in a manner that ultimately conflicted with federal law. Given the procedural posture of the case, it was unreasonable for the court to defer to the state habeas court, which was in no way better situated to evaluate the "alleged prosecutorial misconduct" that occurred before a different court over twenty years prior. Ultimately, the New Mexico Supreme Court's application of *Trujillo* and *Duffy* to Mr. Case's case resulted in a decision that was contrary to clearly established *Brady* law.

### 2. Piecemeal Evaluation of Suppressed Statement's Materiality

At the commencement of its materiality analysis, the New Mexico Supreme Court correctly identified the appropriate legal principle as established by the United States Supreme Court. It stated: "Evidence is material under *Brady* only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Case*, 183 P.3d at 919 (quoting *Bagley*, 473 U.S. at 682 (alterations omitted)). The

116

court further implicitly recognized that "[i]mpeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule." *Bagley*, 473 U.S. at 676; *see also Giglio v. United States*, 405 U.S. 150, 154 (1972). However, the court failed to recognize the Supreme Court's extension of this principle: that impeachment evidence and exculpatory evidence should not be viewed as two distinct categories of evidence. *Bagley*, 473 U.S. at 676 ("This Court has rejected any [] distinction between impeachment evidence and exculpatory evidence."); *Kyles*, 514 U.S. at 433 (disavowing "any difference between exculpatory and impeachment evidence for *Brady* purposes."). Rather, suppressed evidence should be assessed for its holistic value to the defense, both as impeachment and exculpatory evidence. *Id*. at 437 (describing "materiality" under *Brady* and *Bagley* as an inquiry into the "cumulative effect of suppression"); *id*. at 440-41 (reversing Court of Appeals for making "a series of independent materiality evaluations" rather than "assess[ing] the cumulative effect of the evidence"). The Tenth Circuit has summarized the relevant Supreme Court precedent as follows:

> The touchstone of materiality is a reasonable probability of a different result, which exists when the government's evidentiary suppression undermines confidence in the outcome of the trial. This inquiry does not permit piecemeal evaluation of suppressed evidence; instead, courts must review the cumulative impact of the withheld evidence; its utility to the defense as well as its potentially damaging impact on the prosecution's case. Furthermore, courts should evaluate the materiality of withheld evidence in light of the entire record in order to determine if the omitted evidence creates a reasonable doubt that did not otherwise exist. What might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict.

*Trammell*, 485 F.3d at 551 (internal quotations, citations, and alterations omitted).

Rather than apply this principle to its opinion, the New Mexico Supreme Court explicitly divided its analysis into two subparts, first considering the suppressed statement for its impeachment value and next considering it for its exculpatory value. The court agreed with Mr. Case that the statement carried "some impeachment value," but ultimately concluded that it was

immaterial as impeachment evidence, as it "would have been cumulative of other evidence used to impeach Autry." *Case*, 183 P.3d at 919-20.  The court then examined whether or not the suppressed statement had any exculpatory value, and concluded that it did not; accordingly, it did not proceed to a materiality analysis as to the statement's potentially exculpatory nature. The court's conclusions regarding the immateriality of the statement are discussed in Sections III(B)(2)–(3), *infra*.

The New Mexico Supreme Court's division of its materiality analysis into two distinct components was contrary to clearly established federal law, which requires a cumulative assessment of the suppressed evidence.  *Kyles*, 514 U.S. at 440.  In analyzing each aspect of the suppressed statement separately, the court failed to analyze the statement's aggregate value to the defense.  By engaging in this superficial compartmentalization, the court failed to consider whether the evidence could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," as mandated by *Kyles*.  *Id*. at 435.

Although the lower court's analysis in *Kyles* was flawed for different reasons, the errors that court committed are similar in significance to those of the New Mexico Supreme Court.  In *Kyles*, the Fifth Circuit affirmed the district court's denial of the petitioner's habeas petition, and the Supreme Court reversed.  514 U.S. 419.  The Fifth Circuit opinion left the record unclear as to whether it had "made an assessment of the cumulative effect of the evidence."  *Id*. at 440. The Supreme Court concluded that the opinion was "compatible with a serious of independent materiality evaluations, rather than the cumulative evaluation required by *Bagley*."  *Id*. at 441. The Court so concluded because the opinion "contain[ed] repeated references dismissing particular items of evidence as immaterial and so suggesting that cumulative materiality was not the touchstone."  *Id*. at 440.  The Court listed examples of the Fifth Circuit's independent

assessment of individual pieces of evidence for their materiality, and summarized its conclusions that each piece of evidence, when viewed independently, was immaterial.  *Id*.  The Court went on to evaluate the evidence as a whole, and ultimately reversed the Fifth Circuit.  *Id*. at 454.

At issue in Mr. Case's case was one sole piece of suppressed evidence: the February 3, 1982 Bobby Autry interview.  Yet the New Mexico Supreme Court's evaluation of the materiality of that piece of evidence was strikingly similar to the piecemeal evaluation struck down by the Supreme Court in *Kyles*.  Rather than assessing the evidence for its comprehensive value to the defense, the Court created two superficial categories of evidence, a compartmentalization squarely rejected by the Supreme Court in *Bagley* and *Kyles*.

The Court has considered "what arguments or theories supported . . . the state court's decision."  *See Harrington*, 131 S. Ct. at 786.  Perhaps the New Mexico Supreme Court interpreted *Kyles* as prohibiting only the piecemeal evaluation of distinct pieces of evidence, rather than prohibiting the division of the materiality analysis of one piece of evidence into two sub-inquiries.  However, such a theory is untenable in light of the true import of *Brady* and *Kyles*.  The court's separate analyses of impeachment value and exculpatory value renders its opinion incompatible with the mandate of *Brady* and its progeny to assess "the touchstone of materiality," *Kyles*, 514 at 434: whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id*. at 433.  The same flaws that led to *Kyles's* reversal of the Fifth Circuit's piecemeal evaluation plagued the New Mexico Supreme Court's procedure in the instant case, a procedure evidencing the court's erroneous belief "that cumulative materiality was not the touchstone."  *See id*. at 440.

As the Court will discuss in depth in Sections III(B)(2)–(3), *infra*, the New Mexico Supreme Court's conclusions that (1) the suppressed statement was not material for its

impeachment value and (2) the statement carried no exculpatory value, involved an unreasonable application of clearly established federal law and further amount to unreasonable factual determinations in light of the evidence presented in the state habeas proceeding.  In fact, as discussed in detail below, the statement is indeed material when considered for its exculpatory and impeachment value.  Therefore, the New Mexico Supreme Court's improper division of its materiality analysis, in direct conflict with clearly established federal law, is significant notwithstanding its conclusion that the statement held no exculpatory value.  This flawed analysis, combined with the erroneous standard of review discussed above, render the court's opinion objectively unreasonable.

### 3.        Presentation of Perjured Testimony

Finally, the Court reviews one other aspect of the New Mexico Supreme Court's opinion which, while not amounting to a decision that runs contrary to clearly established federal law, exhibits the court's troubling lack of thoroughness in its review of Supreme Court precedent.  In *Agurs*, the Supreme Court explained that one circumstance in which *Brady* applies is when "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury."  427 U.S. at 103.  In *Bagley*, a plurality of the Court explained that *Agurs* established "a materiality standard under which the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt."  473 U.S. at 679.

In its opinion, the New Mexico Supreme Court failed to acknowledge the category of circumstances where the prosecution presents testimony at trial that it knows or should know is perjured.  Prior to conducting its *Brady* analysis, the court stated: "We . . . do not interpret [Mr. Case's] petition as contending that the prosecution deliberately participated in the presentation of

false testimony." *Case*, 183 P.3d at 910.  The court analyzed whether or not the *unknowing* use of perjured testimony amounted to a denial of due process, and concluded based on the precedent of a majority of federal circuit courts that it did not.  The court did not address the question of whether the prosecution presented testimony it *should have known* was perjured, nor did it revisit the issue of perjured testimony during its *Brady* analysis.  Given the Supreme Court's announcement in *Agurs* and the plurality's subsequent affirmance in *Bagley* that *Brady* applies in situations where the prosecution either knew or should have known of perjured testimony, the Court finds it troubling that the New Mexico Supreme Court overlooked this distinct category of *Brady* violations when it issued its opinion in the instant case.

Mr. Case has consistently argued before every court to hear his habeas claims that the February 3, 1982 Bobby Autry statement demonstrates that Mr. Autry perjured himself in 1982 when he testified that he had never had sexual intercourse with Nancy Mitchell.  This Court agrees that Mr. Autry indeed committed perjury.  It appears from the state evidentiary hearing transcript that Respondent's position during that proceeding was that "trying" to have sexual intercourse is not significantly different from succeeding in penetrating a woman half-way before she becomes mad and terminates the sexual act.  *See* State Evid. Hr'g Tr. at 26-27 & 45-49.  This, according to Respondent, would render Mr. Autry's statements on February 3rd more or less consistent with his testimony at trial.  Such a position is untenable given the investigators' follow-up questions to Mr. Autry, after which he admitted that his penis going half-way into Ms. Mitchell's vagina was, indeed, intercourse, and further admitted that he had previously lied when he told investigators that he had not had intercourse with Ms. Mitchell.  Such a position on the part of Respondent is even less tenable when the prosecutor taking that position is representing the State in a rape case.  The pertinent portion of New Mexico's definition of criminal sexual

penetration (which is identical to the 1982 definition) is: "the causing of penetration, to any extent . . . , of the genital or anal openings of another."  N.M. STAT. ANN. § 30-9-11 (2009); N.M. STAT. ANN. § 30-9-11 (1978) (orig. pamphlet).  The penetration to which Bobby Autry admitted undisputably falls within the definition of "penetration, to any extent" of Ms. Mitchell's vagina.  It is simply inconceivable that the prosecutor – either in 1982 or in 2005 – failed to comprehend the difference between Mr. Autry's two statements: his February 3rd admission that he had penetrated Ms. Mitchell's vagina half-way, versus his statement at trial that he had tried to have intercourse with her but had never succeeded.

Mr. Case has further argued that Mr. Klipstine's testimony at the state habeas proceeding demonstrates that he knew of the contents of the February 3rd statement, and hence knowingly presented perjured testimony in 1982.  This Court cannot so conclude.  The Court finds Mr. Klipstine's manner of questioning Bobby Autry at trial suspicious, in that he posed his questions about Mr. Autry's prior sexual contact with Ms. Mitchell in sufficiently general terns such that he would not receive a detailed answer.  *See* Trial Tr. at 980 & 1031.  His testimony at the state evidentiary hearing was also suspicious, but not enough so to support a firm conclusion that he subjectively knew of the contents of the February 3rd interview when he twice elicited testimony from Mr. Autry that he had never had intercourse with Nancy Mitchell.  *See* State Evid. Hr'g Tr. at 334 ("The facts that are set out in this interview I had knowledge of"); *id*. at 346-52 (giving vague testimony as to what portions of the February 3rd statement he referred to when he stated that he "had knowledge of" the facts of the interview).  Moreover, the Court notes that in 1989, Mr. Klipstine was indefinitely suspended from the practice of law for numerous ethical violations, including "submitting falsified documents to the Court" and "engag[ing] in conduct involving deceit and misrepresentation."  *In re Klipstine*, 775 P.2d 247, 248 (N.M. 1989).  The

New Mexico Supreme Court affirmed the disciplinary board's suspension, concluding that "Klipstine sought to avoid the consequences of his ineptitude by lying." *Id.* at 249. Although these facts might hint that Mr. Klipstine knew that Bobby Autry's 1982 testimony was perjured, they are insufficient for the Court to so find.

Notwithstanding the Court's inability to conclude that Mr. Klipstine knew of the perjured testimony when he elicited it, the Court can confidently conclude that Mr. Klipstine *should have known* of the perjury. Given Deputy Dominguez's multiple follow-up questions challenging Mr. Autry's contention that he and Ms. Mitchell had not had intercourse, Mr. Autry's subsequent admission that they had indeed had intercourse and he had previously lied to investigators about it, and the investigators' taking of hair, blood and saliva samples following the statement, the sheriff's department viewed this interview as significant. Although it appears that representatives of that department did not transcribe the interview, they certainly gave the audio tape to the D.A.'s office, as Mr. Case's counsel found the tape in the prosecution's file. The February 3rd statement encompasses the most incriminating evidence the State had with respect to a suspect who was initially arrested, charged, and placed in custody for the rape and murder of Nancy Mitchell. It is therefore apparent that if the individual prosecutor representing the State did not subjectively know of the tape, he certainly should have. Mr. Klipstine accordingly should have known that Bobby Autry's trial testimony that he never had sex with Ms. Mitchell, amounted to perjury.

The Court is troubled by the New Mexico Supreme Court's utter failure to analyze whether or not Mr. Klipstine should have known of the perjured testimony. However, most of the cases examining this specific category of *Brady* violation focus heavily on cases in which the prosecution indeed had subjective knowledge of the perjury. The Supreme Court has articulated

little in the way of legal standards controlling courts' analyses of *Brady* claims involving the

prosecution's presentation of testimony it should have known was perjured.  As the Supreme

Court explained in *Harrington*, "It is not an unreasonable application of clearly established

Federal law for a state court to decline to apply a specific legal rule that has not been squarely

established by this Court."  131 S. Ct. at 786 (quoting *Knowles v. Mirzayance*, 129 S. Ct. 1411,

1419 (2009)).  The Court therefore cannot conclude that the New Mexico Supreme Court's

failure to address this issue in its *Brady* analysis amounts to an unreasonable application of

clearly established federal law.

> **B.**     **The New Mexico Supreme Court's Decision Involved an Unreasonable**
> **Application of Clearly Established Federal Law and Amounted to an**
> **Unreasonable Determination of the Facts**

In addition to providing an avenue for relief when the state court's decision was contrary

to clearly established federal law, AEDPA grants this Court the authority to grant a writ of

habeas corpus when the state court's adjudication of the claim: (1) involved an "unreasonable

application" of clearly established federal law, or (2) "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."  28 U.S.C. § 2254(d)(1)–(2).  These two components of AEDPA are closely

related, as the first requires the Court to evaluate the New Mexico Supreme Court's application

of federal law to the unique facts of this case, and the second requires evaluation of the state

court's determination of those facts.  *See* Allan Ides, *Habeas Standards of Review Under 28*

*U.S.C. § 2254(d)(1): A Commentary on Statutory Text and Supreme Court Precedent*, 60 WASH.

& LEE L. REV. 677, 687-89 (2003) ("The noun 'application' used in this context refers to the

process through which a court determines the legal consequences pertaining to a particular set of

facts . . . .  [A]n unreasonable application of law might occur if the judge fails to apply an

essential element of controlling doctrine, undertakes an application that displays a material misunderstanding of that doctrine, or fails to attend to all facts relevant under the terms of the doctrine.").

As the Court has already discussed, the opinion of the New Mexico Supreme Court demonstrates an utterly incomplete understanding of *Brady* and its progeny.  In turn, the court's application of *Brady* to the facts of this case was unreasonable.  Moreover, the state court's factual findings themselves so conflict with the record, that this Court concludes that the New Mexico Supreme Court's factual findings amount to an unreasonable determination of the facts in light of the evidence presented in the state habeas proceeding.

### 1.      Finding that Ms. Knight and Mr. Dunlap's Recantations Were Cumulative Was an Unreasonable Factual Determination

In its analysis of Mr. Case's due process claim,[29] the New Mexico Supreme Court set out to ascertain "whether the recanted testimony was discovered after the original trial was completed."  *Case*, 183 P.3d at 916.  The court found that the substance of the recantations was "qualitatively similar" to the statements the recanting witnesses had initially given to representatives of the Eddy County Sheriff's Department, wherein they asserted that they had no knowledge of the crime.  *Id*.  Characterizing the recantations as "efforts to revert to the original statements they gave to the police," the court concluded that they were not newly discovered evidence, as Mr. Case was obviously aware of these statements at the time of his trial.  *Id*. at 918.  Ultimately, the court concluded that the recantations were cumulative.

---

[29] This claim is not part of the instant federal petition.  However, as described in Section III(B)(3), "Finding that Bobby Autry's Suppressed Statement Was Not Exculpatory Was an Unreasonable Factual Determination and Involved an Unreasonable Application of *Brady* and its Progeny," *infra*, the New Mexico Supreme Court's factual finding concerning this claim partially governed its analysis of Mr. Case's *Brady* claim.

In arriving at its conclusion that the recantations were cumulative, the New Mexico

Supreme Court relied on three federal cases:  *United States v. Earles*, 983 F. Supp. 1236 (N.D.

Iowa 1997); *Olson v. United States*, 989 F.2d 229 (7th Cir. 1993); and *United States v. Ramsey*,

761 F.2d 603 (10th Cir. 1985).[30]  It characterized various aspects of the facts of these three cases

as similar to Mr. Case's case, and cited these facts to support its conclusion that the recantations

were cumulative.

In *Earles*, a key prosecution witness had testified at a grand jury proceeding, and then

recanted his testimony at a second grand jury proceeding.  983 F. Supp. at 1241-43.  He asserted

his Fifth Amendment privilege at the actual trial, but both versions of his grand jury testimony

were presented to the jury.  *Id*. at 1243.  After trial, the witness recanted his first recantation,

reverting back to his original grand jury testimony.  *Id*.  Similar to Ms. Knight, the witness in

*Earles* stated that his first recantation was fabricated from hints and coaching by law

enforcement.  *Id*. at 1243-44.  Similar to Mr. Dunlap, the witness further stated that he offered

false testimony in part out of pressure he felt from the prosecutor, who warned him that he was a

suspect in the crime.  *Id*.  However, distinctly different from Mr. Case's case, the witness in

*Earles* had twice testified under oath, and the substance of the testimony was inconsistent such

that the witness was clearly lying under oath on one of those occasions.  *Id*. at 1241-43.

Whereas in *Earles* the jury heard both versions of sworn testimony and decided which one to

credit, the jury in Mr. Case's case understandably credited the sworn testimony – which included

explanations for their previous inconsistent statements – over the unsworn statements the

_____

[30] These cases are not "clearly established federal law" for purposes of AEDPA.
However, analysis of the New Mexico Supreme Court's application of these cases to the facts of
the instant case is necessary to demonstrate the unreasonableness of that court's factual
determinations.

witnesses had given months before the trial.  Here, a jury has never had the opportunity to evaluate the credibility of the sworn recantations, and the state habeas judge failed to issue findings as to their credibility.  Yet the New Mexico Supreme Court analogized this case and *Earles*, indicating that they were similar in that the defendant "knew about both sets of testimony."  *Case*, 183 P.3d at 916 (citing *Earles*, 983 F. Supp. at 1243-44).

   *Olson* is similar to *Earles*, only in *Olson*, recanting witnesses testified under oath at two grand jury proceedings *and* testified at trial.  989 F.3d at 231.  Therefore, the jury in *Olson* heard all three versions of the testimony; the testimony at trial comported with that at one of the grand jury proceedings, but not the other.  *Id*.  The jury chose to credit the testimony at trial, and discredit the inconsistent grand jury testimony.  *Id*.  After trial, the witnesses recanted, reverting back to the inconsistent grand jury testimony.  *Id*. at 230.  The court in *Olson* held that the recantations were simply efforts to revert back to sworn testimony that the jury had already heard and rejected.  *Id*. at 231-32.  For the same reasons discussed with respect to *Earles*, the New Mexico Supreme Court's comparison of the recantations in this case to one in which a jury compared multiple sworn versions of contradictory testimony is flawed.[31]

   Finally, the court compared Ms. Knight's and Mr. Dunlap's recantations to those at issue in *Ramsey*.  In doing so, the court offered an incomplete version of the facts and procedural history of *Ramsey*, which in fact included two distinct cases.  In *United States v. Ramsey*, 726

---

[31] The court also noted that the court in *Olson* found the recantations unpersuasive in part because "the witnesses did not provide an alibi for the petitioner or identify anyone else as the murderer."  *Case*, 183 P.3d at 916 (citing *Olson*, 989 F.2d at 232).  Such a comparison is odd, because the entire crux of Ms. Knight and Mr. Dunlap's recantations is that they were simply uninvolved in Nancy Mitchell's murder and witnessed no part of it.  The fact that they are unable to offer another explanation as to what Mr. Case was actually doing when Ms. Mitchell died, or who actually killed Ms. Mitchell, is not indicative of Mr. Case's guilt.  The New Mexico Supreme Court's focus on this portion of *Olson* suggests a lack of understanding of the operative facts of Mr. Case's case.

F.2d 601 (10th Cir. 1984) ("*Ramsey I*"), the district court denied the defendant's motion for a

new trial based on newly discovered evidence.  Similar to the instant case, the newly discovered

evidence took the form of a key prosecution witness who had implicated the defendant in the

crime, yet came forth to recant his testimony in its entirety.  *Id*. at 604.  The Tenth Circuit held

that the district court abused its discretion in denying the motion for new trial without holding a

hearing, reasoning as follows:

> The recantation here is not merely impeaching or cumulative.  When a witness
> recants his testimony, presumably he will testify as to the new version at a new trial.
> Thus, the recantation is substantial evidence  . . . .  While the defendant's counsel
> had the opportunity to cross-examine and to impeach [the now recanting witness] at
> trial, it is unrealistic to assume that the defense attorneys could have elicited the
> recantation at trial.  Thus, the defendant, exercising reasonable diligence, could not
> have discovered and produced this evidence at trial . . . .
>
> If a jury heard and believed [the recanting witness's] new version of the events at a
> new trial, the result would almost surely be an acquittal. But whether a new trial
> should be ordered in the instant case turns on the credibility of [the witness's]
> repudiation of his trial testimony.

726 F.2d at 604-05 (citations omitted).

On remand, the district court held a hearing and proceeded to again deny the motion for a

new trial.  *United States v. Ramsey*, 761 F.2d 603 (10th Cir. 1985) ("*Ramsey II*").  At the

hearing, the recanting witness testified that he had signed an affidavit that his trial testimony

implicating the defendant was false, but further admitted that he had signed the affidavit out of

fear of the defendant.  *Id*. at 604.  He ultimately testified that "the statements in the affidavit

were false and that his statements during the trial had been true."  *Id*.  The district court

accordingly held that the recantation was false, and that it did not constitute newly discovered

evidence.  *Id*.  The Tenth Circuit affirmed, classifying the recantation and subsequent reassertion

as a "flip-flop," and noting that the district court judge was in a better position to evaluate

whether or not the recanting witness's trial testimony was sufficiently credible to support the

128

jury's guilty verdict.  *Id.*

It is plain that the facts in *Ramsey* supporting the Tenth Circuit's conclusion are in no way similar to the facts of the instant case.  The *only* similarity of substance is that the recanting witness in *Ramsey* made statements prior to trial that were consistent with his recantation, and the defense cross-examined him at trial as to those inconsistent statements.  *Ramsey II*, 761 F.2d at 604.  Yet the Tenth Circuit explicitly found that the recantation was "not merely impeaching or cumulative."  *Ramsey I*, 726 F.2d at 604.  Therefore, the facts pertaining to *Ramsey* that are indeed similar to those of this case would support a finding that Ms. Knight's and Mr. Dunlap's recantations are *not* cumulative, but rather are "substantial evidence."  *See id.* at 604.

The enormous difference between *Ramsey* and the instant case is that the recanting witness in *Ramsey* signed an affidavit as to the falsity of his trial testimony, yet testified under oath that the statements *in the affidavit* were false.  No court could seriously dispute the *Ramsey* district court's finding that the jury, if presented with both versions of this testimony, would still reach the same verdict.  Yet in its summary of the facts of *Ramsey*, the New Mexico Supreme Court omitted the crucial detail that the witness had repudiated his recantation under oath.  Rather, it focused on the fact that the witness had been cross-examined at the original trial as to his pretrial statements that he knew the defendant was innocent.  While this aspect of *Ramsey* bears factual similarity to the instant case, this similarity is dwarfed by the fact that the recanting witnesses here testified under oath as to the *truthfulness* of their recantations as opposed to the *Ramsey* witness's admission under oath that his recantation was a lie.

It bears mentioning that in any case where law enforcement officers, without notice, interview an individual who indeed knows nothing about a crime under investigation, the individual will almost surely deny knowledge of the crime.  Here, both Ms. Knight and Mr.

Dunlap were unprepared to answer questions about Nancy Mitchell's murder when investigators surprised them at their school and place of employment (respectively) to conduct interviews. It is of course entirely possible that, had they actually witnessed the crime and feared the perpetrators, they still would have denied knowledge. However, it is almost *certain* that any witness in either of their positions who indeed possessed no knowledge of the crime would have answered in the manner that these witnesses did. Therefore, the New Mexico Supreme Court's logic is highly flawed, in that not only did the court analogize the facts of this case to cases whose facts were entirely distinguishable, but it concluded that a recantation is necessarily cumulative when the recanting witness at some point prior to trial asserted a lack of knowledge about the crime. The finding that the recantations were cumulative amounts to an unreasonable factual determination.

> **2.      Finding that Bobby Autry's Suppressed Statement Was Cumulative Was an Unreasonable Factual Determination and Involved an Unreasonable Application of *Brady* and its Progeny**

The New Mexico Supreme Court further concluded that the suppressed Bobby Autry statement was not material as impeachment evidence, but rather "would have been cumulative of other evidence used to impeach [him]." *Case*, 183 P.3d at 920. This reflects a merely cursory understanding of the relevant facts surrounding Bobby Autry's testimony. Moreover, this conclusion involved an unreasonable application of *Brady* in that it exhibits a failure to understand the substantial value the statement held not only to impeach Mr. Autry, but also to undermine the jury's confidence in the entire investigation of Nancy Mitchell's murder, thus creating a "reasonable probability" of a different result. *See Kyles*, 514 U.S. at 434.

In *Smith*, the Tenth Circuit rejected a strikingly similar argument regarding the allegedly cumulative nature of impeachment evidence. 50 F.3d at 829-30.[32]  There, the State had suppressed a police report that described another suspect's potential involvement in the crime for which the *Smith* petitioner was convicted.  *Id*. at 829.  The court found that the evidence contained in the report was favorable and material, as it "would have provided important investigative leads and impeachment evidence to [the petitioner] and his attorney regarding [the other suspect,] Randy Newell."  *Id*.  The Tenth Circuit explained that the defense had some success in impeaching Mr. Newell's credibility at trial by demonstrating to the jury that he was a heroin addict and had mischaracterized his relationship with his girlfriend on direct examination. *Id*. at 809.  However, the court rejected the lower court's conclusion that the suppressed report, which also contained impeachment evidence, was cumulative.  *Id*. at 829.  Noting that the report included "*more thorough* impeachment evidence," *id*. (emphasis added), than the evidence already in the defense's possession, the Tenth Circuit held:

> To the extent the magistrate judge concluded this impeachment evidence would merely have been cumulative, the record provides no support for this finding and it is therefore clearly erroneous. "Cumulative evidence" is defined as evidence "which goes to prove what has already been established by other evidence." BLACK'S LAW DICTIONARY 343 (5th ed. 1979).  [The suppressed] report might have been cumulative had the specific contents of it been disclosed to the defense at some other time. But . . . the contents of the report were not disclosed nor was Mr. Newell ever impeached about any of the material contained in the report.

*Id*.

---

[32] Respondent argues that *Smith* has no value whatsoever because it was decided prior to AEDPA's enactment. Doc. 18 at 11. With no support for this assertion, he states that *Smith* "stands as an antiquated monument to the very concerns that Congress was addressing when it enacted AEDPA the following year." *Id*. at 11-12. On the contrary, AEDPA did not systematically overrule all federal habeas cases decided prior to 1995, and the legal reasoning in any given pre-AEDPA case may be instructive in a federal court's application of AEDPA. A "citing references" check of *Smith* reveals that since AEDPA's enactment, *Smith* has been cited positively in literally hundreds of federal cases.

The definition of "cumulative" the Tenth Circuit employed in *Smith* still comports with the common understanding of the term.  Black's Law Dictionary now defines "cumulative evidence" as "Additional evidence that supports a fact established by the existing evidence (esp. that which does not need further support)."  BLACK'S LAW DICTIONARY 636 (9th ed. 2009).  In a non-legal dictionary, "cumulative" is defined as "increasing or increased in quantity, degree, or force by successive additions."  NEW OXFORD AMERICAN DICTIONARY 422 (3d ed. 2010). Alternatively, the American Heritage College Dictionary defines the term "cumulative" specifically in the legal context as: "Supporting the same point as earlier evidence."  AMERICAN HERITAGE COLLEGE DICTIONARY 443 (4th ed. 2000).  When viewed in combination, these definitions compel the conclusion that evidence may be termed cumulative if it has value only insofar as supporting a point that has already been established.  The fact that two items of evidence both tend to impeach a witness does not make them cumulative; rather, depending on the circumstances, they may each have independent impeachment value.  Significantly with respect to this case, two pieces of independent impeachment evidence in fact strengthen each other's respective value, as they tend to corroborate the notion that the witness is untrustworthy or untruthful.  Given the plain meaning of the term "cumulative," the Court finds that Mr. Case has rebutted the New Mexico Supreme Court's factual determination with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).

The New Mexico Supreme Court was correct in concluding that the defense had succeeded in impeaching Mr. Autry's testimony to some degree.  First, defense counsel aggressively cross-examined Mr. Autry and successfully undermined his claim that he had no recollection of what he did the day after he witnessed the attack on Nancy Mitchell.  *See* Trial Tr. at 1006-10.  Counsel continued to draw attention to Mr. Autry's inability to remember

various details.  He also elicited testimony that Mr. Autry had experienced "problems" with Mr. Worley and Mr. Case, suggesting he might have a motive to falsely implicate them.  *Id.* at 1021. Finally, Mr. Autry testified that he was frightened of going to prison after having spent time in jail while charged with the rape and murder; however, he concluded: "I ain't stupid enough to go to the state penitentiary."  *Id.* at 1027.  In addition to Mr. Autry's own potentially impeaching testimony, the defense presented witnesses who stated that he was reputed to be a liar.

Notwithstanding the defense's ability to present Mr. Autry as an unsavory character, without access to the suppressed statement, defense counsel never had the opportunity to impeach Mr. Autry with respect to the content of the statement.  *See Smith*, 550 F.3d at 829 ("[N]or was Mr. Newell ever impeached about any of the material contained in the report."). The substance of Mr. Autry's February 3rd statement – that he and Ms. Mitchell began to have sexual intercourse and she then got mad at him and shoved him off her, and he got mad as a result – had substantial impeachment potential.  Such a statement could have supported a defense theory that Mr. Autry was the actual perpetrator.  *See* Part II, Section II(B)(3), "Analysis," *supra*. Most importantly, the defense was unable to demonstrate to the jury that Mr. Autry had lied under oath when he stated on direct examination that he had never had sexual intercourse with Ms. Mitchell.  Nor could the defense impeach Mr. Autry with his admission to police that he had indeed lied when he said the two had never had sexual intercourse, nor his explanation for the lie: "I didn't know if she was raped at the time or what, and I didn't want nobody to point the finger at me."  Tr. 2/3/82 Autry Statement at 15.

The New Mexico Supreme Court's determination that the February 3rd statement was cumulative therefore amounts to an unreasonable determination of the facts.  The evidence used to impeach Mr. Autry at trial – the aggressive cross-examination and the witnesses who testified

as to Mr. Autry's tendency to lie – was in no way similar to the substance of the suppressed tape. The tape was accordingly not cumulative of the impeachment evidence the jury already had before it; rather, it had greater and more specific impeachment value that would have supplemented the material the jury considered in its assessment of the credibility of one of three crucial eyewitnesses.

This determination was also an unreasonable application of clearly established *Brady* law, which defines material evidence as evidence creating a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Smith v. Workman*, 550 F.3d 1258, 1273 (10th Cir. 2008) (citations and quotations omitted). The substance of the February 3rd interview held much more specific and valuable impeachment potential, as opposed to general statements regarding Mr. Autry's dishonesty and the other statements that the defense elicited on cross-examination. Equally importantly, the statement would have raised questions in the jury's minds as to why the Sheriff's Department did not focus its investigation on Mr. Autry. Such doubts would undermine the jury's confidence in the investigation, likely making jurors more closely scrutinize the inexplicable inconsistencies in the remaining witnesses' testimony. *See* Part II, Section II(B)(3), "Analysis," *supra* (discussing ways in which defense could have used suppressed statement to undermine jury's confidence in caliber of police investigation). This creates "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

The Court has searched for possible rationales supporting the New Mexico Supreme Court's decision, but it ultimately concludes that "fairminded jurists," *see Yarborough*, 541 U.S.

at 664, could not disagree that the decision involved an unreasonable application of *Brady* and
its progeny.  The conclusion is inescapable that the court's determination that the suppressed
statement was cumulative amounted to a distortion of the principle that materiality hinges on
whether the suppressed evidence creates a reasonable probability that the result of the
proceeding would have been different.  Given Bobby Autry's crucialness to the prosecution's
case, the State's ability to contrast his purportedly gentlemanly image with that of the "animals"
that raped Nancy Mitchell, and the many doors impeachment of this witness could have opened
for Mr. Case's defense, fairminded jurists could not agree with the New Mexico Supreme
Court's conclusion that the suppressed statement was immaterial notwithstanding its
impeachment value.

### 3.   Finding that Bobby Autry's Suppressed Statement Was Not Exculpatory Was an Unreasonable Factual Determination and Involved an Unreasonable Application of *Brady* and its Progeny

Next the New Mexico Supreme Court found that although the February 3rd statement held
some impeachment value, it had no exculpatory value, as any argument that it created a motive
for Mr. Autry to kill Ms. Mitchell would have been speculative.  In finding that Mr. Case had
pointed to no other evidence linking Mr. Autry to the murder of Ms. Mitchell, the court ignored
numerous facts and arguments that clearly contradict such a conclusion.  First, Mr. Case drew
attention to the fact that the forensic evidence at trial – establishing that no semen was found
inside Ms. Mitchell and she had no bruising on the back side of her body – was more consistent
with a scenario in which Mr. Autry briefly penetrated her and then beat her in his car and
dragged her off after she rejected him.  In addition, the parties agree that the last undisputed
sighting of Ms. Mitchell occurred at Ricky and Mary Worley's house, when she was in Mr.
Autry's company, wearing the same clothing in which her body was found.  Both of these facts

constitute circumstantial evidence linking Mr. Autry to Ms. Mitchell's murder.  *See* BLACK'S

LAW DICTIONARY 256 (3d pocket ed. 2006) (defining "circumstantial evidence" as "Evidence

based on inference and not on personal knowledge or observation").  Mr. Case has accordingly

satisfied his burden of showing by clear and convincing evidence that the New Mexico Supreme

Court made an erroneous factual finding when it concluded that no other evidence linked Mr.

Autry to the murder.  *See* 28 U.S.C. § 2254(e)(1).

     The court further concluded that the content of the tape held no exculpatory value

because it simply demonstrated that "days or weeks before the murder," Mr. Autry became

angry at Ms. Mitchell for her refusal to complete a sexual act with him.  *Case*, 183 P.3d at 920.

This also amounts to an unreasonable factual determination, as it assumes that the murder in fact

occurred at a party at Six-Mile Dam on January 1, 1982.  It was unreasonable for the court to

merely assume that this factual conclusion was correct, "rather than systematically scrutinizing

the relevant facts."  RANDY HERTZ & JAMES S. LIEBMAN, 2 FEDERAL HABEAS CORPUS PRACTICE

& PROCEDURE § 32.3 at 1599 & n.38 (5th ed. 2005) (citing *Wiggins*, 539 U.S. at 527-28).

     The court entirely disregarded the strong evidence indicating that no party ever occurred

on January 1, 1982, and further failed to analyze how the recantations might call into question

the date of the attack established at trial.  Audrey Knight and Paul Dunlap's recantations of their

testimony strongly corroborate Mr. Case's contention that this party never occurred.  Without the

benefit of Ms. Knight and Mr. Dunlap's trial testimony, Mr. Autry and Mr. Case – who has

admitted his trial testimony was a fabrication – are the only witnesses to corroborate the State's

theory that a party occurred at Six-Mile Dam on January 1, 1982.  Having found that the

recantations were cumulative, it appears the New Mexico Supreme Court did not consider their

content and simply assumed that the State's theory at the 1982 trial – that Ms. Mitchell was

murdered on January 1, 1982 – was still intact.  In reality, the medical evidence presented at trial would have been squarely consistent with Ms. Mitchell dying in December of 1981.  Given the unreasonableness of the court's finding that the recantations were cumulative, its consequent finding that Mr. Autry's sexual encounter with Ms. Mitchell occurred days or weeks before the murder is also unreasonable.  In summary, the New Mexico Supreme Court's opinion involved an unreasonable determination of the facts in light of the evidence presented in the state habeas proceeding.  Mr. Case has rebutted the factual finding that Mr. Autry's encounter with Ms. Mitchell occurred "days or weeks before the murder" with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).

In addition, clearly established *Brady* law mandates the conclusion that, had Carl Case's defense counsel had access to the suppressed Bobby Autry statement, it is reasonably probable that the result of the proceeding would have been different.  As discussed in Part II, Section II(B)(3), "Analysis," *supra*, the suppressed statement creates a viable defense theory as to who the actual perpetrator was.  Had defense counsel had access to the statement, he would have had no reason to put his client on the stand to offer "incredible testimony."  *See Banks*, 54 F.3d at 1512 & 1520 (characterizing habeas petitioner's testimony in his own behalf as "incredible" given the fact that he placed himself at the scene of the murder but minimized his involvement).  As the Court has thoroughly discussed, *see* Part II, Section II(B)(3), "Analysis," *supra*, such a drastically different trial strategy on the part of the defense would have substantially altered the remainder of the trial: the prosecution would not have been able to urge the jury to "determine who has a reason to lie," Trial Tr. at 1647; the prosecution could not have pointed to Mr. Case's testimony to distract from the sheriff's department's puzzling failure to further investigate Bobby Autry as a suspect; and the jury would have been left to make sense of the eyewitnesses'

137

irreconcilable versions of the attack on Nancy Mitchell.  It is therefore undeniable that the suppressed statement "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles*, 514 U.S. at 435.

**IV.    *DE NOVO* REVIEW OF *BRADY* CLAIM**

Having found that the New Mexico Supreme Court's adjudication of Mr. Case's *Brady* claim amounted to a decision that was contrary to clearly established federal law, the Court proceeds to analyze Mr. Case's claim without the deference normally mandated in habeas cases. *Trammell*, 485 F.3d at 550; *see also Malicoat*, 426 F.3d at 1246 ("[I]t is not clear that the [state court] applied the federal standard.  Accordingly, we . . .  engage in *de novo* review of that claim[.]").  As the Court is "unconstrained by AEDPA deference," it must review *de novo* "the state court's legal conclusions and resolution of mixed questions," while reviewing factual findings for clear error.  *Trammell*, 485 F.3d at 550.

Rather than repeat its analysis, the Court simply refers to Part II, Section II(B)(3), "Analysis," *supra*, wherein it fully evaluated Mr. Case's *Brady* claim for purposes of determining whether or not he had established constitutional error under 28 U.S.C. § 2244(b)(2). Having established that the prosecution in his 1982 trial violated *Brady*, Mr. Case is entitled to relief.

**PART IV: *CONCLUSION***

The Court's analysis demonstrates that the New Mexico Supreme Court's affirmance of the trial court's denial of Mr. Case's petition for habeas corpus resulted in a decision contrary to clearly established federal law and involved an unreasonable application of federal law.  The decision also amounted to an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Relief is therefore warranted under 28

U.S.C. § 2254(d)(1)–(2).

The Court **DECLINES TO ADOPT** the Magistrate Judge's Proposed Findings and Recommended Disposition [Doc. 41] and **FINDS** that Carl Case's Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody [Doc. 1] is **CONDITIONALLY GRANTED**. The New Mexico District Court's Judgment, Sentence and Commitment in cause number CR-82-70, dated November 1, 1982, is **VACATED** and **SET ASIDE**. Accordingly, Respondent's Motion to Dismiss the Application for Writ of Habeas Corpus [Doc. 17] is **DENIED WITH PREJUDICE**.

The State of New Mexico **IS HEREBY ORDERED** to notify this Court whether or not it intends to re-try Carl Case within thirty (30) days of entry of this order. Upon expiration of this thirty-day period, the State shall take prompt steps to initiate proceedings against Mr. Case, or shall cause him to be released from custody.

The Court **FURTHER FINDS** that Petitioner's Motion for Partial Reconsideration [Doc. 76] shall be **DENIED** as moot.

**JUDGMENT** is hereby entered in favor of Mr. Case in accordance with this Memorandum Opinion and Order. **IT IS SO ORDERED**.


Dated this 28th day of March, 2011.

_____
**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**

*Attorneys for Petitioner:*
Todd A. Coberly
Peter Schoenburg
Marc M. Lowry

*Attorney for Respondent:*
Margaret E. McLean

*Attorney for Witness Audrey Knight:*
Jacquelyn Robins

*Attorney for Witness Paul Dunlap:*
Erlinda O. Johnson